UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| FRIENDS OF THE CLEARWATER; and ALLIANCE FOR THE WILD ROCKIES, | Case No. 2:20-cv-00243-BLW |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| JEANNE HIGGINS, Idaho Panhandle National Forest Supervisor; UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture; and UNITED STATES FISH & WILDLIFE SERVICE, an agency of the U.S. Department of Interior, | |
| Defendants, | |
| and | |
| STIMSON LUMBER COMPANY, | |
| Intervenor-Defendant. | |

**INTRODUCTION**

Before the Court is Plaintiffs' Motion for Preliminary Injunction. Dkt. 7. The Court held a hearing on the motion on June 25, 2020. For the reasons that

**MEMORANDUM DECISION AND ORDER - 1**

follow the Court will deny the motion.

## BACKGROUND

On October 3, 2019 the U.S. Forest Service issued a Decision Notice and Finding of No Significant Impact (FONSI) for the Brebner Flat project. *FONSI*, Dkt 24-2. The Brebner Flat project is located in the St. Joe Ranger District of the Idaho Panhandle National Forests in Shoshone County, Idaho. *Id.* The project area includes the Theriault Creek, Kelly Creek, Williams Creek, and Siwash Creek drainages within the St. Joe River watershed. *EA*, Dkt. 24-1 at 1. The northern boundary of the project includes the wildland-urban interface of Avery, Idaho and Forest Highway 50. *Id.* at 6. Shoshone County has identified this area as an area of concern for their Community Wildfire Protection Plan. *Id.* The northern boundary of the project is also within the St. Joe Wild and Scenic River Corridor. Dkt 24-2 at 9. However, there are no activities proposed within the corridor. *Id.*

The goals of the project are: 1) To improve forest health and increase vegetation resilience to large scale disturbances such as wild fire, drought, and disease; 2) provide sustainable use of natural resources and benefit local communities; and 3) reduce hazardous fuels to lessen wildfire severity and enable safe fire suppression efforts. *Id.* at 1. The project area is almost 12,000 acres and will include approximately 1,700 acres of timber harvest and prescribed burning.

Dkt. 24-1 at 1. Approximately 10.5 miles of roads will be constructed or reconstructed for the project. *Id.* at 9-10.

In early 2018 the Forest Service issued a scoping notice soliciting public comments on the project. *Id.* at 6. A draft Environmental Assessment (EA) was issued in March 2019. *Id.* The final EA was issued in June 2019. Dkt. 24-1.

The Final EA found that no federally endangered or threatened wildlife species were likely to be affected by the project. *Id.* at 25. To determine whether any listed species were present in the project area the Forest Service checked the U.S. Fish and Wildlife Service (USFWS) Information and Planning and Consultation (IPaC) maps for Idaho.[1] *Wildlife Report*, Dkt 24-5 at 3; *Hendricks Dec.*, Dkt. 24-6. The IPaC system creates species lists by cross referencing maps of potential species presence with a map of the project area. Dkt. 24-6 ¶ 3. The Forest Service has been instructed by USFWS to use IPaC to generate a list of federally listed species that may be present in a project area. *Id.* ¶ 6; *Sarensen Dec.*, Dkt. 24-

---

[1] The Forest Service and USFWS discussed the Brebner Flat project at a meeting on October 25, 2018. This meeting focused on bull trout, which was the only species presented for consultation by the Forest Service. *Sarensen Dec.* ¶ 15-17, Dkt. 24-9. The USFWS biologist present at the meeting does not recall discussing grizzly bears or lynx in connection with the project. *Id.* The biologist states that she had no reason to believe an individual grizzly bear was moving trough the action area, and did not consider it inappropriate for the Forest Service not to raise the issue during consultation. *Id.*

9 ¶ 4-5. However, the IPaC map is a starting point, and USFWS requires federal agencies to determine for themselves whether listed species may be present in the action area based on species biology and project-specific information. Dkt. 24-6 ¶ 3. The IPaC website states that an official species list that complies with § 7 of the ESA can only be obtained by making a regulatory review request through the website or from the local field office. Dkt. 7-15 at 4. According to the IPaC map the only endangered species that may be present in the project area is canada lynx. Dkt 24-5 at 2.

The wildlife report considered, but did not analyze in detail, impacts to canada lynx and grizzly bears. Dkt 24-5 at 10. The wildlife report found that there would be no effect to lynx because there was a lack of suitable habitat in the project area and lynx are not known or suspected in the project area. *Id.* at C-1. The wildlife report based its analysis on the Northern Rockies Lynx Management Direction and noted there is no lynx critical habitat on the St. Joe Ranger District, and the nearest Lynx Analysis Unit is 15 miles from the project area. *Id.*

The wildlife report also determined the project would have no effect on grizzly bears. *Id.* This determination was based largely on the lack of grizzly bear occurrence on the St. Joe Ranger District or the project area. The wildlife report noted that although, "based on current knowledge, the potential for grizzly bear

occurrence on the St. Joe Ranger District and in the project area cannot be totally dismissed, there is nothing to suggest any occurrence other than the possibility of transient individuals; with even the potential for that considered to be unlikely." *Id.* The wildlife report went on to state the "St. Joe Ranger District is not within any Bear Management Unit, linkage zone, or area of known grizzly bear use." *Id.*

In response to the Plaintiffs' notice of intent to sue, the Forest Service asked the USFWS for information regarding bears that have been found near the project area. Dkt. 7-9. The letter notes that a radio collared bear traveled from, and returned to, the Selway-Bitterroot in 2019. While the bear traveled into the Idaho Panhandle National Forest it was never closer than 15 miles to the project. *Id.* The letter noted that a 2007 bear mortality, and 2018 radio located bear were "also not close to the project area." *Id.* In 2017, biologists from the Idaho Department of Fish and Game collected one grizzly bear scat sample from a den approximately 12 miles south of the project area. Dkt. 7-10. The biologists were not able to confirm what type of animal used the den, and no grizzly bears were recorded visiting bait stations set a little less than a mile from the den site. *Id.* On the other hand, the Idaho Department of Fish and Game hunting regulations warn black bear hunters

that grizzly bears may be found in big game unit 7, in which the project area sits.[2]
Dkt. 7-12.

The main area of concern addressed by the EA, regarding wildlife, was elk
security habitat. Dkt. 24-1 at 25. Elk security habitat is habitat that has timbered
areas greater than 250 acres more than one-half mile from a motorized route. *Id.* at
26. The project area is located within elk management unit 7-6, which was the
geographic scope for the elk security analysis. *Id.* Elk management unit 7-6 is a
low priority management unit. *Id.* The Forest Plan calls for management activities
to maintain existing levels of elk security where possible. *Id.* The Brebner Flat
project—specifically timber harvest and road construction—will reduce elk
security habitat by 210 acres in unit 7-6. The Forest Service considered amending
the Forest Plan to allow for the reduction in elk security habitat. Dkt. 24-2 at 6.
However, after further analysis the Forest Service determined the seasonal closure
of an ATV trail in unit 7-6 would offset the loss of elk security habitat. *Id.* The
seasonal closure of the ATV trail would occur from September through December,
during elk hunting season. Dkt. 24-1 at 27. This seasonal closure would occur

---

[2] Plaintiffs also submitted a news article discussing a grizzly bear that traveled from near
Montana's Spar Lake northwest of the project area to somewhere south of the project area.
However, there is no information on the route the bear took or if it came near the project area.

outside of the project area, but still within unit 7-6. The EA shows that this seasonal closure would increase elk security habitat by 314 acres, resulting in a net gain in elk security habitat of 94 acres in unit 7-6 over the no-action alternative.

The EA does not explicitly state how the seasonal ATV trail closure would be implemented. Dkt. 24-1 at 27. However, the wildlife report shows that the closure would be implemented by installing a gate on the ATV trail. Dkt. 24-5 at 16-17. The EA discusses in some detail how gates are monitored to ensure the security of the gates in elk security habitat. Dkt. 24-1 at 27. The EA notes that gates on the ranger district are generally secure, but there are 5-10 "problem" gates that need to be monitored or repaired annually. *Id.* The wildlife report indicates that current levels of elk security in the area have been established by seasonally closing roads to motorized use during elk hunting season. Dkt. 24-5 at 18.

On page 1 of the EA it states that the "project area … does not include … the wild and scenic river corridor." On page 7 the EA states that "the wild and scenic river corridor is not proposed for timber harvest." While the FONSI states that parts of the northern boundary of the project fall within the St. Joe Wild and Scenic River Corridor, no activities are proposed in the corridor, and a section 7(a) evaluation was completed. Dkt. 24-2 at 9.

The EA considered impacts to the hydrology of the tributaries that flow into

the St. Joe River. Dkt. 24-1 at 19. It also considered the impact to fisheries, specifically the potential for sediment generated from the project to reach the St. Joe River. *Id.* at 33. The fisheries section of the EA also called out impacts to the St. Joe River. *Id.* at 37. The project maps attached to the EA also show the project area bordering the St. Joe River.

The Forest Service prepared a section 7(a) Evaluation for the Wild and Scenic Rivers Act for the project.[3] Dkt. 24-10. The evaluation specifically considered the removal of 15 culverts in the Siwash tributary, which are considered water resource projects. *Id.* The evaluation found that the culvert removals would not diminish the scenic, recreation, fish, or wildlife, values of the river. The findings of the evaluation were also discussed in the Recreation Report. Dkt. 24-11 at 10.

The Forest Service received comments from Friends of the Clearwater regarding the lack of analysis in the EA on impacts to the Wild and Scenic River Corridor. Dkt. 24-4 at 8, 11. In its response to these comments the Forest Service noted that the Wild and Scenic Rivers Act was addressed in Appendix B of the

_____

[3] The Forest Service also prepared a fisheries biological assessment for the project related to bull trout and received concurrence from the USFWS that the project may affect, but is not likely to adversely affect, bull trout and designated critical habitat. Dkt. 25-4, 25-5.

Recreation Report, and concluded that no activities were planned in the corridor, and that water resource activities had been evaluated in a section 7(a) analysis.

Plaintiffs now seek a preliminary injunction to prevent timber harvest and road construction in the Brebner Flat Project. Plaintiffs allege the Forest Service violated the Administrative Procedures Act in the following ways: 1) by failing to request a species list from the USFWS and by failing to prepare a biological assessment that included grizzly bears and canada lynx as required by the Endangered Species Act (ESA); 2) by failing to take a hard look at the cumulative effects of the project on the elk population and failing to analyze the efficacy of the proposed mitigation measure as required by the National Forest Management Act (NFMA) and National Environmental Policy Act (NEPA); and 3) by failing to take a hard look at potential impacts to the St. Joe Wild and Scenic River Corridor.

## LEGAL STANDARD

### A.    Administrative Procedures Act

Plaintiffs' claims are reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, et seq. Under the APA, the reviewing court must set aside the agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, ... in excess of statutory jurisdiction, ... [or] without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

Such a review is "deferential and narrow, establishing a high threshold for setting aside agency action." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1067 (9th Cir. 2010). A court must not substitute its judgment for that of the agency. Neither should a court just "rubber-stamp" administrative decisions. *Ariz. Cattle Growers' Ass'n v. U.S. Fish and Wildlife Servs.*, 273 F.3d 1229, 1236 (9th Cir. 2001). Instead, the court must presume the agency action to be valid and uphold it if a reasonable basis exists for the action. *See Nw. Ecosystem All. v. U.S. Fish and Wildlife Servs.*, 475 F.3d 1136, 1140 (9th Cir. 2007).

### B.    Preliminary Injunction

The party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities/hardship tips in their favor; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def Council*, 555 U.S. 7, 20-23 (2008). Since *Winter* was decided, the Ninth Circuit has held that the "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Even in cases involving endangered

species, "there is no presumption of irreparable injury where there has been a procedural violation" of a federal environmental statute. *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015). "A plaintiff must show irreparable injury to justify injunctive relief." *Id.*

## ANALYSIS

### A.    Likelihood of Success on the Merits

#### 1.  Endangered Species Act – Grizzly Bears and Lynx

The question presented by Plaintiffs' claim is whether the ESA requires the action agency to request a list of endangered or threatened species that may be present in the project area, and prepare a biological assessment for any species that may be present, even though the agency has determined that the project will have no effect on the species. Plaintiffs, citing the language of the ESA, 16 U.S.C. § 1536, argue that the Forest Service is required to obtain a list of endangered or threatened species from the USFWS for any agency action, and if a species may be present then a biological assessment (BA) must be prepared. *Pl's Br.* at 8, Dkt. 7-1. Plaintiffs argue that, by failing to request a list from USFWS and include analysis

of impacts to grizzly bears[4] or lynx in the BA for the project,[5] the Forest Service's actions were arbitrary and capricious and violated the ESA. *Id.* Defendants, relying on the regulations implementing the ESA, argue that the Forest Service does not have a duty to request a species list or prepare a BA unless the agency action is a "major construction activity." [6] *Def.'s Resp.* at 5, Dkt. 24. Defendants argue that consultation requirements are only triggered when the action agency determines that an action "may affect" a listed species, and because the Forest Service determined that the project would have "no effect" on grizzly bears or lynx it had no duty to consult with the USFWS.

The ESA provides that:

Each Federal agency shall, in consultation with and with the assistance of the Secretary [of Interior], insure that any action authorized, funded, or carried out by such agency ([hereinafter] "agency action") is not likely to jeopardize the continued existence of

---

[4] There is some dispute whether grizzly bears may be present in the project area. Dkt. 24 at 17. However, the Forest Service took the effort to analyze grizzly bears in its wildlife report and determined that the project would have "no effect" on bears.

[5] Plaintiffs make distinct claims to each grizzly bears and lynx. However, because the Court agrees with Plaintiffs that a BA is required for any listed species that may be present in the project area, and the Forest Service did not prepare a BA for either species, the analysis for both species is the same.

[6] Major construction activity is defined as "a construction project (or other undertaking having similar physical impacts) which is a major Federal action significantly affecting the quality of the human environment as referred to in the National Environmental Policy Act [NEPA, 42 U.S.C. 4332(2)(C)]." 50 C.F.R. § 402.02.

any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species …. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

16 U.S.C. § 1536(a)(2).

To facilitate compliance with the requirements of subsection (a)(2), each Federal agency shall, with respect to any agency action of such agency . . . request of the Secretary information whether any species which is listed or proposed to be listed may be present in the area of such proposed action. If the Secretary advises, based on the best scientific and commercial data available, that such species may be present, such agency shall conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action. Such assessment shall be completed within 180 days after the date on which initiated … and, before any contract for construction is entered into and before construction is begun with respect to such action. Such assessment may be undertaken as part of a Federal agency's compliance with the requirements of section 102 of the National Environmental Policy Act of 1969

*Id.* § 1536(c)(1).

The regulations implementing the above sections of the ESA were promulgated by the USFWS and National Marine Fisheries Service in 1986. 51 Fed. Reg. 19926 (June 3, 1986); 50 C.F.R. Part 402. Under the regulations the action agency is only required to consult with the USFWS if it first determines that the action "may affect" a listed species. Thus, under the regulations, if an agency determines that its action will have "no effect" on a listed species it does not need to consult. *See San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581,

596–97 (9th Cir. 2014).

The Services interpreted § 1536(a)(2) as requiring "formal consultation" if the action agency determines that its action "may affect" any listed species, unless the action agency determines that the action "is not likely to adversely affect" such species through informal consultation, or the preparation of a biological assessment, and received concurrence of the USFWS.[7] 51 Fed. Reg. 19941; 50 C.F.R. § 402.14.[8] "Informal consultation" is an optional process to help the action agency determine whether formal consultation is required. 50 C.F.R. § 402.13. Under the regulations a biological assessment is only required for "major construction activities," however the action agency may choose to prepare a

---

[7] The "may affect" threshold was originally adopted by the Services in the 1978 regulations implementing the Endangered Species Act of 1973. 43 Fed. Reg. 870, 874 (Jan. 4, 1978).

[8] 50 C.F.R § 402.14 provides:

(a) Requirement for formal consultation. Each Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat. If such a determination is made, formal consultation is required, except as noted in paragraph (b) of this section….

(b) Exceptions.

(1) A Federal agency need not initiate formal consultation if, as a result of the preparation of a biological assessment under § 402.12 or as a result of informal consultation with the Service under § 402.13, the Federal agency determines, with the written concurrence of the Director, that the proposed action is not likely to adversely affect any listed species or critical habitat.

biological assessment to assist with its determination in any action. 50 C.F.R. §
402.12.

The Services, relying on the Conference Report to the 1978 ESA
amendments, determined that the provisions of § 1536(c)(1), requiring the
preparation of biological assessments, should only be mandatory for "major
construction activities." 51 Fed. Reg. 19936 ("The legislative history of section
7(c) of the Act plainly focused the mandatory duty to prepare biological
assessments on 'major Federal actions . . . designed primarily to result in the
building or erection of dams, buildings, pipelines and the like.'" (quoting H.R.
Conf. Rep. 96-697, 13, 1979 U.S.C.C.A.N. 2572, 2577)). Under the regulations,
the action agency must first determine whether an action is a major construction
activity. 50 C.F.R. § 402.12. If the agency so determines, it must request a list of
species that may be present in the action area from the USFWS. *Id.* The agency
must prepare a BA for any listed species that may be present. *Id.* If the action is not
a major construction activity then, under the regulations, the agency is not required
to request a species list nor prepare a biological assessment. Nowhere do the
regulations limit the ability of an agency to prepare a BA.

The issue here is whether the plain language of § 1536(c)(1) requires the
preparation of a BA for any agency action where a listed species may be present,

even though the regulations only require a BA for major construction activities.

The Ninth Circuit has not directly decided this issue. *Swan View Coal. v. Weber*,

783 F. App'x 675, 678 n.1 (9th Cir. 2019).

In a case decided before the regulations were promulgated, the Ninth Circuit

described the requirements of the ESA as follows:

> The Act prescribes a three-step process to ensure compliance with its
> substantive provisions by federal agencies. Each of the first two steps
> serves a screening function to determine if the successive steps are
> required. The steps are:
>
> (1) An agency proposing to take an action must inquire of the
> [USFWS] whether any threatened or endangered species
> "may be present" in the area of the proposed action. *See* 16
> U.S.C. § 1536(c)(1).
> (2) If the answer is affirmative, the agency must prepare a
> "biological assessment" to determine whether such species
> "is likely to be affected" by the action. *Id*. The biological
> assessment may be part of an environmental impact
> statement or environmental assessment. *Id*.
> (3) If the assessment determines that a threatened or endangered
> species "is likely to be affected," the agency must formally
> consult with the USFWS. *Id*. § 1536(a)(2).

*Thomas v. Peterson*, 753 F.2d 754, 763 (9th Cir. 1985). The Ninth Circuit went on

to state that

> [o]nce an agency is aware that an endangered species may be present
> in the area of its proposed action, the ESA requires it to prepare a
> biological assessment to determine whether the proposed action "is
> likely to affect" the species and therefore requires formal consultation
> with the [USFWS].… Without a biological assessment, it cannot be
> determined whether the proposed project will result in a violation of
> the ESA's substantive provisions.

**MEMORANDUM DECISION AND ORDER - 16**

*Id.* In *Thomas*, the Ninth Circuit was considering whether the Forest Service violated the ESA by failing to request a species list from USFWS and prepare a BA for the grey wolf, which the Forest Service recognized, may be present in the area of planned forest road.

Since *Thomas*, and the promulgation of the regulations, the bulk of Ninth Circuit authority describes the ESA as requiring consultation only when the action agency has determined that its action "may affect" a listed species. *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1447–48 (9th Cir.1996).[9] Defendants rely on this line of caselaw to argue that, because the Forest Service has discretion to determine whether its action may affect a listed species in the first place, before initiating consultation, and because the requirements of § 1536(c)(1) are designed to facilitate compliance with the consultation requirement of § 1536(a)(2), it does not need to consult, or prepare a BA, if it determines the action will have no effect. Dkt. 24 at 6.

The issue here, however, is not whether the Forest Service needs to initiate

---

[9] *See also San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 596 (9th Cir. 2014); *Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012); *California ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1019 (9th Cir. 2009); *Defs. of Wildlife v. Flowers*, 414 F.3d 1066, 1069–70 (9th Cir. 2005); *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1054 n.8 (9th Cir.1994).

consultation, but instead whether it needs to follow the requirements of §

1536(c)(1)—requesting a species list and preparing a BA for species that may be

present—to determine if the action may affect a listed species in the first place.

Two Ninth Circuit cases rely on *Thomas* to suggest a biological assessment is

required for any agency action where a listed species may be present. *Forest*

*Guardians v. Johanns*, 450 F.3d 455, 457 (9th Cir. 2006); *City of Sausalito v.*

*O'Neill*, 386 F.3d 1186, 1215–16 (9th Cir. 2004). Ultimately the issue here was not

directly at issue in any of the Ninth Circuit cases cited by either party.

 This Court is aware of three district court cases within the Ninth Circuit

addressing the issue presented here. In two of the cases the courts rejected the

agencies' arguments that, because the agency action was not a major construction

activity, they were not required to request a species list or prepare a BA. *Native*

*Ecosystems Council v. Marten*, 2020 WL 1479059, at *4 (D. Mont. Mar. 26,

2020); *Ctr. for Food Safety v. Johanns*, 2006 WL 2927121, at *1 (D. Haw. Oct. 11,

2006).[10] In *W. Watersheds Project v. Bureau of Land Mgmt.*, 552 F. Supp. 2d 1113,

1139–40 (D. Nev. 2008), the court agreed with the agencies that § 1536(c)(1) only

---

 [10] In *Center for Food Safety* the court was focused on whether the agency needed to request a species list under § 1536(c)(1). Because the agency had not requested a species list to determine which species may be present the court did not determine whether a BA was also required. However, the court's analysis is informative in this case.

requires a BA if the agency action is a major construction activity.[11]

In *Marten* the court rejected many of the same arguments Defendants make here. There the court found that Congress had clearly spoken on the issue through § 1536(c)(1) and the agency's interpretation was not entitled to *Chevron* deference. *Marten*, 2020 WL 1479059 at *5. The court found that the plain language of § 1536(c)(1) required a BA for any agency action where a listed species may be present. *Id.* The court also rejected the defendants' argument that the references to contracts for construction in § 1536(c)(1) meant the section only applied to "major construction activities" and rejected defendants' reliance on the legislative history. *Id.* Finally, the court held that adopting defendants' reading would be structurally inconsistent with the purpose of the ESA. *Id.* at 6. This Court agrees with the analysis of *Marten*.

First, § 1536(c)(1) provides that its requirements are "[t]o facilitate compliance with the requirements of subsection (a)(2)." Defendants argue that the

---

[11] In *Western Watersheds* the court relied on First and Eighth Circuit cases it described as not requiring a biological assessment unless the agency action was a major construction activity. In the First Circuit case the court didn't reach the issue of whether a BA was required because it determined that, even if it was, the Navy had included the contents of a BA in its consultation package. *Water Keeper All. v. U.S. Dep't of Def.*, 271 F.3d 21, 33 (1st Cir. 2001). In the Eighth Circuit case the court, relying on the regulations, stated that a BA is only required for major construction activities, but it found that the Forest Service had adequately determined the agency action would have no effect on listed species through a detailed biological evaluation. *Newton Cty. Wildlife Ass'n v. Rogers*, 141 F.3d 803, 810 (8th Cir. 1998).

Court must give meaning to this section in its interpretation of subsection (c)(1). Dkt. 24 at 6. Defendants essentially argue because subsection (a)(2) does not apply when there has been a "no effect" determination, subsection (c)(1) should also not apply. The "may affect"/"no effect" distinction was created by the Services through the regulations regarding consultation. The plain language of the statute contains no such limitation. Further, it is entirely consistent with the language of the statute to conclude that the requirements of subsection (c)(1) are designed as a precursor to assist in the determination that an agency action may have an effect on a listed species. *See, e.g., Thomas*, 753 F.2d at 763; *Nat'l Wildlife Fed'n v. Fed. Emergency Mgmt. Agency,* 345 F. Supp. 2d 1151, 1175 (W.D. Wash. 2004) (holding that FEMA was required to document its "no effect" determination).

Second, subsection (c)(1) does not limit the applicability of its requirements in any way; by its terms it applies to "any agency action." True, it does reference contracts for construction. But that reference is only to make clear (1) that the statute did not apply to contracts for construction that had already been signed, and (2) that the requirements must be met before a contract for construction is signed. Nothing about those two references expressly or implicitly exclude agency actions

where there is no contract for construction.[12]

By its plain terms subsection (c)(1) requires the action agency to request a list of endangered or threatened species and prepare a biological assessment for any species that may be present for any agency action. This was the Ninth Circuit's original understanding of the statute in *Thomas* and the regulations do not command otherwise. Here, the Defendants failed to prepare a biological assessment for grizzly bears or lynx as required by the statute.[13] Accordingly, the Court finds that the Plaintiffs have shown a likelihood of success on the merits.

### 2.  NEPA/NFMA - Elk

---

[12] Defendants reliance on the congressional history is also unavailing. While the conference report recognized that the subsection (c)(1) required agencies to conduct biological assessments for major federal actions, this limitation was not included in the language of the statute. H.R. Conf. Rep. 96-697, 13, 1979 U.S.C.C.A.N. 2572, 2577. "Legislative history… is meant to clear up ambiguity, not create it." *Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011). Further it is not clear where this understanding of subsection (c)(1) derived from. The prior versions of the act contained no such limitation. P.L. 95–632, November 10, 1978, 92 Stat 3751. And, the history of the prior versions contained no discussion of "major federal actions" in relation to then subsection (c)(3), now (c)(1). *See* H.R. Rep. 95-1625, 20, 1978 U.S.C.C.A.N. 9453, 9470 ("The new section 7(c)(3) is designed to stimulate the development of additional biological information to assist federal agencies in complying with section 7."); H.R. Conf. Rep. 95-1804, 19, 1978 U.S.C.C.A.N. 9484, 9486.

[13] The Court is also skeptical that the Forest Service's reliance on the IPaC website, to determine which species may be present in the project area, is sufficient to meet its obligations under subsection (c)(1). The website advises that the list produced is not sufficient for the Section 7 consultation process. Curiously, if the Forest Service had requested a species list from the USFWS or sent its own list to the USFWS for concurrence, the USFWS may have determined neither lynx or grizzly bears may be present in the project area and this issue may have been moot.

Plaintiffs challenge the Forest Service's analysis regarding elk, arguing that the agency failed to take the required hard look at the cumulative impacts of the project to the elk population, and failed to address the efficacy of the proposed mitigation measure in violation of NEPA. Plaintiffs also argue that the Forest Service's use of a sign to seasonally close an ATV trail does not actually add to elk security habitat, in violation of the Revised Forest Plan and the NFMA. Defendants argue that the EA, supplemented by the wildlife report, complies with NEPA and Forest Plan and adequately addresses the cumulative effects of the proposed project and the effectiveness of the mitigation measures.

"An EA must include brief discussions of the need for the [federal action], of reasonable alternatives, and of the anticipated environmental impacts." *Hapner v. Tidwell,* 621 F.3d 1239, 1244 (9th Cir.2010); *see also* 40 C.F.R. § 1508.9(b). An EA need not meet all the requirements of an EIS, but "it must be sufficient to establish the reasonableness of the decision not to prepare an EIS." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.,* 538 F .3d 1172, 1215 (9th Cir.2008) (internal quotation marks and brackets omitted).

The majority of the EA's wildlife analysis focuses on the projects impact to elk security habitat, but not its impact on the elk population. However, both the EA and wildlife report discuss motorized access management as an important tool for

managing elk populations because of their popularity as a hunted species. Dkt. 24-1 at 26; Dkt. 24-5 at 15 ("elk are particularly vulnerable to disturbance emanating from increased human access into elk habitat"). The forest plan addresses elk population management through the concept of "elk security" and sets goals related to maintaining or improving elk security habitat. Dkt. 24-1 at 26. The Forest Plan has two goals related to elk security habitat: 1) "Management activities in elk management units should maintain existing levels of elk security," 2) "Over the life of the Plan, increase by 3 the number of high or medium priority elk management units … that provide >30 percent elk security." Dkt. 24-14 at 31, 32. Unit 7-6 is a low priority unit because of the limited opportunity to improve elk security, which is due to the large amount of private land in the unit. Dkt. 24-5 at 16. The Forest Service considers all private land in the unit as "not secure." *Id.* The large amount of private land, and harvest on that land, in the unit ensures sufficient forage, however it also limits the amount of security habitat. *Id.*

  NEPA requires agencies to assess the cumulative impact of any environmental projects they seek to undertake. *Klamath-Siskiyou Wildlands Center v. BLM*, 387 F.3d 989, 993 (9th Cir. 2004). The cumulative impact of a project is "the impact on the environment which results from the incremental impact of the

action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7.

Plaintiffs urge that the EA considered the cumulative impacts of the project on elk security habitat, it did not consider the cumulative effect on the elk population itself. However, the EA and wildlife report explicitly link elk security habitat to the elk population itself. The wildlife report considered the cumulative impacts of timber harvest, fire suppression, pre-commercial thinning, and public activities to elk security habitat. In its initial analysis the Forest Service had considered amending the Forest Plan to account for the reduction in security habitat due to the project. However, the Forest Service decided it could create additional security habitat through the seasonal closure of an ATV trail. While the EA has a brief discussion of cumulative effects to elk security habitat, and in turn the elk population, the wildlife report provides a thorough discussion of the cumulative effects of the project to elk security habitat. While the Plaintiffs may disagree with the Forest Service's conclusion, they have not raised serious questions regarding the Forest Service's cumulative impacts analysis.

Under NEPA, an environmental analysis must discuss mitigation measures. *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 733 (9th Cir. 2001) "A mere listing of mitigation measures is insufficient to qualify as the reasoned

discussion required by NEPA." *Nw. Indian Cemetery Protective Ass'n v. Peterson*,

764 F.2d 581, 588 (9th Cir. 1985)

> While the agency is not required to develop a complete mitigation
> plan detailing the precise nature of the mitigation measures, the
> proposed mitigation measures must be developed to a reasonable
> degree. A perfunctory description, or mere listing of mitigation
> measures, without supporting analytical data, is insufficient to support
> a finding of no significant impact.

*Id.* (citations omitted).

Plaintiffs repeatedly argue that the Forest Service will use a "sign" to

implement the seasonal closure of the ATV trail and that the Forest Service has not

discussed the efficacy of such a measure. However, both the EA and wildlife report

contemplate that a gate or gates will be used. Dkt. 7-5 at 27. The EA also discusses

the Forest Service's plan to monitor all gates on the district and address gates that

are breached or driven around, ensuring the effectiveness of these measures.

Accordingly, the Court finds that Plaintiffs have failed to raise serious questions as

to whether the Forest Service complied with NEPA in analyzing its chosen

mitigation measure.

The Plaintiff also argues the EA fails to comply with the Forest Plan. The

Forest Service violates NFMA if it fails to comply with the provisions of a Forest

Plan. *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 961 (9th Cir.

2005). If the Forest Service finds that any provision of the forest plan is no longer

relevant, it must properly amend the plan rather than disregard it in environmental reports. *Id.*

Here the Forest Service considered the possible reduction of elk security habitat in unit 7-6, which is a low priority unit. It then decided to seasonally close an ATV trail to increase elk security habitat. Because the court finds that the Plaintiffs' have not raised serious questions relating to the Forest Service's NEPA analysis of the cumulative effects on elk and the chosen mitigation measure the Court also finds that Plaintiffs have not raised serious questions as to the NFMA claim.

### 3.  Wild and Scenic Rivers Act – St. Joe River

The Wild and Scenic Rivers Act (WSRA) directs the Forest Service to protect designated rivers for the "benefit and enjoyment of present and future generations" by "protect[ing] the water quality" and "fulfill[ing] other vital national conservation purposes." 16 U.S.C. §§ 1283(a), 1271, 1272. The St. Joe River is a designated Wild and Scenic River, and Siwash Creek is one of its tributaries in the Project Area. Regarding the WSRA, NEPA requires, "[t]o the extent possible, authorizing agencies should ensure that any environmental studies, assessments, or environmental impact statements prepared for a water resources project adequately address the environmental effects on resources protected by the

Wild and Scenic Rivers Act." 36 C.F.R. § 297.6(a). The Forest Service has a "great deal of discretion" in deciding how to achieve the broad policy goals of the WSRA. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004). With respect to NEPA documents, the agency must take a "hard look" at the impacts of its action by providing "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1194 (9th Cir. 2008) (citations omitted). The Court must determine whether the EA "foster[s] both informed decision-making and informed public participation." *Id.*

Plaintiffs emphasize the initial misstatement in the EA that the project area is not in the wild and scenic river corridor. Defendants, however, assert the Forest Service corrected the mistake in the FONSI. The EA states "the project area . . . does not include . . . the wild and scenic river corridor." Dkt. 7-5 at 6. When discussing regeneration harvest treatments, the EA states "the wild and scenic river corridor were not proposed for timber harvest." *Id.* at 12. The first reference to the corridor was incorrect, as the project area falls within the corridor. However, the second reference is correct, because no actual timber harvest was proposed in the corridor. The FONSI corrected the misstatement by explaining that, "[p]arts of the northern boundary of the project area falls within the St. Joe Wild and Scenic River

Corridor (WSR). There are no activities proposed within the WSR corridor." Dkt. 7-3 at 8.

The Plaintiffs argue, however, that the public was not given an opportunity to comment on the potential harms to the wild and scenic river corridor because it was not included in the EA and the misstatement was not corrected until after the public comment opportunity had passed. Dkt. 7-1 at 22. Plaintiffs further argue that the Forest Service failed to take a "hard look" at the impacts of the project to the corridor. The project includes the removal of 15 culverts in the Siwash tributary of the St. Joe River. Dkt. 24-10 at 1. These culvert removals are considered water resource projects under the WSRA and must be analyzed. *Id.*

On the one hand, the EA mentions these culvert removals but does not specify whether they are located on tributaries to the St. Joe River. Dkt. 24-1 at 35. The EA never explicitly mentions impacts to the Wild and Scenic River Corridor nor the Section 7(a) evaluation that was prepared. The recreation report, included as an appendix to the EA, contains a brief statement related to the section 7(a) analysis and includes the analysis as a two page appendix. Dkt. 24-11 at 7; Dkt. 24-10. The section 7(a) evaluation provides a brief discussion of the culvert removals on the corridor and references the analysis of the Biological Assessment for fisheries. Dkt. 24-10.

On the other hand, the EA discussed in detail the impacts of the project to hydrology and fisheries in tributaries of the St. Joe River and to the river itself. Dkt. 24-1 at 19, 33. The EA also discussed impacts to scenery and recreation resources, including to the St. Joe River. *Id.* at 29, 30. Here, the main area of concern for the culvert removals, and the project generally, is an increase in sediment into the St. Joe River which may affect bull trout and their critical habitat. The Forest Service prepared a biological assessment for bull trout and received concurrence from the USFWS that the project may affect, but is not likely to adversely affect, bull trout and designated critical habitat. Dkt. 25-4, 25-5. The concurrence noted that, while the project may increase sediment loads in tributaries to the St. Joe, the sediment will settle out before reaching the St. Joe River.

While the EA could have been more explicit that the project area fell within the corridor, Plaintiffs have not raised serious questions on the merits of the Forest Service's compliance with the WSRA and NEPA. *See San Diego Navy Broadway Complex Coal. v. U.S. Dep't of Def.*, 817 F.3d 653, 661 (9th Cir. 2016) ("The Navy could certainly have made the public's participation easier by including more specific information about the potential environmental effects … in the 2009 EA itself to create a single, clear document. Nonetheless, the Federal Defendants' method of addressing those concerns can 'reasonably be discerned.'").

### B.      Irreparable Harm

Since the Plaintiffs have shown a likelihood of success on the merits as to the ESA claim, the Court now turns to irreparable harm. Road construction is scheduled to begin on July 15, 2020. Plaintiffs argue that the area will be irreversibly degraded, and the project will negatively impact their ability to enjoy the project area and to view and study wildlife including elk, grizzly bears, and lynx in their natural habitat. Dkt. 7-2 ¶ 4. Defendants argue that Plaintiffs have offered only generalized allegations of harm and that their 7-month delay calls the imminence of alleged harm into doubt. Dkt. 24 at 21. Plaintiffs argue that the delay was caused by their need to find counsel.

The FONSI was issued for the project in September 2019. However, Plaintiffs waited to file their complaint until May 20, 2020 and filed a motion for injunctive relief on June 1, 2020. Intervenor, Stimson Lumber, is set to begin project work on July 15. Plaintiff's delay suggests they did not perceive the project as creating an irreparable harm. However, in cases where courts have found that delay argues against an injunction the motion for injunctive relief was filed after work on the project had begun. *Helena Hunters & Anglers Ass'n v. Marten*, 2019 WL 5069002, at *2 (D. Mont. Oct. 9, 2019). Ultimately delay is not enough to deny Plaintiffs' motion. *See id.*

The irreparable harm inquiry is flexible as "environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e. irreparable." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014). Of course, this does not mean that "any potential environmental injury" warrants an injunction. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Further, the harm prevented by entry of a preliminary injunction must legitimately relate to the legal theory asserted in a case. *See Garcia v. Google, Inc.*, 786 F.3d 733, 744 (9th Cir. 2015).

Certainly, there will be environmental harm from road construction and timber harvest activities. But, is this harm irreparable, rising to the level of injunctive relief? Plaintiffs argue that

> [i]f operations are allowed to proceed as planned, the area will be irreversibly degraded because once logging occurs, the Forest Service cannot put the trees back on the stumps, and once the road work occurs, the Forest Service cannot remove the sedimentation from the bull trout habitat. Thus, our interests in the area will be irreparably harmed to the point that the area is no longer adequate for our esthetic, recreational, scientific, spiritual, vocational, and educational interests. Therefore, this specific project will likely cause irreparable damage to our members' interests because it will harm our members' ability to view, experience, and utilize the area in its undisturbed state and thus prevent the use and enjoyment by our members of hundreds of acres of the Forest.

Dkt. 7-1 at 6. Plaintiffs have also offered a declaration of Jeff Juel that suggests the

**MEMORANDUM DECISION AND ORDER - 31**

Plaintiffs' members interests will be harmed due to their interest in "viewing, studying, and enjoying elk, grizzly bears, lynx, bull trout and other wildlife species…" Dkt. 7-2 ¶ 4. Finally, Plaintiffs include two letters from hunters who suggest the project will harm their ability to hunt elk. Dkt. 7-7; 7-8.

Most of Plaintiffs statements of harm are only general allegations which do not relate to any of their legal theories in this case. Their concerns about elk, bull trout, and sedimentation are negated by the Courts finding that they have not raised a serious question going to the merits of their NFMA, WSRA, and NEPA claims. The Forest Service fully addressed the impacts of sediment from the project in the fisheries biological assessment. The Forest Service also considered impacts of the project to elk security habitat and elk population stability.

Certainly, the concern about the project's impacts to grizzly bears and lynx would constitute irreparable harm if Plaintiffs had shown a likelihood that those species would be harmed by the project. However, they have not. Plaintiffs make general allegations that roads allow poachers to shoot grizzly bears, and that mother bears teach their cubs to stay away from roads. Dkt. 7-2 ¶ 5. Plaintiffs make no specific allegations of harm with regard to lynx beyond their members' ability to enjoy lynx in the project area.

The problem here is how speculative Plaintiffs claims of harm are with

regard to grizzly bears and lynx. The Court recognizes a transient bear may wander near the project area. However, no bears have ever been identified in the project area, there is no known bear population in the St. Joe Ranger District and the project area is not in critical bear habitat, a Grizzly Bear Recovery Area, nor even in the Bitterroot Grizzly Bear Evaluation Area. Dkt. 7-13 at 29-30. At most three grizzly bears have come within 12-15 miles of the project area in the past three years.

With regard to lynx, the project area is not in a Lynx Analysis Unit or critical habitat and there is a low amount of suitable habitat in the western half of the St. Joe Ranger District. *Id.* at 29. Further, lynx are not known or suspected in the project area due to the lack of suitable lynx habitat. *Id.* Plaintiffs must show more than a possibility of harm to an endangered species, they must show a likelihood of harm. *Cottonwood*, 789 F.3d at 1089. Even though "establishing irreparable injury should not be an onerous task," Plaintiffs have failed to meet this low bar. *Id.* at 1091.

Accordingly, the Court finds that Plaintiffs have not shown a likelihood of irreparable harm from the project going forward.

### C.    Public Interest and Balance of equities

When the government is a party, the analyses of the public interest and

balance of equities merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092

(9th Cir. 2014). Plaintiffs did not meaningfully address the public interest or

balance of equities. Instead, they relied on the statement in *Cottonwood* that

"courts do not have discretion to balance the parties' competing interests in ESA

cases because Congress 'afford[ed] first priority to the declared national policy of

saving endangered species.'" *Cottonwood*, 789 F.3d at 1090. However, Plaintiffs

have failed to demonstrate that any endangered species will be measurably harmed

by the project activities, and the public interest factors do not automatically tip in

Plaintiffs' favor. *See Native Ecosystems Council v. Krueger*, 40 F. Supp. 3d 1344,

1350 (D. Mont. 2014).

      With regard to the public interest, the Ninth Circuit has recognized "the

well-established public interest in preserving nature and avoiding irreparable

environmental injury." *Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir.

2008). But, there is no irreparable injury here. On the other hand, the project is

designed to reduce hazardous fuels and the threat of wildfire in the wildland-urban

interface of Avery and improve the ingress and egress routes should there be a fire.

*See* Dkt. 24 at 26. The project will also contribute to the local economy and is

broadly supported by the local community. *Id.* Accordingly, the Court finds that

the public interest and balance of equities tips in favor of the Defendants.

**MEMORANDUM DECISION AND ORDER - 34**

**D.      Conclusion**

Plaintiffs have shown a likelihood of success on the merits of their ESA claim. However, their generalized allegations of harm do not demonstrate likely irreparable injury. Because of this last factor the public interest and balance of equities tips in favor of Defendants. Accordingly, the Court will deny Plaintiff's motion for an injunction.

## ORDER

**IT IS ORDERED** that Plaintiffs' Motion for Preliminary Injunction (Dkt. 7) is **DENIED.**

DATED: July 13, 2020

_____

B. Lynn Winmill
U.S. District Court Judge