## UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| FRIENDS OF THE CLEARWATER; and ALLIANCE FOR THE WILD ROCKIES, | Case No. 2:20-cv-00243-BLW |
| Plaintiffs, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| JEANNE HIGGINS, Idaho Panhandle National Forest Supervisor; UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture; and UNITED STATES FISH & WILDLIFE SERVICE, an agency of the U.S. Department of Interior, | |
| Defendants, | |
| and | |
| STIMSON LUMBER COMPANY, | |
| Intervenor-Defendant. | |

### INTRODUCTION

Before the Court are Plaintiffs' Motion for Judicial Notice, Completion of

the Administrative Record, and/or Supplementation of the Administrative Record

**MEMORANDUM DECISION AND ORDER - 1**

(Dkt. 38) and Supplemental Motion for Judicial Notice (Dkt. 47). Defendants' and Intervenor-Defendant oppose the motions. Dkt. 41, 42, 48, 49. For the reasons that follow the Court will grant Plaintiffs' first motion in part and deny it in part, and deny Plaintiffs' second motion.

## BACKGROUND

In this case Plaintiffs are challenging the Forest Services' Brebner Flat logging project under the Endangered Species Act, Administrative Procedures Act, National Environmental Policy Act, Wild and Scenic Rivers Act, and National Forest Management Act. The background of the Brebner Flat project, and this case, are more fully set out in the Court's order denying Plaintiffs' motion for a preliminary injunction. Dkt. 28. Relevant here, the Forest Service issued its Final Environmental Assessment for the project in June 2019 and its Decision Notice and Finding of No Significant Impact (FONSI) on October 3, 2019. The Forest Service determined that no federally endangered or threatened wildlife species were likely to be affected by the project.

Plaintiffs contend that the project will negatively impact grizzly bears and Canada lynx. The parties dispute whether grizzly bears and lynx "may be present" in the project area. If either species may be present the Forest Service has a duty to determine whether the project may affect the species.

Defendants lodged the administrative record on September 21, 2020. Plaintiffs now seek to have the Court consider multiple exhibits related to their ESA claims and supplement the administrative record with a draft environmental assessment.

## ANALYSIS

### A.   Exhibits Related to Plaintiffs' ESA Claims

#### 1.   Scope of Review

Plaintiffs seek to have the Court consider 12 exhibits in support of their ESA claims. The exhibits offered by Plaintiffs were not part of the administrative record. Defendants argue that the scope of review in ESA cases is limited to the administrative record, and thus, the Court should not consider the additional exhibits.

Plaintiffs bring their ESA claims under the ESA's citizen suit provision. 16 U.S.C. § 1540(g). Because the ESA contains no internal standard of review, courts have adopted the Administrative Procedures Act's standard of review. *Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc); *Vill. of False Pass v. Clark*, 733 F.2d 605, 609 (9th Cir. 1984). Under this standard, "a court may set aside an agency action if the court determines that the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Karuk Tribe*, 681 F.3d at 1017 (quoting 5 U.S.C. § 706(2)(A)).

Defendants urge that, under this line of precedent, not only does the APA determine the standard of review, but also the scope of review. The Ninth Circuit explicitly rejected this argument in *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011). In *Kraayerbrink*, the court stated:

> As we explained in *Washington Toxics Coalition* [*v. Environmental Protection Agency*, 413 F.3d 1024 (9th Cir. 2005)], the APA applies only where there is "no other adequate remedy in a court," 5 U.S.C. § 704, and—because the ESA provides a citizen suit remedy—the APA does not apply in such actions. 413 F.3d at 1034. Therefore, under *Washington Toxics Coalition* we may consider evidence outside the administrative record for the limited purposes of reviewing Plaintiffs' ESA claim. *See id*. at 1030, 1034.

*Id*. at 497.

Defendants argue that *Kraayerbrink* was silently overruled by the Ninth Circuit in *Karuk Tribe*. There, the Ninth Circuit noted, under the heading of "Standard of Review," "[b]ecause this is a record review case, we may direct that summary judgment be granted to either party based upon our review of the administrative record." 681 F.3d at 1174. The problem with Defendants' reliance on *Karuk Tribes* is that this single sentence is the only reference to the scope of review in the entire opinion. The scope of review was not an issue by the time the

court heard the case en banc.[1] Further, *Karuk Tribes* does not mention *Kraayerbrink*. Accordingly, *Karuk Tribes* cannot be read as overruling *Kraayerbrink*. *See Nw. Coal. for Alternatives to Pesticides v. U.S. E.P.A.*, 920 F. Supp. 2d 1168, 1174 (W.D. Wash. 2013).

   Further refuting Defendants' argument, that *Karuk Tribe* somehow overruled *Kraayerbrink*, is the Ninth Circuit's recent opinion in *National Family Farm Coalition v. U.S. Environmental Protection Agency*, 966 F.3d 893 (9th Cir. 2020). There the court recognized that an agency's compliance with the ESA is reviewed under the arbitrary and capricious standard of the APA. *Id.* at 923. But, the court also considered an interim status report the agencies had submitted to Congress, which was not in the administrative record. *Id.* at 926 & n. 11 ("Although the Interim Report is not in the administrative record, we can consider it 'for the limited purpose[ ] of reviewing [Petitioners'] ESA claim.'" (quoting *Kraayerbrink*, 632 F.3d at 497)).

   This Court previously relied on *Kraayerbrink* to allow extra-record evidence

---

[1] In its opinion, the district court had excluded extra-record evidence. The Ninth Circuit panel that originally heard *Karuk Tribes* upheld this decision, finding that the merits of the factual dispute supported by the extra-record documents were not relevant to the legal question at issue in the case. *Karuk Tribe of California v. U.S. Forest Serv.*, 640 F.3d 979, 984 n. 3 (9th Cir. 2011). The panel decision in *Karuk Tribe* makes no mention of *Kraayerbrink*, even though *Kraayerbrink* was decided only two months earlier.

to support a plaintiff's ESA citizen suit claim. *W. Watersheds Project v. U.S. Fish & Wildlife Serv.*, 2013 WL 3270363, at *4 (D. Idaho June 26, 2013). This Court agrees with many other district courts that *Kraayerbrink* is still good law, and that it allows the Court to consider evidence outside the record in ESA cases.[2] As the plain language of *Kraayerbrink* states, the Court "may consider evidence outside the administrative record for the limited purposes of reviewing Plaintiffs' ESA claim." *Kraayerbrink*, 632 F.3d at 497.

Having determined that the Court may consider evidence outside the record in support of Plaintiffs ESA claim, it must next determine what evidence may be considered.[3] Plaintiffs ask the Court to take judicial notice of their proffered

_____

[2] The Court recognizes that there is a difference of opinion between the district courts within the Ninth Circuit regarding the proper reading of *Kraayerbrink*. *See All. for Wild Rockies v. Kruger,* 950 F. Supp. 2d 1172, 1177 (D. Mont. 2013) (holding that *Kraayerbrink* relaxed the narrowness of the traditional *Lands Council* exceptions for supplementing the record); *Nw. Envtl. Advocates v. United States Fish & Wildlife Serv.,* 2019 WL 6977406, at *13 (D. Or. Dec. 20, 2019) (collecting cases). The Court also recognizes that the holding of *Kraayerbrink* does not entirely square with other Ninth Circuit precedent. But, after carefully reviewing the parties' arguments, and the many cases discussing *Kraayerbrink*, the Court believes the best reading is provided by the plain language of the opinion.

[3] Plaintiffs ask the Court to consider multiple exhibits through judicial notice. In many ESA cases the plaintiff relies on expert declarations, which do not suffer the same challenges to admissibility as unauthenticated exhibits. Ninth Circuit precedent is somewhat opaque with regard to evidence offered through judicial notice in environmental and administrative cases. Most of the time, in these cases, the Ninth Circuit either grants or denies the motion to take judicial notice through a footnote with reference to a footnote in another case. *See, e.g., Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1011 n.5 (9th Cir. 2011).

exhibits. They have offered no affidavits or foundation that would otherwise make these exhibits admissible. Defendants object to the Court taking judicial notice of Plaintiffs exhibits, arguing that judicial notice cannot be used to establish disputed facts. Further, some of the exhibits were generated after the agency decision at issue. Defendants, relying on APA caselaw, argue these exhibits should be excluded because they were not before the agency at the time of the decision.

*Kraayerbrink* did not set out a specific standard as to what evidence a court may rely on in considering an ESA claim. Despite this, a discussion of *Kraayerbrink* is informative to the issue. The plaintiffs in *Kraayerbrink* challenged the Bureau of Land Management's (BLM) amendments to its grazing regulations. The amendments affected 160 million acres of public lands and made changes to public input in rangelands management, the BLM's enforcement powers, and grazing permittee's ownership rights on public grazing lands. The plaintiffs challenged: 1) BLM's determination that the proposed regulations would have no effect on listed species or their critical habitat, and 2) BLM's failure to consult with the U.S. Fish and Wildlife Service (FWS).

In *Kraayerbrink*, the Ninth Circuit recognized that § 706 of the APA governs review of the plaintiffs' ESA claims. Thus, "the normal 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law'

standard applies." *Id.* at 496 (quoting *Village of False Pass v. Clark*, 733 F.2d 605, 609–10 (9th Cir.1984)). Under this standard, "[t]o determine whether the BLM's no effect determination was arbitrary and capricious, we must decide whether the BLM considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Id.* (quotations omitted). "The BLM's decision to forgo consultation with FWS must be reversed if the BLM entirely failed to consider an important aspect of the problem or offered an explanation that runs counter to the evidence before the agency." *Id.* (quotations omitted).

In *Kraayerbrink*, there was significant evidence in the record that BLM's regulations "may affect" listed species. *Id.* at 497. After discussing the evidence in the record, the court went on to discuss several extra-record expert declarations submitted in support of the plaintiffs' ESA claim. The court relied on the record, and the extra-record declarations, to find that there was "resounding evidence" that the regulations "may affect" listed species. *Id.* at 498. The court also relied on the extra-record evidence to determine that the regulatory amendments were not purely administrative, but instead would have a substantive effect on listed species. *Id.*

The court concluded by stating:

Although our review under the arbitrary and capricious standard is deferential, it does not condone a 'clear error of judgment.' Because the BLM failed to consider relevant expert analysis or articulate a rational connection between the facts found and the choice made, we

> conclude that the BLM's no effect finding and resulting failure to
> consult were arbitrary and capricious in violation of the BLM's
> obligations under the ESA.

*Id.* (citations and quotations omitted).

Several guideposts appear from this discussion and subsequent court opinions. First, the bar to using post-decision information to challenge an agency's decision applies in ESA cases. In APA claims, post-decision information may not be used as a new rationalization for attacking an agency's decision. *See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 944 (9th Cir. 2006). The Court may consider post-decision information in very limited circumstances, but may not use it to judge the wisdom of the agency's decision. *Ctr. For Biological Diversity v. U.S. E.P.A.*, 90 F. Supp. 3d 1177, 1198–99 (W.D. Wash. 2015).

Although *Kraayerbrink* expands the scope of review in ESA cases, it does not change the prohibition on using post-decision information to challenge an agency's decision. This is because the agency's decision is still reviewed under the arbitrary and capricious standard, and the court must determine if the agency "failed to consider the relevant factors," or "failed to consider an important aspect of the problem." *Kraayerbrink*, 632 F.3d at 496. Further, under the ESA, the agency must "use the best scientific and commercial data available." 16 U.S.C. §

1536. The agency is not required to "make decisions on data that does not yet exist." *National Family Farm Coalition*, 966 F.3d at 925 (citation omitted). It would go beyond both the mandate of the ESA, and arbitrary and capricious review, for the Court to rely on information generated after the agency's decision.

Second, the evidence must be relevant to the question of whether relief should be granted. *See Nw. Coal. for Alternatives to Pesticides*, 920 F.Supp.2d at 1176; *see City of Sausalito v. O'Neill*, 386 F.3d 1186, 1223 n.2 (9th Cir. 2004).

Third, because the evidence is not part of the record, it must be otherwise admissible. In this case, as in most environmental cases, the merits of Plaintiffs' claims will be decided on motions for summary judgment. "A trial court can only consider admissible evidence in ruling on a motion for summary judgment." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e)). Here, plaintiffs offer exhibits without supporting affidavits or other foundation. *See id.*; Fed. R. Evid. 901(a) Plaintiffs instead seek to admit the exhibits through judicial notice.[4]

---

[4] In cases where the scope of review is governed by the APA and a plaintiff seeks to have the court consider extra-record evidence through judicial notice, that evidence still must meet one of the exceptions identified in *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) to be added to the record. *Bear Valley Mut. Water Co. v. Jewell*, 790 F.3d 977, 986 n.2 (9th Cir. 2015); *All. for Wild Rockies v. Probert*, 412 F. Supp. 3d 1188, 1198 (D. Mont. 2019).

MEMORANDUM DECISION AND ORDER - 10

Federal Rule of Evidence 201 permits a court to take judicial notice of facts not subject to reasonable dispute that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). "[A] court may take judicial notice of 'matters of public record.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001). "But a court may not take judicial notice of a fact that is 'subject to reasonable dispute.'" *Id.* (quoting Fed. R. Evid. 201(b)). *See also City of Sausalito v. O'Neill*, 386 F.3d 1186, 1223 n.2 (9th Cir. 2004) ("We may take judicial notice of a record of a state agency not subject to reasonable dispute."); *Arizona Libertarian Party v. Reagan*, 798 F.3d 723, 727 (9th Cir. 2015) ("We may take judicial notice of official information posted on a governmental website, the accuracy of which is undisputed." (citations and alterations omitted)).

Thus, the Court may take judicial notice of government documents to prove their existence and contents, but not for the truth of the matters asserted therein when the facts are disputed. *Coal. for a Sustainable Delta v. Fed. Emergency Mgmt. Agency*, 812 F. Supp. 2d 1089, 1093 (E.D. Cal. 2011); *accord Dine Citizens Against Ruining Our Env't v. Bureau of Indian Affairs*, 932 F.3d 843, 848 n.1 (9th Cir. 2019); *Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1011 n.5 (9th Cir. 2011); *Dent v. Holder*, 627 F.3d 365, 371–72 (9th Cir.

2010).

In conclusion, in ESA citizen suit cases, the Court may consider evidence outside the administrative record. But, post-decision information cannot be used to challenge the merits of the agency's decision. Further, the evidence must be relevant and otherwise admissible. The Court can take judicial notice of government documents for their existence and contents, but not for the truth of the matter asserted when the facts are in dispute. With this in mind, the Court turns to Plaintiffs' exhibits.

### 2. Plaintiffs' Exhibits

Plaintiffs seek to have the Court consider 12 exhibits related to their ESA claims. The Court will discuss each in turn.

#### a. Exhibit 1

Exhibit 1 is a paper by U.S. Fish and Wildlife Service staff, published in 2001, titled Identification and management of linkage zones for grizzly bears between the large blocks of public land in the Northern Rocky Mountains. Dkt. 38-2. The paper was published in the Proceedings of the 2001 International Conference on Ecology and Transportation. The authors use computerized geographic information systems to model and display the potential for linkage zones, or movement corridors, between various grizzly bear recovery areas.

Plaintiffs describe this exhibit as "map[ping] out potential grizzly bear linkage zones…." Dkt. 38-1 at 11. Plaintiffs specifically offer a map on page 8 of the exhibit they describe as showing "that the St. Joe Ranger District falls within the Cabinet to Bitterroot Linkage Zone for grizzly bears…." *Id.* at 8. But, as Defendants point out, this map does not show linkage zones, instead it shows "Linkage Zone Prediction Model evaluation areas with terrain, cities, recovery area boundaries, and major highways…." *Id.* The report notes that "[a] model is an abstraction of reality that simplifies natural processes …. The [] model should be considered a point of departure for more intensive and accurate mapping of potential linkage zones." Dkt. 38-2 at 14. This report is not probative of whether grizzly bears may be present in the Brebner Flat Project area. *See All. for the Wild Rockies v. Krueger*, 664 F. App'x 674, 677 (9th Cir. 2016).

  b. *Exhibit 2*

Exhibit 2 is the Grizzly Bear Recovery Program, 2019 Annual Report, published by the U.S. Fish and Wildlife Service. Dkt. 38-3. The report was published after the EA and FONSI. The report contains information about a bear traveling from the Cabinet Mountains into the Bitterroot Ecosystem, during the summer months of 2019, before returning to the Cabinet Mountains. The report notes that the bear crossed I-90 in June 2019. Most of the bear's travels occurred

after the EA was finalized. Because both the report, and the bulk of the bear's travels occurred after the agency's issuance of the EA the court will not consider the report in ruling on Plaintiffs' ESA claims.

c.  *Exhibit 3*

Exhibit 3 is a letter from the Grizzly Bear Recovery Coordinator to the Western Federal Highway Lands Division, dated October 9, 2008, regarding comments on the Little Joe Road Environmental Assessment. Dkt. 38-4. The letter notes that "grizzly bears are expected to inhabit the Little Joe Project area." Dkt. 38-4 at 4. And, that a bear traveled from the Selkirk Mountains, in northern Idaho, to the Kelly Creek area, approximately 45 miles south-southeast of the Little Joe Project area, where it was shot.

The Little Joe Road Project area stretched between St. Regis, Montana and St. Maries, Idaho. *Id.* It also appears that the Wildlife Report discussed this bear. Dkt. 41-3 at 30. This exhibit is of questionable relevance, but Defendant's do not dispute the fact that a bear traveled from the Selkirk Mountains and was eventually shot in the Kelly Creek area. Therefore, the Court will take judicial notice of this document.

d.  *Exhibit 4*

Exhibit 4 is a printout of the U.S. Fish and Wildlife Service Environmental

Conservation Online System from October 5, 2020. Dkt. 38-5. The printout

contains a map of the "Current Range" for grizzly bears, which shows a large

section of central Idaho as current grizzly bear range. Defendant's dispute that the

map actually shows the "current range" for grizzly bears. Further, this exhibit was

produced after the agency's decision. Therefore, the Court will not consider this

exhibit.

e.  *Exhibit 5*

Exhibit 5 is the Final Environmental Impact Statement for Grizzly Bear

Recovery in the Bitterroot Ecosystem. The FEIS was signed February 22, 2000.

This FEIS was cited by the Wildlife Report for the Brebner Flat project and is

included in the index of the administrative record. Dkt. 37-2 at 13. However, the

full FEIS does not appear in the actual administrative record.

Defendants argue that they only relied on the summary of the FEIS to

describe the status of grizzly bear management in the Wildlife Report. Defendants

further argue that Plaintiffs are relying on elements and alternatives in the FEIS

that were not adopted. Defendants relied on the FEIS, even if just the summary, in

drafting the Wildlife Report. The Court will take judicial notice of this exhibit for

its existence and its contents, but will not take judicial notice of any "facts" in the

FEIS unless they are truly undisputed.

MEMORANDUM DECISION AND ORDER - 15

### f.   Exhibit 6

Exhibit 6 is a copy of the 2020 Idaho Big Game hunting regulations published by the Idaho Department of Fish and Game. Dkt. 38-7. The regulations advise hunters that grizzly bears may be found in Game Unit 7. Game unit 7 runs along the Idaho/Montana border and the Brebner Flat Project is located on the western edge. It is not clear when the regulations were published, and the regulations are of questionable relevance considering the size of Game Unit 7. However, the Court will take judicial notice of this exhibit for its existence and contents but not for the truth of the assertions made therein.

### g.   Exhibit 7

Exhibit 7 is a press release issued by Idaho Department of Fish and Game on April 22, 2020. Dkt. 38-8. The press release notifies the public that Fish and Game had confirmed grizzly bear tracks approximately 7 miles south of Grangeville, Idaho. The press release also states that a grizzly bear was photographed by a game camera in the area in spring 2019. Hair testing confirmed that the bear seen in 2019 came from near the Idaho-Canada border. The press release was published after the agency's decision, and is of questionable relevance considering the distance between Grangeville, Idaho and the project area. The Court will not consider this exhibit.

h. *Exhibit 8*

Exhibit 8 is a single page document titled "Bussel 484" describing potential grizzly bear occurrence on the St. Joe Ranger District. Dkt. 38-9. Plaintiffs describe this document as being from a 2008 logging project on the St. Joe Ranger District and argue that most of it was cut and pasted into the Wildlife Report for the Brebner Flat project. Dkt. 38-1 at 17-18. The document also contains a report of a bear being shot in the Clearwater River drainage. But, the information regarding the bear being shot is already in the Wildlife Report and this document is not otherwise relevant.

i. *Exhibit 9*

Exhibit 9 is an Idaho Panhandle National Forest document describing the lynx habitat mapping process, dated April 17, 2008. Dkt. 38-10. The exhibit also includes a legacy lynx habitat and lynx analysis unit map and a working draft map of the same. The 2005 version of the revised lynx analysis unit map was litigated in *Native Ecosystems Council v. United States Forest Service*, 866 F.Supp.2d 1209 (D. Idaho 2012). There the Court found that the Forest Service failed to take a hard look at the 2005 revised map as required by NEPA. *Id.* at 1231.

The administrative record includes maps of 2007 lynx analysis units and a revised 2008 map with extensive discussion on the lynx habitat analysis. AR

015743-015767; Ex. C, Dkt. 41-5 at 187. Therefore, plaintiffs exhibit is redundant.

Further, it seems incongruous to allow plaintiffs to collaterally challenge the

agency's determination that a proposed lynx analysis unit "did not contain

adequate habitat," Dkt. 41-5 at 198, through this lawsuit.

### j.  Exhibit 10

Exhibit 10 is an article published by the Bonner County Daily Bee on June

23, 2019. Dkt. 38-11. The article describes how a collared grizzly bear moved from

Montana to an area south of Kellog, Idaho then on to the Kelly Creek drainage.

Plaintiffs offer this article to show there "was publicly available information of

verified grizzly reports in the St. Joe" in contrast to the statement in the Wildlife

Report that there were no verified records or reports of grizzly bears on the St. Joe.

Dkt. 38-1 at 20. This article was published three days before the EA was finalized.

The Court will take judicial notice of this document, but only to "indicate what was

in the public realm at the time, not whether the contents of those articles were in

fact true." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954,

960 (9th Cir. 2010) (citations omitted).

### k.  Exhibit 12

Exhibit 12 is a U.S. Fish and Wildlife Service map showing the estimated

current distribution of grizzly bears, grizzly bear recovery zones, and areas where

grizzly bears may be present. Dkt. 47-2. The map is dated December 16, 2020.

This is post-decision information and the Court will not consider it.

### l.  Exhibit 13

Exhibit 13 is a printout of Plaintiffs' query in the U.S. Fish and Wildlife

Services' IPaC system. Dkt. 47-3. Based on the polygon drawn by Plaintiffs,

roughly representing the Brebner Flat project area, the IPaC query indicated that

grizzly bears and lynx may be "potentially affected by activities in this location."

*Id.* at 4. Not only is this post decision information, but the polygon was drawn by

plaintiffs and does not accurately reflect the boundaries of the Brebner Flat project.

In summary, the Court will take judicial notice of exhibits 3, 5, 6, and 10,

but only for their existence and content and not for the truth of the matters asserted.

The Court will deny Plaintiffs' motion as to the remaining exhibits.

### B.    Exhibit 11 – September 2018 Draft EA

Plaintiffs move to complete the administrative record with a draft

environmental assessment for the Brebner Flat project dated September 25, 2018.

This document was provided by Defendants in response to Plaintiffs' FOIA

request, but was not included in the administrative record. Plaintiffs argue that this

document was "considered" by the agency in making its decision and is properly

part of the record. Plaintiffs also argue that Defendants' failure to include this

document in the record warrants requiring Defendants to prepare a privilege log of other "deliberative" documents excluded from the record. Defendants argue that this document is "deliberative" and "predecisional" and not properly part of the record and thus no privilege log is required.

Review of an agency decision under § 706 of the APA is based on "the whole record or those parts of it cited by a party…." 5 U.S.C. § 706. The whole record "includes everything that was before the agency pertaining to the merits of its decision." *Portland Audubon Soc. v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1993). "The whole administrative record, however, is not necessarily those documents that the agency has compiled and submitted as 'the' administrative record." *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (citations and quotations omitted). "The 'whole' administrative record, therefore, consists of all documents and materials directly or *indirectly* considered by agency decision-makers and includes evidence contrary to the agency's position." *Id.* (citations omitted) (emphasis in original).

"The administrative record submitted by the government is entitled to a presumption of completeness which may be rebutted by clear evidence to the contrary." *In re United States*, 875 F.3d 1200, 1206 (9th Cir.), *vacated on other grounds*, 138 S. Ct. 443 (2017). To overcome the presumption a plaintiff must

"identify reasonable, non-speculative grounds for the belief that ... documents were considered by the agency and not included in the record." *Beverly Hills Unified Sch. Dist. v. Fed. Transit Admin.*, 2018 WL 5919218, at *3 (C.D. Cal. Sept. 17, 2018) (quoting *Ctr. for Food Safety v. Vilsack*, 2017 WL 1709318, *3 (N.D. Cal. May 3, 2017)).

The real issue here is whether, and to what extent, purportedly deliberative documents may be excluded from the record. Defendants rely on cases from the D.C. Circuit, which holds that predecisional and deliberative documents are not part of the administrative record. *See Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019). The D.C. Circuit holds that, absent a showing of bad faith or improper behavior, agency deliberations and predecisional documents are irrelevant and not required to be placed on a privilege log. *Id.* Essentially, Defendants argue that they should be the final arbiter of which documents are "deliberative" and need not be included in the record.

The Ninth Circuit has not squarely addressed this issue. *See In re United States* 875 F.3d at 1206. The growing consensus among district courts in the Ninth Circuit, however, is that "the 'whole record' includes deliberative materials that were 'directly or indirectly considered by agency decision-makers.'" *Ctr. for Biological Diversity v. Bernhardt*, 2020 WL 1130365, at *3 (D. Mont. Mar. 9,

2020) (quoting *Thompson*, 885 F.2d at 555).[5] As the court in *Ksanka Kupaqa*

*Xa'lcin v. United States Fish and Wildlife Service* stated:

> The administrative record broadly encompasses "all documents and
> materials directly or indirectly considered by agency decision-makers
> and includes evidence contrary to the agency's position." *Thompson v.*
> *U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989). This
> necessarily includes deliberative materials. Further, judicial review
> would be severely undermined if agencies could keep information
> from the court merely by classifying them as deliberative. Indeed,
> "[i]f the record is not complete, then the requirement that the agency
> decision be supported by 'the record' becomes almost meaningless."
> *Portland Audubon Soc'y*, 984 F.2d at 1548.

2020 WL 4193110, at *2 (D. Mont. Mar. 9, 2020).

Although deliberative documents considered by agency staff may be part of

the record, the agency may still assert the deliberative process privilege to prevent

these documents from being disclosed or becoming part of the record.[6] As the court

---

[5] *See also WildEarth Guardians v. Bernhardt*, 2020 WL 7388615, at *4 (C.D. Cal. Dec.
16, 2020); *Washington v. United States Dep't of Homeland Sec.*, 2020 WL 4667543, at *3 (E.D.
Wash. Apr. 17, 2020); *In re Clean Water Act Rulemaking.*, 2020 WL 6686370, at *2 (N.D. Cal.
Nov. 12, 2020). The only district court in the Ninth Circuit to consistently hold that deliberative
documents are not properly part of the administrative record appears to be the District of
Arizona. *Nat'l Tr. for Historic Pres. v. Bernhardt*, 2020 WL 5221647, at *4 (D. Ariz. Aug. 5,
2020). The court, in *Ctr. for Biological Diversity v. Zinke*, 2018 WL 8805325, at *4 (D. Alaska
Nov. 16, 2018), held that the agency was not required to provide intra-agency deliberative
documents, but that it was required to provide inter-agency deliberative documents.

[6] The deliberative process privilege "was developed to promote frank and independent
discussion among those responsible for making governmental decisions ... and also to protect
against premature disclosure of proposed agency policies or decisions." *F.T.C. v. Warner*
*Commc'ns, Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984).

thoughtfully explained in *Oceana, Inc. v. Ross*:

> There is a tension between the court's duty to consider whether the decision was based on a consideration of the relevant factors ... on the one hand, and a privilege that protects from disclosure deliberative documents reflecting the factors the agency considered in making its decision. There can be no doubt that under some circumstances, pre-decisional deliberative communications may go to the heart of the question of whether an agency action was arbitrary and capricious, an abuse of discretion or otherwise inconsistent with the law under Section 706(2) of the APA. Thus, the appropriate way to address these circumstances is through in camera review and a rigorous application of the balancing test set forth in [*F.T.C. v.*] *Warner* rather than rejecting the application of the privilege altogether in cases involving APA record review.

2020 WL 2128853, at *2 (N.D. Cal. May 5, 2020) (citations and quotations omitted).

The Court agrees with *Oceana, Inc.* that the correct way to address the tension between APA review and deliberative process privilege is for Defendants either to file a privilege log or submit allegedly privileged documents for in camera review. *Washington v. United States Dep't of State*, 2019 WL 1254876, at *3 (W.D. Wash. Mar. 19, 2019); *Mickelsen Farms, LLC v. Animal & Plant Health Inspection Serv.*, 2017 WL 2172436, at *4 (D. Idaho May 17, 2017). To the extent Defendants assert deliberative process privilege the Court will determine if the

documents are privileged using the test set out in *F.T.C. v. Warner Communications, Inc.*[7]

Turning to the Draft EA specifically at issue here. Defendants do not assert it is a privileged document or contains privileged information. Instead, they argue that it was not "before" or "considered by" the agencies in making their decision.[8] This simply does not square with reality. The document is a draft environmental assessment for the Brebner Flat Project dated less than a year before the final EA was issued, containing comments from agency staff. The Court does not understand how it could not have been "considered by" the agency staff in reaching their decision. This document certainly fits within the Ninth Circuit's broad definition of the "whole record." Further, because Defendants assumed that

---

[7] For the deliberative process privilege to apply, a document must meet two requirements. *F.T.C.*, 742 F.2d at 1161 (citations omitted). "First, the document must be predecisional—it must have been generated before the adoption of an agency's policy or decision." *Id*. "Second, the document must be deliberative in nature, containing opinions, recommendations, or advice about agency policies." *Id*. Finally, because the privilege is qualified, a court must consider four factors to determine if a plaintiff's "need for the materials and the need for accurate fact-finding override the government's interest in non-disclosure." *Id*. These factors include: "(1) the relevance of the evidence; (2) the availability of other evidence; (3) the government's role in the litigation; and (4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions." *Id.*

[8] Defendants disclosed this document to Plaintiffs through a FOIA request. Defendants could have asserted the deliberative process privilege in refusing to disclose this document, but chose not to.

deliberative documents were not part of the record, and excluded at least one deliberative document the presumption of completeness has been overcome. *Ctr. for Biological Diversity, 2020 WL 1130365, at \*3*. Therefore, the Court will grant Plaintiffs motion as to this document and require Defendants' to include it in the record. The Court will also require Defendants to produce a privilege log of deliberative documents withheld from the record.

## ORDER

**IT IS ORDERED that:**

1.      Plaintiffs' Motion for Judicial Notice, Completion of the Administrative Record, and/or Supplementation of the Administrative Record (Dkt. 38) is **GRANTED in part and DENIED in part** as described above.

2.      Defendants shall prepare and provide Plaintiffs with a privilege log within 30 days of this order.

2.      Plaintiffs' Supplemental Motion for Judicial Notice (Dkt. 47) is **DENIED**.

DATED: March 4, 2021

B. Lynn Winmill
U.S. District Court Judge

**MEMORANDUM DECISION AND ORDER - 25**