Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC
P.O. Box 7584
Missoula, MT 59807
(406) 531-8133 (tele)
(406) 830-3085 (fax)
publicdefense@gmail.com
Idaho Bar No. 8346

Attorney for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

## NORTHERN  DIVISION

---

FRIENDS OF THE CLEARWATER, et al.,

        Plaintiffs,

vs.

JEANNE HIGGINS, et al.

        Defendants, and,

STIMSON LUMBER COMPANY,

        Defendant-Intervenor.

Case No: 2:20-cv-243-BLW

BRIEF IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT

[DKT 61  ]

TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INDEX OF EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III. STATEMENT OF MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

IV.  SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

V.  STANDARDS OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

VI.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       A.     The Forest Service's refusal to prepare a Biological Assessment for the Project for grizzly bears violates the ESA.  To the extent the Fish and Wildlife Service's species list does not include grizzly bears, the species list also violates the ESA . . 4

       B.     The Forest Service has prepared a Biological Assessment for lynx for the Project, thereby providing Plaintiffs with the relief they requested and rendering Claim Two moot . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

       C.     The analysis of impacts to elk and elk habitat in the Project EA violate NEPA and fail to establish compliance with the Forest Plan, in violation of NFMA . . . . . . . 17

             1.     The Project EA fails to address cumulative effects to the declining elk population in the area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

             2.     The Project EA fails to honestly analyze the efficacy of elk security mitigation and fails to demonstrate compliance with the Forest Plan elk security provision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

       D.     The Forest Service's failure to address potential impacts on the St. Joe Wild and Scenic River in the Project EA violates NEPA, the APA, and the Wild and Scenic River Act regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

VII. REMEDY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

VIII. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

CERTIFICATE  OF  SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

TABLE OF AUTHORITIES

CASES

*California Communities Against Toxics v. EPA*, 688 F.3d 989 (9th Cir. 2012) . . . . . . . . . . . .  32

*All. for Wild Rockies v. Marten*, 2018 WL 2943251 (D. Mont. 2018) . . . . . . . . . . . . . . . . . .  32

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) . . . . . . . . . . . . . .  34, 35

*Alliance for the Wild Rockies v. USFS*, 907 F.3d 1105 (9th Cir. 2018) . . . . . . . . . . . . . . . .  1, 32

*Bark v. USFS*, 958 F.3d 865 (9th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22, 23

*Colorado Wild v. USFS*, 523 F.Supp.2d 1213 (D. Colo. 2007). . . . . . . . . . . . . . . . . . . . . . . . .  33

*Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4, 15, 17

*Cottonwood Environmental Law Ctr. v. U.S. Forest Serv.*,
   789 F.3d 1075 (9th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3, 6, 33, 34

*Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172 (9th Cir. 2008). . . . . . . . . . . . . . . . .  22

*Ctr. for Food Safety v. Vilsack*, 734 F.Supp.2d 948 (N.D. Cal. 2010) . . . . . . . . . . . . . . . . . . .  32

*Federal Election Commission v. Akins*, 524 U.S. 11 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

*Forest Guardians v. Johanns*, 450 F.3d 455 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . .  6, 17

*Foundation for North American Wild Sheep v. USDA*,
   681 F.2d 1172 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24, 25, 28, 29

*Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.*, 378 F.3d 1059 (9th Cir. 2004) . . . .  5

*Great Basin Resources Watch v. BLM*, 844 F.3d 1095 (9th Cir. 2016). . . . . . . . . . . . . . . . .  18, 22

*Idaho Conservation League v. Bennett*, 2005 WL 1041396 (D. Idh. 2005) . . . . . . . . . . . . .  18, 19

*Idaho Sporting Congress v. Rittenhouse*, 305 F.3d 957 (9th Cir. 2002) . . . . . . . . . . . . . . . .  34, 35

*Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . .  18

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989 (9th Cir. 2004) .  18, 22

*League of Wilderness Defs. v. Connaughton,* 752 F.3d 755 (9th Cir. 2014). . . . . . . . . .  33, 34, 35

*Lujan v. Defs. of Wildlife,* 504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

*Monsanto Company v. Geertson Seed Farms,* 561 U.S. 139 (2010). . . . . . . . . . . . . . . . . .  24, 32

*Motor Vehicle Mfrs. Association v. State Farm Mutual Auto. Insurance Company,*
   463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

*National Parks and Conservation Association v. Babbitt,* 241 F.3d 722 (9th Cir. 2001). . . . . .  24

*National Wildlife Federation v. NMFS,* 524 F.3d 917 (9th Cir. 2008) . . . . . . . . . . . . . . . .  24, 29

*Native Ecosystems Council v. Krueger,* 946 F.Supp.2d 1060 (D. Mont. 2013) . . . . . .  7, 8, 16, 29

*Native Ecosystems Council v. Marten,*
   - - - F.Supp.3d - - - -, 2020 WL 1479059 (D. Mont. 2020) . . . . . . . . . . . . . . . . . . . . . . . .  8, 29

*Native Ecosystems Council v. USFS,* 866 F.Supp.2d 1209 (D. Id. 2012) . . . . . . . . . . . . . . . . .  33

*Neighbors of Cuddy Mountain v. USFS,* 137 F.3d 1372 (9th Cir. 1998) . . . . . . . . . . . . . . passim

*Northwest Indian Cemetery Protective Assn. v. Peterson,* 764 F.2d 581 (9th Cir. 1985). . .  23, 25

*Southern Fork Band Council Of Western Shoshone Of Nevada v. U.S. Department of Interior,*
   588 F.3d 718 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23, 25, 29

*Sierra Club v. Bosworth,* 352 F.Supp.2d 909 (D. Minn. 2005). . . . . . . . . . . . . . . . . . . .  24, 28, 33

*Swan View Coalition v. Barbouletos,* 2008 WL 5682094 (D. Mont. 2008) . . . . . . . . . . . . . . .  17

*Te-Moak Tribe of Western Shoshone of Nevada v. U.S. Department of Interior,*
   608 F.3d 592 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

*Tennessee Valley Authority v. Hill,* 437 U.S. 153 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Thomas v. Peterson,* 753 F.2d 754 (9th Cir.1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6, 15, 16

STATUTES

5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1, 4, 31

16 U.S.C. § 1536 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

16 U.S.C. § 1540 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1, 3

16 U.S.C. §1531. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4, 5

16 U.S.C. §1604. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

REGULATIONS

36 C.F.R. § 297 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30, 31

40 C.F.R. § 1500.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

40 C.F.R. §1508.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

50 C.F.R. §402.12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

50 C.F.R. §402.13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

50 C.F.R. §402.14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

INDEX OF EXHIBITS

| Exhibit 1 | U.S. Fish & Wildlife Service, Bitterroot Grizzly Reintroduction EIS |
|-----------|---------------------------------------------------------------------|
| Exhibit 2 | U.S. Fish & Wildlife Service, Grizzly Bear Recovery Coordinator's Comments on St. Joe Highway Project |
| Exhibit 3 | "Grizzly Bear Moves from Kellogg to Kelly Creek Area," Bonner County Daily Bee (June 23, 2019) |
| Exhibit 4 | Idaho Fish and Game Hunting Regulations |

## I. INTRODUCTION

This is a civil action for judicial review under the Administrative Procedure Act and Endangered Species Act of the U.S. Forest Service's (Forest Service) October 3, 2019 Decision Notice approving the Brebner Flat (Project) on the Idaho Panhandle National Forest (Forest). Plaintiffs Friends of the Clearwater and Alliance for the Wild Rockies (Plaintiffs) attest that the final decision approving the Project is arbitrary and capricious, an abuse of discretion, and/or otherwise not in accordance with law.  Defendants' actions or omissions regarding the Project violate the Endangered Species Act (ESA), 16 U.S.C. §§ 1531 *et seq*., the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4331 *et seq*., the National Forest Management Act, 16 U.S.C. §§ 1600 *et seq*, the Wild and Scenic River Act, 16 U.S.C. §1278 (a), 36 C.F.R. §297.6, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq*.  Plaintiffs request that the Court either vacate the Project decision pursuant to 5 U.S.C. § 706(2)(A) and/or 16 U.S.C. § 1540, or enjoin implementation of the Project until the Forest Service has complied with the law.  *See, e.g., Alliance for the Wild Rockies v. USFS*, 907 F.3d 1105, 1121-22 (9th Cir. 2018)(presumption of vacatur applies in National Forest logging case).

## II. JURISDICTION

This action arises under the laws of the United States and involves the United States as a Defendant. Therefore, this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346.  Further, Plaintiffs have standing to bring this case because the interests of Plaintiffs and their members will be directly affected by the Project.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 563 (1992); Declaration of Jeff Juel, Dkt 7-2 ¶¶ 1-12 (June 1, 2020).

## III. STATEMENT OF MATERIAL FACTS

Pursuant to Local Rule 7.1 (b)(1) and this Court's May 14, 2021 Order (Dkt 60),

1

Plaintiffs are concurrently filing a separate 15-page statement of material facts.

## IV.  SUMMARY OF ARGUMENT

In this case, as set forth in detail below, the Forest Service violated the ESA by failing to prepare a Biological Assessment for the grizzly bear for the challenged logging project.  Each year brings additional verified reports of grizzly bears traveling through and even denning in the St. Joe Ranger District, within easy traveling distance of the Brebner Flat Project area, in an attempt to recolonize the Bitterroot Ecosystem.  The growing number of verified reports of grizzly bears in the St. Joe indicates that grizzly bears "may be present" in the Brebner Flat Project area at some point during the multiple years and seasons of Project implementation.  The "may be present" threshold does not require permanent occupancy or known presence; it only requires the possibility that a species may travel through an area at some point during an agency action.  Grizzly bears meet this low threshold.  To the extent there is any doubt regarding this inquiry, the law requires that the benefit of the doubt must weigh in favor of protecting the species.  Accordingly, the Forest Service's refusal to prepare a Biological Assessment for grizzly bears for the Project violates the ESA.

Regarding lynx, the Forest Service initially refused to prepare a Biological Assessment for lynx for the Project despite the fact that lynx are listed by the U.S. Fish & Wildlife Service on the "official species list" for the Project area.  It was not until after this Court issued an order finding that Plaintiffs were likely to succeed on the merits of this claim that the Forest Service prepared a Biological Assessment for lynx.  By preparing a Biological Assessment for lynx for the Project, the Forest Service has now provided Plaintiffs with the relief they sought for their lynx claim.  Therefore, Plaintiffs agree that their lynx claim (Claim Two) may be dismissed as moot.

Regarding elk, the Project Environmental Assessment (EA) does not include a discussion of the cumulative effects of the Project and past activities on the dramatically declining elk population in the area, even though this information was available to the agency and of significant interest to the public.  The Project EA also fails to provide a discussion of the efficacy of the proposed mitigation measure for elk security.  Regardless of whether the Forest Service is proposing a sign or a gate as its mitigation measure for elk security, both measures have alarmingly high failure rates, but the high failure rates were not disclosed or discussed in any meaningful way in the Project EA.  Both of these failures regarding elk violate NEPA. Additionally, because the proposed mitigation measure is not effective, the Project will reduce elk security.  Thus, the Project violates the Forest Plan and therefore violates NFMA.

Regarding the St. Joe Wild and Scenic River, the Project EA falsely represents that there is no portion of the St. Joe Wild and Scenic River Corridor within the Project area.  This false representation in the Project EA and the subsequent omission from the EA of any Section 7(a) evaluation under the Wild and Scenic Rivers Act violates the regulations implemented under that Act, and constitutes a failure to take a hard look under NEPA.

## V.  STANDARDS OF REVIEW

Two of Plaintiffs' claims were brought under the ESA.  16 U.S.C. §1540(g).  The Supreme Court holds that the value of an endangered species is "incalculable" and thus the preservation of endangered species takes "priority over the 'primary missions' of federal agencies."  *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 187 (1978).  Accordingly, reviewing courts must "afford[] endangered species the highest of priorities," and act with "institutionalized caution" when reviewing ESA cases.  *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015), *rehearing en banc denied* (Dec. 17, 2015),

*cert. denied* (Oct. 11, 2016).  In other words, courts must "give the benefit of the doubt to the species."  *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988).

Two of Plaintiffs' claims were brought under the APA.  Under the APA standard of review, a "reviewing court shall . . . hold unlawful and set aside" an agency decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law . . . ."  5 U.S.C. §706(2)(A),(D).  The Supreme Court holds that an agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## VI.  ARGUMENT

### A.  The Forest Service's refusal to prepare a Biological Assessment for the Project for grizzly bears violates the ESA.  To the extent the Fish and Wildlife Service's species list does not include grizzly bears, the species list also violates the ESA.

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). The ESA states that "various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation[.]" 16 U.S.C. §1531(a)(1).  The ESA further states that species that are endangered or threatened have "esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people[.]"  *Id*. at §1531(a)(3).  Thus, Congress passed the ESA to "provide a program for the conservation of . . . endangered species and threatened species" and to "provide a means whereby the ecosystems upon which endangered species and

4

threatened species depend may be conserved." 16 U.S.C. §1531(b).

To receive protection under the ESA, a species must first be listed by the Secretary of the Interior or Secretary of Commerce as "endangered" or "threatened" pursuant to ESA Section 4. 16 U.S.C. §§1533, 1532(15).  Once a species is listed, the ESA mandates that "all Federal departments and agencies shall seek to  conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of" the ESA. 16 U.S.C. §1531(c)(1). "Conservation" means the use of "all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary," i.e., the use of all measures necessary for species recovery. *See* 16 U.S.C. §1532(3). As the Ninth Circuit has summarized: "the ESA was enacted not merely to forestall the extinction of species (i.e., promote a species survival), but to allow a species to recover to the point where it may be delisted."  *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004), *amended on other grounds by* 387 F.3d 968 (9th Cir. 2004).

Accordingly, the Supreme Court holds that "[t]he plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, *whatever the cost*. . . .The [language] . . . reveals a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies."  *Hill*, 437 U.S. at 184-85.  The Supreme Court further holds:

> Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as "institutionalized caution." Our individual appraisal of the wisdom or unwisdom of a particular course consciously selected by the Congress is to be put aside in the process of interpreting a statute.

*Hill*, 437 U.S. at 194.

As a first step in meeting the recovery goals of the ESA, and consistent with the ESA's "institutionalized caution" mandate, the ESA requires:

> each Federal agency shall . . . request of the Secretary information whether any species which is listed or proposed to be listed may be present in the area of such proposed action. If the Secretary advises, based on the best scientific and commercial data available, that such species *may be present*, such agency *shall conduct a biological assessment* for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action.

16 U.S.C. § 1536 (c)(1)(emphases added).  In short, "[o]nce an agency is aware that an endangered species may be present in the area of its proposed action, the ESA requires it to prepare a biological assessment . . . ."  *Thomas v. Peterson*, 753 F.2d 754, 763 (9th Cir.1985), *overruled on other grounds as recognized by Cottonwood*, 789 F.3d at 1092.  "A failure to prepare a biological assessment for a project in an area in which it has been determined that an endangered species may be present cannot be considered a *de minimis* violation of the ESA." *Thomas*, 753 F.3d at 763-64.

The ESA regulations provide that in order to implement this section of the statute, the action agency, here the Forest Service, "shall convey" to the Fish and Wildlife Service either "a written request for a list of any listed . . . species . . . that may be present in the action area" or "a written notification of the species . . . that are being included in the biological assessment."  50 C.F.R. §402.12 (c).  If the Forest Service conveys its own species list to the Fish and Wildlife Service, the Fish and Wildlife Service "shall either concur with or revise the list . . . ." 50 C.F.R. §402.12 (d).  Thus, the Forest Service's first step in complying with the statutory Biological Assessment requirement is to obtain from the Fish and Wildlife Service "a list of any listed or proposed species or designated or proposed critical habitat that may be present in the action area."  50 C.F.R. § 402.12(c)-(d); *see also Forest Guardians v. Johanns*, 450 F.3d 455, 457 (9th Cir. 2006) (explaining the process - (1) receive species list, (2) prepare biological assessment, (3)

make effects determination).

The conclusions of the Fish and Wildlife Service in the species list are not given blind deference however.  A species list will violate the ESA, and thus have no legal effect, if it does not apply the "may be present" threshold properly "based on the best scientific and commercial data available . . . ."  16 U.S.C. § 1536 (c)(1).  The phrase  "may be present" is a term of art.  As explained in the formal agency rule adopting the ESA regulations:

> One of these commenters urged the Service to include only species actually known or believed to occur in the action area. . . . However, the Act requires the Service to provide a list of all listed or proposed species that "may be present" in the action area. Thus, migratory species that "may be present" at some point within the action area must be included in the species list.

51 Fed. Reg. 19926, 19946 (June 3, 1986).  Accordingly, the test for whether a Biological Assessment is required is not whether the species is "actually known or believed to occur" but rather whether a species "may be present" by traveling through the area "at some point" during the action.  *Id.*  Consistent with the ESA's "institutionalized caution" mandate, *see Hill*, 437 U.S. at 194, this test is a low bar.

As further explained by the District of Montana,  "the 'may be present' standard does not require actual occurrence" because such a requirement would "conflict with the statutory language" and "create[] a metric more stringent than, and contrary to, what the ESA dictates." *Native Ecosystems Council v. Krueger*, 946 F.Supp.2d 1060, 1074 (D. Mont. 2013).  Thus, a species list that only lists species "actually known or believed to occur" must be remanded for the application of the proper definition of "may be present."  *Id*. at 1074.  In *Krueger*, the District of Montana remanded a species list to the Fish and Wildlife Service because the species list did not apply the "may be present" threshold in a lawful manner, and the court held that "the Project must be enjoined until the Wildlife Service reconsiders its listing determination in accordance

7

with this opinion." *Id.*

Once the low "may be present" threshold is reached, the Forest Service "shall" prepare a Biological Assessment. 16 U.S.C. § 1536 (c)(1). The Biological Assessment itself must reach one of the following conclusions regarding a project's effects: (1) no effect, (2) may affect but not likely to adversely affect, or (3) may affect and likely to adversely affect. *See Native Ecosystems Council v. Marten*, - - - F.Supp.3d - - - -, 2020 WL 1479059, at *6 (D. Mont. 2020). Thus, "a no effect determination does not obviate the need for a BA, as the BA is the mechanism by which an agency concludes that its proposed action will have 'no effect,' 'may affect,' or 'is likely to adversely affect' a listed or proposed species.'" *Id.* A "may affect but not likely to adversely affect" conclusion in a Biological Assessment requires "informal" consultation with the Fish and Wildlife Service in the form of a "Letter of Concurrence." 50 C.F.R. §402.13 (c). A "may affect and likely to adversely affect"conclusion in a Biological Assessment requires "formal" consultation with the Fish and Wildlife Service in the form of a "Biological Opinion." 50 C.F.R. §402.14 (b)(1), (h).

As discussed in Plaintiffs' Statement of Material Facts, the Grizzly Bear Recovery Plan recognizes seven distinct ecosystems that still provide either remnant populations or sufficient habitat for grizzly bears: Greater Yellowstone, Northern Continental Divide, Cabinet-Yaak, Selkirk, North Cascades, Bitterroot, and San Juan Ecosystems. USFS AR:008213. The Bitterroot Ecosystem is centered in the Selway-Bitterroot Wilderness Area in Montana and Idaho, and includes National Forest lands surrounding this Wilderness Area and the Frank Church - River of No Return Wilderness Area on both sides of the Salmon River. USFS AR:008214.

When the 1993 Grizzly Bear Recovery Plan was published, the Fish and Wildlife Service

8

found: "It is unclear at this point as to whether grizzly bears in this area are permanent residents. However, the study confirms that the Bitterroot evaluation area contains sufficient amounts of quality habitat to warrant grizzly bear recovery []." USFS AR:008214. The Grizzly Bear Recovery Plan states:

> One objective of the recovery plan is to identify specific management measures needed to remove population and habitat limiting factors so that populations will increase and sustain themselves at levels identified as the recovery goals. One factor that may affect the sustainability of grizzly bear populations in the future is the ability of individual animals to move between ecosystems. Accurate information is necessary to assess the potential for this type of movement in linkage zones between existing adjacent grizzly bear recovery zones.

USFS AR:008228. The Grizzly Bear Recovery Plan further states:

> In order to adequately assess the capacity for linkage, the Service initiated a 5-year process to assess the linkage potential between the various ecosystems. This process will be led by the US. Fish and Wildlife Service. . . . At the completion of the 5-year evaluation effort, a report will be available to the IGBC on the potential for linkage between existing ecosystems . This report will be the basis for future actions regarding the linkage zone question.

USFS AR:008228-29.

The Grizzly Bear Recovery Plan includes a map of potential linkage zones between Recovery Zones, and the St. Joe area falls within one of these potential linkage zones (indicated with an arrow):



Figure 3.  Proposed linkage zone assessment areas and distances between existing ecosystems.

USFS AR:008229.  Subsequently, the Fish and Wildlife Service published a 1996 Supplement to

the Grizzly Bear Recovery Plan to address the Bitterroot Ecosystem (Bitterroot Supplement).

USFS AR:010697-010724.  The Bitterroot Supplement explains that the Bitterroot Ecosystem

"formerly contained grizzly bears" and "[t]he demise of the grizzly from the [Bitterroot

Ecosystem] was due to the actions of humans." USFS AR:010698.

Several years after the Bitterroot Supplement was issued, the Fish and Wildlife Service

issued a Record of Decision and final rule authorizing the reintroduction of grizzly bears into the

Bitterroot.  65 Fed. Reg. 69624-26, 2000 WL 1711586 (November 17, 2000).  However, the

agency never took action to implement that decision.  *See* 66 Fed. Reg. 33620, 2001 WL 697605

(June 22, 2001)(proposing to reevaluate its decision and select the "no action" alternative from

the reintroduction EIS).   In the 2000 Bitterroot grizzly reintroduction rule, the Fish and Wildlife

Service found that "[t]he reestablishment of a grizzly bear population in the Bitterroot ecosystem

will increase the survival probabilities and further the conservation of the species in the lower 48

States."  *Id.* at 69625.  The Bitterroot grizzly reintroduction analysis designated a "Bitterroot

Experimental Population Area," which encompasses the Brebner Flat Project area:



Exhibit 1 at xvii; *see also* 65 Fed. Reg at 69642.

The Bitterroot grizzly reintroduction EIS states: "[f]or grizzly bears to naturally repopulate the [Bitterroot Ecosystem] they must gradually extend their range south . . . . If this occurred, grizzly bears would also inhabit the area between the two ecosystems as a result of their southern range extension."  Exhibit 1 at 2-49 - 2-50.  The EIS finds that "land-use activities (including timber harvest) could be altered solely for grizzly bears if grizzly presence was documented . . . and research indicates that . . . linkage zone restrictions are necessary to promote grizzly bear recolonization."  The EIS further finds: "If grizzly bears recolonize, it is estimated that reductions in timber harvest on affected currently roaded national forest lands would be between 8.3 and 39.7 million board feet per year over the next decade."  Exhibit 1 at xxxi.

Similar to the Grizzly Bear Recovery Plan, the Bitterroot grizzly reintroduction EIS also states that "[a]n analysis of linkage zones for habitat suitability and potential impediments to bear movement is being conducted by the USFWS . . . . This analysis will determine if linkage zones among grizzly bear ecosystems could occur and where those zones might exist."   Exhibit 1 at 2-46.  The "analysis of linkage zones for habitat suitability" referenced in the Bitterroot grizzly reintroduction EIS, Exhibit 1 at 2-46, and Grizzly Bear Recovery Plan, USFS AR:008228-29, was completed by in 2001, and is entitled "Identification and management of linkage zones for grizzly bears between the large blocks of public land in the Northern Rocky Mountains,"  but this document was not included in the agencies' record, and the Court has declined to take judicial notice of this document.  Dkt 53 at 13.  Thus, it will not be discussed here.

Although the Fish & Wildlife Service never followed through with its grizzly reintroduction plan for the Bitterroot Ecosystem, grizzly bears have slowly started attempts to naturally recolonize this area. The first known grizzly attempting to immigrate into the Bitterroot

Ecosystem was a grizzly that traveled south from the Selkirk Ecosystem, which is north of the

Project area, but was killed near Kelly Creek, Idaho, which is south of the Project area.  Exhibit 2

at 5-6.  In comments on a 2008 highway project, the Fish & Wildlife Service Grizzly Bear

Recovery Coordinator states:

> In contrast to what is stated in the EA on p. 62, grizzly bears are expected to
> inhabit the Little Joe Project area. . . . While we have no exact route for the
> movement of this bear because it was unmarked, a straight line between the
> Selkirk Mountain origin of this bear and the location where it died in Kelly Creek
> passes directly through the Little Joe Project area.

Exhibit 2 at 5-6.

On June 23, 2019, the Bonner County Daily Bee published an article entitled "Grizzly

Bear Moves from Kellogg to Kelly Creek Area" that detailed more recent evidence of grizzly

bears in the St. Joe:

> A grizzly that denned northeast of Clark Fork near Montana's Spar Lake has
> turned up in the Kelly Creek drainage in Idaho's Clearwater forest.
>
> According to the Fish and Wildlife Service, the 2-year-old collared male bear that
> was observed in the Cabinet Mountains near Spar Lake in 2018 moved south
> across the Clark Fork River, where it spent the summer before returning to den in
> the Cabinets last winter.
>
> The bear emerged in March, crossed the Clark Fork River in April and was
> located 40 miles southeast of Kellogg 10 days ago before making its way to the
> Kelly Creek drainage.
>
> The bear was spotted by a black bear hunter in Unit 10, where the black bear
> hunting season is currently open.
>
> Kelly Creek is a drainage of the North Fork of the Clearwater River, which flows
> into Dworshak Reservoir north of Orofino.
>
> The *bear moved from the St. Joe area south of Kellogg to Kelly Creek in three
> days*, according to USFWS data.
>
> Idaho Fish and Game, which manages the black bear hunting season in the state,
> is asking hunters throughout north and north central Idaho to make sure they can
> identify grizzly bears, and to be aware of the increased frequency of grizzlies.

"Black bear hunters in north-central Idaho, specifically those who are hunting in Unit 10 and 12, are asked to use increased vigilance after a radio-collared grizzly bear was spotted (there) by a hunter," according to a USFWS press release.

Unit 10 and 12 are not an area where hunters would normally expect to encounter a grizzly bear, although grizzlies have been encountered there in the past.  In 2007, a hunter killed a grizzly he thought was a black bear while hunting near Kelly Creek, according to USFWS.

"We want to make sure that hunters in the area be extra-vigilant and careful while afield, both in identifying their targets and while traveling to their hunting spot, because we do have at least one known grizzly bear in there," said Jon Rachael, state game manager for Fish and Game.

Exhibit 3 at 1-2 (emphasis added)

The grizzly bear discussed in the Bonner County Daily Bee article quoted above is radio-collared grizzly bear 927 ("Bear 927").  USFS AR:000353.  In its travels through the St. Joe area, Bear 927 was tracked traveling within one mile of the eastern boundary of EMU 7-6, and approximately 13 miles east of the eastern boundary of the Project area:



USFS AR:000353 (Plaintiffs have superimposed the approximate boundary of EMU 7-6 on this photo; red circles on the right show radio-collared grizzly locations).

13

Additionally, in October 2019, Idaho Fish and Game provided information to the Forest Service regarding a den with confirmed grizzly DNA in the St. Joe, which was incidentally observed in the area during an aerial mountain goat survey in 2017:

> Near Blackdome Peak, St. Joe National Forest. Drive road 301 from Avery to road 457. Park in turnout at saddle before peak. Den is on west aspect near the top of the ridge in boulder field among large (i.e. >5ft diameter boulders). There were two main caves beneath the rocks with hair, scat etc. It looked like there were remains of several birds, snowshoe hairs, ground squirrels etc as well as a few ungulate hairs. I collected 20 envelopes full of hair and scat (sample names: Den2017_1 – Den2017_20). Coordinates: 46.98791, -115.82269 Elevation: 6308 ft.

USFS AR:014798.  The Idaho Fish and Game email further states: "We submitted 11 scat samples and 6 hair samples to Wildlife Genetics International (WGI) for species testing and the results are as follows: 7 samples: Red Fox [,] *1 (scat) sample: Grizzly Bear*[,] 9 samples: Failed." USFS AR:014798 (emphasis added).

Grizzly bears are a wide-ranging species: "Movements of grizzly bears may exceed 60 airline miles and their home ranges can encompass up to 1,000-1,500 [square miles]." USFS AR:008225.  Grizzly bears can also travel at speeds up to 45 miles per hour.  USFS AR:008204. As noted above, Bear 927 moved from the St. Joe area south of Kellogg, Idaho to Kelly Creek, Idaho – a distance of approximately 80 miles –  in just three days, according to the Fish and Wildlife Service.  Exhibit 3 at 2.

The den with grizzly bear DNA on Blackdome Peak is approximately 12 miles south of the Project area, and if the grizzly came from Northern Idaho it could  have traveled directly through the Brebner Flat Project area.  Moreover, a grizzly bear denning 12 miles south of the Project area could be including the Brebner Flat Project area as part of its home range.  *See* USFS AR:008225.   Consistent with these possibilities, and consistent with the ESA's institutionalized caution mandate, *Hill*, 437 U.S. at 194, Idaho's 2020 hunting regulations now state: "Grizzly

14

bears *may be found* in 3 areas of Idaho [including] The Panhandle in big game units 1, 2, 3, 4, 4A, 6, 7 and 9 . . . ."  Exhibit 4 at 7 (emphasis added).  The Brebner Flat Project falls within Zone 7.  USFS AR:015022 (map).  Thus, according to Idaho's wildlife management agency, grizzly bears "may be found" in the Brebner Flat Project area.  Exhibit 4 at 7.

In an appendix in the Project Wildlife Report, even the Forest Service concedes that "the potential for grizzly bear occurrence on the St. Joe Ranger District and in the project area cannot be totally dismissed . . . ."  USFS AR:014831.  The Forest Service further concedes that there is a "possibility of transient individuals," i.e. traveling grizzly bears, in the area.  USFS AR:014831.  Finally, in light of verified records or reports of grizzly bears on the St. Joe, including grizzly DNA from scat found in a den, USFS AR:014798, and radio-collar locations, USFS AR:014798, the Forest Service's stale representation that "there are no verified records or reports of grizzly bears on the St. Joe," USFS AR:014831, is demonstrably false.  This representation, and the fact that the Forest Service Wildlife Report does not use any evidence more recent than 2010,[1] USFS AR:014830-31, establish that the Forest Service did not issue a determination "based on the best scientific and commercial data available" for this Project, as required by the ESA, 16 U.S.C. § 1536 (c)(1), *Conner*, 848 F.2d at 1454 (agency "cannot ignore available biological information").

As discussed above, because of the "institutionalized caution" mandate that protects ESA-listed species, *Hill*, 437 U.S. at 194, the possibility that a grizzly "may be present" in the area is all that is required under the law in order to mandate preparation of a Biological Assessment, 16 U.S.C. § 1536(c)(1), *Thomas*, 753 F. 2d at 763.  The "may be present" threshold for preparation of a Biological Assessment does not require permanent occupancy, known

---

[1]The Wildlife Report cites three references:  USFWS (2000), USFWS (1996), and Servheen and Shoemaker (2010).  USFS AR:014830-31.

occurrence, or even believed occurrence, but instead includes migratory or transient individuals that may travel through the area "at some point . . . ." 51 Fed. Reg at 19946.

The case most similar to the instant case is *Krueger*.  In *Krueger*, the District of Montana addressed the "may be present" standard as applied to traveling grizzly bears in Montana and found that a Biological Assessment was required::

> no grizzlies have been sighted in the Project area itself. . . . [however] it is not necessary that grizzly bears occupy an area . . . . Grizzly bears "may be present" if "transitory bears [ ] might move through the project area." [].  The Project area has "fairly good connectivity" with areas with known grizzly bear activity, [], and implicit in the Wildlife Report's and Environmental Assessment's discussion . . . is the possibility that grizzly bears, which are known to occur nearby and are a wide-ranging species, might travel through the Project area. . . . . the first question in the section 7 analysis—whether grizzly bears may be present in the action area—must have been answered in the affirmative . . . .

*Krueger*, 946 F.Supp.2d at 1077.

The same result is required in this case.  Just as in *Krueger*, as discussed above, here too grizzly bears are wide-ranging, and their presence has been confirmed in nearby areas within easy traveling distance and with good connectivity to the Project area.  *See id.*  Moreover, here the relevant state wildlife management agency finds that grizzly bears "may be found" in Unit 7, which encompasses the Project area.  Exhibit 4 at 7.  Furthermore, even the Forest Service concedes that "the potential for grizzly bear occurrence on the St. Joe Ranger District and in the project area cannot be totally dismissed," and it expressly acknowledges that there is a "possibility of transient individuals" in the area.  USFS AR:014831.  These circumstances satisfy the very low "may be present" threshold; therefore, a Biological Assessment must be prepared. 16 U.S.C. § 1536 (c)(1); *Thomas*, 753 F.2d at 763.

Finally, if there is any doubt regarding this claim, "institutionalized caution" must be applied, and the Court must "give the benefit of the doubt to the species" by ordering preparation

of a Biological Assessment.  *Conner*, 848 F.2d at 1454; *see also Swan View Coal. v. Barbouletos*, 2008 WL 5682094, at *15 (D. Mont. 2008)("Defendants fail to explain why any ambiguity should be resolved to the detriment of grizzly bears . . . . The ESA requires that protected species be given 'the benefit of the doubt' in management decisions.")

**B.      The Forest Service has prepared a Biological Assessment for lynx for the Project, thereby providing Plaintiffs with the relief they requested and rendering Claim Two moot.**

On July 13, 2020, this Court held that Plaintiffs were likely to succeed on the merits of Claim Two because the Forest Service did not prepare a Biological Assessment for lynx for the Brebner Flat Project.  Dkt 28 at 21.  In response, on September 3, 2020, the Forest Service provided the Fish and Wildlife Service with a Biological Assessment for lynx for the Project. USFS AR:018000.

Now that the Forest Service has complied with the statutorily-mandated ESA Section 7 procedure by (1) preparing a Biological Assessment for lynx based on the "may be present" inquiry, and (2) using the Biological Assessment to make its "no effect" determination for lynx, Plaintiffs' request for a Biological Assessment for lynx is moot.  Accordingly, Claim Two may be dismissed as moot.  *See Forest Guardians v. Johanns*, 450 F.3d 455, 462 (9th Cir. 2006).

**C.      The analysis of impacts to elk and elk habitat in the Project EA violate NEPA and fail to establish compliance with the Forest Plan, in violation of NFMA.**

As set forth below, the Forest Service's failure to take a hard look at cumulative effects on the declining elk population in the area, and failure to take a hard and honest look at the efficacy of the proposed mitigation measure for elk security, violate NEPA and require a full EIS. In addition, the proposed mitigation measure – likely only a posted sign, but perhaps a gate – will fail to effectively prevent motorized use on Road 1956E; therefore, the Project will cause a net loss in elk security in violation of the Forest Plan and NFMA.

1.    **The Project EA fails to address cumulative effects to the declining elk population in the area.**

Cumulative effects are defined in NEPA's implementing regulations as follows:

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. §1508.7.  NEPA requires that where "several actions have a cumulative . . . environmental effect, this consequence must be considered in an EIS."  *Neighbors of Cuddy Mountain v. USFS*, 137 F.3d 1372, 1378 (9th Cir. 1998) (citation omitted).

"In a cumulative impact analysis, an agency must take a 'hard look' at all actions that may combine with the action under consideration to affect the environment."  *Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1104 (9th Cir. 2016) (citation and quotation mark omitted). "[S]imply listing all relevant actions is not sufficient."  *Id.*   Instead, "some quantified or detailed information is required. Without such information, neither the courts nor the public, in reviewing the Forest Service's decisions, can be assured that the Forest Service provided the hard look that it is required to provide."  *Neighbors*, 137 F.3d at 1379.

The cumulative effects analysis must be in the NEPA document – here the EA.  *See, e.g., Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1078 (9th Cir. 2002)("At a minimum, the BLM is required to provide such an analysis in the EA"); *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 994 (9th Cir. 2004)("Although each of the EAs contains a section of more than a dozen pages under the heading 'Cumulative Effects,' a close read reveals that those sections do not adequately discuss the subject."); *see also Idaho Conservation League v. Bennett*, 2005 WL 1041396, at *5 (D. Id. 2005).

The Ninth Circuit holds that Plaintiffs need not prove cumulative effects will occur in

order to prevail on a cumulative effects claim:

> In order for Plaintiffs to demonstrate that the [agency] failed to conduct a sufficient cumulative impact analysis, they need not show what cumulative impacts would occur.  To hold otherwise would require the public, rather than the agency, to ascertain the cumulative effects of a proposed action. [].  Such a requirement would thwart one of the twin aims of NEPA- to  ensure that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process. []  Instead, we conclude that Plaintiffs must show only the potential for cumulative impact.

*Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 608 F.3d 592, 605 (9th Cir. 2010)(internal quotation marks and citations omitted).

In this case, Plaintiffs meet their burden to "show only the potential for cumulative impact."  *See id.*  As set forth below, there is a potential for cumulative effects on the local elk population, and the Forest Service has failed to conduct an adequate cumulative effects analysis of this issue.  First, according to the Idaho Elk Management Plan, the elk population in Unit 7 – which encompasses the Project area – has "declined dramatically" since 2006.  USFS AR:015023.  More specifically, "[t]he 2012 survey showed about one third as many elk as estimated in 2006."  USFS AR:015023.  Idaho's Elk Management Plan lists the elk population's current status as "decreasing."  USFS AR:015024.

Additionally, the private lands surrounding the Project area have been heavily clearcut in recent times, and the Project will allow 1,719 acres of further clearcutting of some of the last best forested buffers for elk.  USFS AR:000005; USFS AR:000076.  One local resident explained:

> Our family has been hunting and camping in the Kelly Creek/Siwash Peak area for over 50 years. . . . We are probably more familiar with that drainage than anyone in the region and have seen all of the changes that have taken place over this time and how these changes have altered elk behavior. . . .  It once was a beautiful area with a thriving elk population. These trails have all been destroyed by clear cut logging as have all the major game trails which were landmarks unto themselves. . . .  If the logging you propose was in an area where recent logging had not been so drastic it would be acceptable, however it comes on the back end of very significant clearcutting of private and Forest Service land in the area and in fact,

what you are proposing, is basically logging the only areas that haven't already
been taken.

USFS AR:000313; *see also* USFS AR:000347-348 (another local resident stating "I strongly

disagree with USFS putting new over 40-acre clear cuts and eliminating the elk security areas. . .

.  The elk are not flourishing . . . .").

The public comments include a map to show proposed Project logging and recent

clearcutting in the area:



USFS AR:000314. The explanation of the map states:

> The majority of the logging in red was in the form of clearcuts which completely
> eliminated the forested area. . . .The elk have been forced to take refuge in the
> forested areas that border these clearcuts. To now come in and log 1,948 acres of
> these borders and add 17 more clearcuts will all but eliminate the timber areas
> available in the area. Your proposal suggests leaving buffer areas for elk habitat,
> but what you are doing is taking away the only buffer areas that currently exist.
> Any supposed buffers remaining will be either stream areas or extremely narrow
> patches, certainly not sufficient to provide cover.

USFS AR:000314.

The best available science supports the sentiment expressed in these public comments

that this Project area lacks sufficient elk security.  The best available science on elk habitat

requires at least 30% of an elk unit to provide "elk security" habitat: "To provide a reasonable

level of bull survival, each security area must be a nonlinear block of hiding cover $\geq$ 250 acres in

size and $\geq$ one-half mile from any open road.  Collectively, these blocks must equal at least 30%

of the analysis unit."  USFS AR:021836; *see also* USFS AR:011595.  Currently, however, the elk

management unit encompassing the Project area – EMU 7-6 – provides only 5% elk security.

*See* USFS AR:000077 (existing condition 2,313 acres of security); USFS AR:014821 (EMU 7-6

is 47,311 acres).  Neither the 30% scientific threshold, nor the 5% existing condition, was

disclosed by the Forest Service to the public in the Project EA.

Moreover, the Project will cause a "reduction in elk security (210 acres) . . . due to

activities associated with timber harvest such as the construction of roads, tree plantings, gopher

control, and fuels treatments in the project area."  USFS AR:000077.  A reduction of 210 acres of

security results in 2,103 acres of elk security, which is 4% of EMU 7-6.  *See* USFS AR:000077;

USFS AR:014821.

Local residents who have hunted this area for decades shared their detailed first-hand

observations of how logging has harmed the elk population over time in this area, and how the

Project is likely to cause further cumulative harm in the area.  USFS AR:000314; USFS

AR:000347-348   Nonetheless, the cumulative effects discussion in the Project EA consists of

three vague sentences:

Cumulative Effects of the Proposed Action

There are no current timber sales within the Brebner Flat project area but there are
foreseeable private land timber harvest activities in the project area that would
occur. In our elk security calculations, all private lands are considered "not secure;"
therefore, any additional harvest in those areas would not change (decrease) the
amount of elk security since we already accounted for the lack of security habitat.
There are no other activities ongoing or planned in the project area that would add

cumulatively and substantially to the proposed action.

USFS AR:000077.

As the Ninth Circuit has recently stated, "[t]hese are the kind of conclusory statements, based on 'vague and uncertain analysis,' that are insufficient to satisfy NEPA's requirements." *Bark v. USFS*, 958 F.3d 865, 872 (9th Cir. 2020). "We have held that cumulative impact analyses were insufficient when they 'discusse[d] only the direct effects of the project at issue on [a small area]' and merely 'contemplated' other projects but had 'no quantified assessment' of their combined impacts." *Id.* (*citing Klamath-Siskiyou*, 387 F.3d at 994).

More specifically, these three sentences fail to provide the public with the available, detailed, and quantified information regarding (a) the dramatically declining elk population in this area, (b) the 30% elk security threshold set by the best available science, (c) the fact that the Project area currently has only 5% security, and (d) the full extent of recent clearcutting on private lands in EMU 7-6 and the fact that the Project will remove most of the remaining forested buffers. The failure to disclose and discuss this basic and available information – that is both of significant public interest and necessary to make an informed decision – violates the Forest Service's legal obligation to take a "hard look" at the cumulative effects of this Project under NEPA. *Great Basin*, 844 F.3d at 1104.

The Forest Service's refusal to disclose these basic facts to the public in the Project EA frustrates the general public's ability to be fully and fairly informed regarding the Project's cumulative effects, which is one of NEPA's fundamental purposes: "the EA [must] foster both informed decision-making and informed public participation." *Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1194 (9th Cir. 2008)(internal alterations omitted); *see also* 40 C.F.R. § 1500.1 ("NEPA procedures must insure that environmental information is available to public . . .

citizens before decisions are made and before actions are taken. The information must be of high

quality. . . . public scrutiny [is] essential to implementing NEPA.")

"Overall, there is nothing in the EA that could constitute 'quantified or detailed

information' about the cumulative effects of the Project" on the declining elk population in this

area. *See Bark*, 958 F.3d at 873.  Thus, the failure of the Project EA to address the cumulative

effects of the Project on the dramatically declining elk population in the area violates NEPA.

**2.    The Project EA fails to honestly analyze the efficacy of elk security
mitigation and fails to demonstrate compliance with the Forest Plan elk
security provision.**

In addition to its failure to adequately disclose and take a hard look at cumulative effects,

the Project EA also fails to address the efficacy of the proposed mitigation measure:  posting a

sign, or perhaps a gate, on Road 1956 E to "create" new elk security to mitigate for the loss of elk

security from Project logging and road-building.  USFS AR:020029, 76; USFS AR:000061, 77.

The Ninth Circuit holds that NEPA requires agencies to "analyze the mitigation measures in

detail [and] explain how effective the measures would be.  A mere listing of mitigation measures

is insufficient to qualify as the reasoned discussion required by NEPA."  *Northwest Indian*

*Cemetery Protective Assn. v. Peterson*, 764 F.2d 581 (9th Cir. 1985).  The Ninth Circuit also

holds: "An essential component of a reasonably complete mitigation discussion is an assessment

of whether the proposed mitigation measures can be effective. . . . The Supreme Court has

required a mitigation discussion precisely for the purpose of evaluating whether anticipated

environmental impacts can be avoided. . . . A mitigation discussion without at least some

evaluation of effectiveness is useless in making that determination."  *S. Fork Band Council Of W.*

*Shoshone Of Nevada v. U.S. Dep't of Interior*, 588 F.3d 718, 727 (9th Cir. 2009).

Thus, "[t]he Forest Service's perfunctory description of mitigating measures is

inconsistent with the 'hard look' it is required to render under NEPA. Mitigation must be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated." *Neighbors of Cuddy Mountain*, 137 F.3d at 1380 (citations & quotation marks omitted). The analysis of the effectiveness of mitigation measures must be supported by analytical data. *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 733-34 (9th Cir. 2001)(*overruled on other grounds by Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010). Furthermore, if "agencies lack the power to guarantee the improvements in question. . . . the proper course is to exclude them from the analysis and consider only those actions that are in fact under agency control or otherwise reasonably certain to occur." *Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917, 936 (9th Cir. 2008).

If the effectiveness of a mitigation measure – such as a road closure – is not assured, then the Forest Service cannot issue a Decision Notice & Finding of No Significant Impact, and instead must prepare an EIS. *See, e.g., Foundation for North American Wild Sheep v. USDA*, 681 F.2d 1172, 1178 (9th Cir. 1982)(finding that the Forest Service had failed to establish that a road closure was an effective mitigation method and therefore requiring a full EIS); *Sierra Club v. Bosworth*, 352 F.Supp.2d 909, 924-25 (D. Minn. 2005)(noting "the questionable efficacy of road closures through use of berms and gates, and the Forest Service's concession that such illegal uses have and do occur . . . . The analysis of this factor favors the necessity of preparing an EIS.")

In this case, the Forest Plan Forest-wide Guideline WL-13 for elk mandates: "Management activities in elk management units should *maintain existing levels of elk security* (see glossary)." USFS AR:003240 (emphasis added). The Forest Service concedes that "[t]he proposed harvest may reduce vegetation to the extent that elk habitat security is decreased, which

would not be consistent with the Forest Plan guideline to maintain existing levels of elk security. . . ."  USFS AR:020029.  More specifically, the Project will cause a "reduction in elk security (210 acres) . . .  due to activities associated with timber harvest such as the construction of roads, tree plantings, gopher control, and fuels treatments in the project area."  USFS AR:000077.  A reduction of 210 acres of security results in 2,103 acres of elk security, which is 4% of EMU 7-6. *See* USFS AR:000077; USFS AR:014821.

Accordingly, in order to comply with the Forest Plan prohibition against reducing elk security, the Forest Service proposes a measure to mitigate the otherwise significant impact of this Project:  it proposes to "create" new elk security by posting a sign that states that a portion of a road is closed:  "[t]he trail would be signed during the seasonal restriction."  USFS AR:000061. The EA simply assumes that this mitigation measure will be effective, and based on this assumption, represents that the Project will not violate the Forest Plan.  USFS AR:000077. However, there is no discussion in the EA regarding the efficacy of posting a sign to prevent motorized use on a road.  This failure to discuss the efficacy of the proposed mitigation measure in the EA violates NEPA.  *See, e.g., S. Fork*, 588 F.3d at 727; *Northwest Indian*, 764 F.2d 581.

Moreover, the record does not support the assumption that this mitigation measure will be effective.  Instead, it is well-established that "[r]oads closed to public use through the use of only signs or gates are often *not* effective (Zager and Jonkel 1983)."  USFS AR:008356 (emphasis added).   Therefore, this Project violates the Forest Plan and an EIS is required to address the significant impact of the Project.  *See e.g. Foundation for North American Wild Sheep*, 681 F.2d at 1178 (finding that Forest Service had failed to establish that a road closure was an effective mitigation method and requiring a full EIS).

Furthermore, although the final EA removes any reference to installing a gate on Road

1956E and instead requires only that "[t]he trail would be signed during the seasonal

restriction,"[2] USFS AR:000061, both the draft EA and the Wildlife Report (which was issued

seven months before the final EA) state that a gate would be installed as the mitigation measure,

USFS AR:020076, USFS AR:014821.  However, even if the Forest Service did install a gate on

Road 1956E, the Project EA representation that "[e]xcept for isolated instances, gates are secure

on the District," is demonstrably false.  USFS AR:000077.  Buried in the project record there is a

spreadsheet documenting the only Forest Service survey of gate effectiveness in EMU 7-6; the

agency's own survey finds a 75% failure rate for gates in EMU 7-6.  USFS AR:011601 - 011603.

 The table below summarizes the gate survey in EMU 7-6:

|  | Road # | Forest Service Finding | Rationale |
|---|---|---|---|
| Gate #1 | 288 | *Not Effective* | No lock |
| Gate #2 | 433 | *Not Effective* | No lock & ATV tracks circumvent gate |
| Gate #3 | 1229 | *Not Effective* | ATV tracks circumvent gate |
| Gate #4 | 1234 | *Not Effective* | ATV tracks circumvent gate |
| Gate #5 | 1235 | *Not Effective* | ATV tracks circumvent gate |
| Gate #6 | 1241 | *Not Effective* | Possible ATV and dirtbike tracks over rock and around gate |
| Gate #7 | 1250 | Effective | 6-10 feet tall alder trees prevent motorized access |
| Gate #8 | 1251 | *Not Effective* | ATV tracks circumvent gate on both sides |
| Gate #9 | 1464 | *Not Effective* | Gate is broken and bent and has no lock |
| Gate #10 | 1467 | Effective | No access |

[2]The final Project EA also includes Appendix B, which clarifies road treatments. Although several other roads – Roads 3468UB, 1236UB, 1234, 1235, 1236, 1239, 1251A, 3465, 3468, 3467, 3464, 3656, 3657, and 3620 – will be closed with a gate, Road 1956E is not listed as a road that will be closed with a gate.  USFS AR:000092-95.

| Gate #11 | 1477 | *Not Effective* | Gate is broken and has no lock |
|----------|------|-----------------|--------------------------------|
| Gate #12 | 1478 | Effective | No access |
| Gate #13 | 1483 | *Not Effective* | Motor bike could circumvent gate |
| Gate #14 | 1488 | *Not Effective* | No lock; bike tracks possibly going around gate |
| Gate #15 | 3469 | *Not Effective* | Possibly accessible to a motor bike |
| Gate #16 | 3656 | Effective | No access |
| Gate #17 | 3661 | Effective | No access |
| Gate #18 | 3662 | Effective | No access |
| Gate #19 | 3759 | *Not Effective* | Gate is locked in an open position with a private lock |
| Gate #20 | 3762 | *Not Effective* | No lock |
| Gate #21 | 3767 | *Not Effective* | No lock |
| Gate #22 | 1237UA | *Not Effective* | Portion of gate is missing; no lock |
| Gate #23 | 1237UB | *Not Effective* | ATV tracks circumvent gate |
| Gate #24 | 1237UK | *Not Effective* | No lock; ATV tracks circumvent gate |
| Gate #25 | 1435 | *Not Effective* | ATV tracks circumvent gate |
| Gate #26 | 1956A | *Not Effective* | No lock |
| Gate #27 | 752UC | *Not Effective* | Broken gate; no lock |
| Gate #28 | 752UD | *Not Effective* | Broken gate |
| Gate #29 | 752UQ | *Not Effective* | Portion of gate is missing |
| Gate #30 | 752UR | Effective | No access |

USFS AR:011601 - 011603.

The Forest Service's finding of a 75% failure rate for gates in EMU 7-6 was never disclosed to the public in the Project EA, and instead the Project EA misleadingly represents and/or implies that the opposite is true:  "[e]xcept for isolated instances, gates are secure on the District."  USFS AR:000077.  As set forth above, in the only monitoring survey in the record, out

27

of 30 total gates, 23 gates were deemed ineffective by the agency itself.  USFS AR:011601 -

011603.  An agency finding of 23 ineffective gates out of 30 gates total cannot be honestly

represented as "isolated incidents," or merely "a handful" of "problem" gates.  *See* USFS

AR:000077 (Project EA making these representations to the public).  Instead, the overwhelming

majority of gates in EMU 7-6 are ineffective.  USFS AR:011601 - 011603.  And not only does

the Project EA fail to disclose the 75% failure rate for gates, but it also fails to address how the

75% failure rate for gates impacts the Forest Service's calculations of elk security.

On a visit to the Project area, Plaintiffs' staff observed an example of one of these failed

gates – Road 1251, which is Gate #8 above –  where ATV users were simply driving around the

gate on a well-established, user-created road that looks as though it has been there for years:



Dkt 7-2 at ¶ 3.

In fact, the regular failure of gates to effectively prevent motorized access has been

known to the Forest Service for decades: "[r]oads closed to public use through the use of only

signs or gates are often not effective (Zager and Jonkel 1983)."  USFS AR:008356; *see also*

*Foundation for North American Wild Sheep*, 681 F.2d at 1178; *Sierra Club*, 352 F.Supp.2d at

924-25.  Moreover, road closure failures are known to be a chronic problem on this specific Forest.  *See All. for Wild Rockies v. Probert*, 412 F.Supp.3d 1188, 1195 (D. Mont. 2019), *appeal dismissed*, 2020 WL 3443468 (requiring new ESA consultation on the northern portion of the Idaho Panhandle National Forest because "ineffective closures have . . . potentially impacted grizzly bears in ways not previously considered").

In summary, the 75% failure rate for gates, and the known chronic, recurring nature of these failures, draws into serious doubt whether a gate in EMU 7-6 could be credibly deemed to be an effective mitigation measure.  As the Ninth Circuit has previously held, if "agencies lack the power to guarantee the improvements in question. . . . the proper course is to exclude them from the analysis and consider only those actions that are in fact under agency control or otherwise reasonably certain to occur."  *Nat'l Wildlife Fed'n*, 524 F.3d at 936.

Without an effective mitigation measure for the loss in elk security that will violate the Forest Plan, the Forest Service must prepare an EIS for this Project.  *Foundation for North American Wild Sheep*, 681 F.2d at 1178.  Additionally, the violation of the Forest Plan elk security provision is a violation of NFMA.  *Native Ecosystems Council v. USFS*, 418 F.3d 953, 961 (9th Cir.2005) (citing 16 U.S.C. §1604(i)).  Thus, if the Forest Service wants to proceed with this Project as currently planned it must first amend the Forest Plan in a process that complies with NFMA and NEPA.  *Native Ecosystems Council*, 418 F.3d at 961.  In the very least, the Forest Service must start at square one and provide the public with a full, fair, and honest discussion of the efficacy of using gates as a mitigation measure in a supplemental EA for the Project.  *S. Fork Band Council*, 588 F.3d at 727; *Neighbors of Cuddy Mountain*, 137 F.3d at 1380.

**D.    The Forest Service's failure to address potential impacts on the St. Joe Wild and Scenic River in the Project EA violates NEPA, the APA, and the Wild and Scenic River Act regulations.**

Plaintiffs' last claim is that the Forest Service's failure to take a hard look at potential Project impacts on the St. Joe Wild and Scenic River in the Project EA violates NEPA,  the Wild and Scenic River regulations, and the APA.   The Wild and Scenic Rivers Act prohibits "developments . . . on any stream tributary" to a Wild and Scenic River if the development will "invade the area or unreasonably diminish the scenic, recreational, and fish and wildlife values present in the area on the date of designation of a river as a component of the National Wild and Scenic Rivers System."  16 U.S.C. § 1278 (a).

The regulations provide explicit direction that potential impacts to a Wild and Scenic River must be assessed in project NEPA Environmental Assessments: "The determination of the effects of a proposed water resources project shall be made in compliance with the National Environmental Policy Act (NEPA). To the extent possible, authorizing agencies should ensure that any environmental . . . assessments . . . prepared for a water resources project adequately address the environmental effects on resources protected by the Wild and Scenic Rivers Act . . . ."  36 C.F.R. § 297.

In the Project EA, the Forest Service falsely represents to the public that "[t]he project area . . . does *not* include . . . the wild and scenic river corridor . . . ."  USFS AR:000051 (emphasis added).  Based on this false representation, the Project EA does not analyze or disclose a determination of the effects of the Project on the St. Joe Wild and Scenic River.  After the public comment opportunity passed, however, in the final Project Decision, the Forest Service acknowledges that "[p]arts of the northern boundary of the project area falls within the St. Joe Wild and Scenic River Corridor (WSR)."  USFS AR:000013.

The September 13, 2018 draft EA, which was not made publicly available, found that "[a]quatic habitat has the potential to be negatively affected due to the negative changes to the stream channel" and bull trout may be affected "due to the potential for sediment generated in Kelley, Siwash, Theirault and Williams to reach the St. Joe River."  USFS AR:020037.  The draft EA further found: "This alternative does not contribute to the Forest Plan goal 'for restoring aquatic habitat . . . .'  The alternative has the potential to slow natural process recovery of the fish bearing streams."  USFS AR:020037.  These unfavorable findings were edited out of the final EA.

The Forest Service's failure to fully inform the public of these potential negative effects on the fisheries of the St. Joe Wild and Scenic River in the Project EA, at a time when the public could offer meaningful comments on this issue, violates the Wild and Scenic Rivers Act regulations, and therefore violates the APA because the EA is not in accordance with law.  The regulation requires the Forest Service to address impacts on Wild and Scenic Rivers in a project EA or EIS.  36 C.F.R. § 297.6.  Additionally, the Forest Service's misleading representations and omissions in the EA, failure to take a hard look at this issue in the Project EA, and failure to fully and fairly inform the public regarding this issue before making a decision violate NEPA.

## VII.  REMEDY

The Administrative Procedure Act directs that a court "shall . . . set aside" any agency action found to be "arbitrary capricious . . . or otherwise not in accordance with law." 5 U.S.C. §706(2)(A). The Supreme Court holds that vacatur is the presumptive remedy for this type of violation. *See Fed. Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998) ("If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case.").  Consistently, the Supreme Court holds that vacatur is preferable to injunctive relief:

"[i]f a less drastic remedy (such as partial or complete vacatur of [the agency's] decision) was sufficient to redress respondents' injury, no recourse to the additional and extraordinary relief of an injunction was warranted." *Geertson Seed Farms*, 561 U.S. at 165-66.

Accordingly, the Ninth Circuit agrees that there is a presumption of vacatur in this type of case challenging a Forest Service logging project. *Alliance*, 907 F.3d at 1121-22. "While the Ninth Circuit 'does not mandate vacatur,' courts 'in the Ninth Circuit decline vacatur only in rare circumstances.'" *All. for Wild Rockies v. Marten*, 2018 WL 2943251, at *2 (D. Mont. 2018). "[T]he Ninth Circuit has only found remand without vacatur warranted by equity concerns in limited circumstances, namely serious irreparable environmental injury." *Ctr. for Food Safety v. Vilsack*, 734 F.Supp.2d 948, 951 (N.D. Cal. 2010). In *California Communities Against Toxics v. EPA*, the Ninth Circuit found that the "limited circumstances" that justified remand without vacatur in that case were regional blackouts, air pollution, mandatory new state legislation, and economic disaster. 688 F.3d 989, 994 (9th Cir. 2012). Under these circumstances, the court determined that "[t]he delay and trouble vacatur would cause are severe" and weighed in favor of a rare remand without vacatur. *Id.*

The Supreme Court holds that if vacatur is "sufficient to redress respondents' injury," then injunctive relief is not warranted. *Geertson Seed Farms*, 561 U.S. at 165-66. In this case, vacatur of the Decision would provide complete relief to Plaintiffs because the Project could not be implemented until a new Decision is issued. At that time, the agency would be free to implement the new Decision, and any challenge to the new Decision would need to be filed in a new lawsuit.

Nonetheless, if the Court declines to vacate the Decision, it may issue an injunction instead. In general, "a plaintiff seeking permanent injunctive relief must satisfy a four-factor test

by showing: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Cottonwood*, 789 F.3d at 1088. However, in ESA cases, the test is altered so that "the equities and public interest factors always tip in favor of the protected species." *Id.* at 1091. The Ninth Circuit holds: "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as institutionalized caution. That fundamental principle remains intact and will continue to guide district courts when confronted with requests for injunctive relief in ESA cases." *Id* (internal cites and punctuation omitted).

Additionally, "[t]he preservation of our environment, as required by NEPA and the NFMA, is clearly in the public interest." *Sierra Club v. Bosworth*, 510 F.3d 1016, 1033 (9th Cir. 2007)(citation omitted). In addition to the preservation of the environment, "ensuring that government agencies comply with the law is a public interest of the highest order." *Native Ecosystems Council v. USFS*, 866 F.Supp.2d 1209, 1234 (D. Idaho 2012)(citation omitted). "The public has an undeniable interest in the Forest Service's compliance with NEPA's environmental review requirements and in the informed decisionmaking that NEPA is designed to promote." *Colorado Wild Inc. v. USFS*, 523 F.Supp.2d 1213, 1223 (D. Colo. 2007). These public interests outweigh the short delay the private logging company will face in receiving profits from public lands. *See, e.g., League of Wilderness Defs. v. Connaughton*, 752 F.3d 755, 765–66 (9th Cir. 2014) ("the marginal harm to the intervenors . . . is the value of moving those jobs and tax dollars to a future year, rather than the present"). As the Ninth Circuit has previously stated: "Because

33

we ask only that the Forest Service conduct the type of analysis that it is required to conduct by law, an analysis it should have done in the first instance, it is difficult to ascertain how the Forest Service can suffer prejudice by having to do so now." *Neighbors of Cuddy Mountain*, 137 F.3d at 1382.

Because monetary damages are not permitted in a case such as this, the only factor remaining to address is the irreparable harm inquiry. *Cottonwood*, 789 F.3d at 1088. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Connaughton*, 752 F.3d at 764 (quoting Supreme Court).  The Ninth Circuit holds that "establishing irreparable injury should not be an onerous task for plaintiffs." *Cottonwood*, 789 F.3d at 1091. In short, a plaintiff must make a "showing that specific projects will likely cause irreparable damage to its members' interests." *Id*. at 1092.

Irreparable harm may be established with a showing that a plaintiff has an expressed desire to visit a project area in an undisturbed state. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).  In *Cottrell*, the Ninth Circuit found that the fact that the logging "Project will prevent the use and enjoyment by AWR members of 1,652 acres of the forest" constituted irreparable harm.  *Id.*  As the Ninth Circuit similarly held in *Connaughton*:

> the LOWD plaintiffs have shown that the Snow Basin project will lead to the logging of thousands of mature trees. The logging of mature trees, if indeed incorrect in law, cannot be remedied easily if at all. Neither the planting of new seedlings nor the paying of money damages can normally remedy such damage. The harm here, as with many instances of this kind of harm, is irreparable . . . .

752 F.3d at 764; *see also Idaho Sporting Cong., Inc. v. Rittenhouse,* 305 F.3d 957, 974 (9th Cir. 2002)*(*"the Conservation Groups have demonstrated irreparable harm here because '[t]he old growth forests [they seek] to protect would, if cut, take hundreds of years to reproduce'");

*Neighbors of Cuddy Mountain*, 137 F.3d at 1382 (same).

In this case, Plaintiffs attest:

The Brebner Flat Project will irreparably harm Friends of the Clearwater's members' interests in the naturally functioning ecosystems of the Forest and Project analysis areas, in particular their interests in looking for, viewing, studying, and enjoying elk, grizzly bears, lynx, bull trout, and other wildlife species undisturbed in their natural surroundings. Once the trees are cut down, the harm is irreparable because the trees cannot be placed back on the stumps. Logging removes important forest cover for lynx, elk, and grizzly bears. . . .Additionally, the Project will continue to degrade and reduce elk security . . . . Project logging is a significant concern due to the extensive clearcuts that already surround the Project area; the Project logging will remove some of the last best forested buffers . . . Thus, the Project road construction and logging will cause irreparable harm and prevent Friends of the Clearwater members' use and enjoyment of the natural areas in the area in its undisturbed state for this purpose. . . .

Dkt 7-2 ¶¶ 4-7

Plaintiffs' declaration establishes irreparable harm from logging under the standard set by *Cottrell*, *Connaughton*, *Rittenhouse*, and *Neighbors of Cuddy Mountain*.  Once the trees are cut down, there is no way to put them back on the stump, and the area will never be the same within the lifetime of Plaintiffs' members.

## VIII.  CONCLUSION

For all of the above-stated reasons, Plaintiffs respectfully request that this Court find that the Brebner Flat Project violates the law, and either vacate the Project Decision or enjoin implementation of the Project pending compliance with the law.

Respectfully submitted this 7th Day of June, 2021.

/s/ Rebecca K. Smith
Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC
Attorney for Plaintiffs

35

CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing brief is no more than 35 pages in 12 point font,

excluding the caption, table of contents, table of authorities, index of exhibits, signature blocks,

and certificates of service and compliance, which complies with the 35-page limit set forth in this

Court's May 14, 2021 Order (Dkt 60).

*/s/ Rebecca K. Smith*
Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC
Attorney for Plaintiffs

CERTIFICATE OF SERVICE

The undersigned certifies that foregoing motion was served today electronically on all parties

through their counsel, Emma Hamilton, Robert Norway, Julie Weis, and Sara Ghafouri, through

this Court's ECF system.

*/s/ Rebecca K. Smith*
Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC
Attorney for Plaintiffs