Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC
P.O. Box 7584
Missoula, MT 59807
(406) 531-8133 (tele)
(406) 830-3085 (fax)
publicdefense@gmail.com
Idaho Bar No. 8346

Attorney for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

## NORTHERN  DIVISION

| | |
|---|---|
| FRIENDS OF THE CLEARWATER, et al., | Case No: 2:20-cv-243-BLW |
| Plaintiffs, | |
| vs. | RESPONSE IN OPPOSITION TO CROSS-MOTIONS FOR SUMMARY JUDGMENT [DKTS 67, 65] & |
| JEANNE HIGGINS, et al. | REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [DKT. 61] |
| Defendant, and, | |
| STIMSON LUMBER COMPANY, | |
| Defendant-Intervenor. | |

TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INDEX OF EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

I. RESPONSE & REPLY   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    In their brief, the agencies evade the primary legal issue in this case: whether the
undisputed possibility of a grizzly bear traveling through the Project area satisfies
the legal "may be present" threshold for preparation of a biological assessment
under the Endangered Species Act.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        1.    Even though the Forest Service wildlife report ignores all available
information since 2010, it still admits the "possibility of transient" grizzly
bears in the Project area. This admission alone satisfies the low "may be
present" threshold. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        2.    The agencies fail to point to any document in the record that indicates they
applied the "may be present" legal standard in the FWS species list or
Forest Service wildlife report.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        3.    Verified grizzly bear DNA was found in 2017 in a den 12 miles south of
the Project area, which puts the Project area in the potential home range of
a grizzly bear. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    B.    Plaintiffs are challenging the adequacy of the species list; as in *Krueger*, here too
the Court may remand the species list to FWS to apply the correct legal standard
for the "may be present" threshold.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    C.    A "no effect" conclusion cannot come before a biological assessment; it is the
biological assessment that must make the "no effect" conclusion.. . . . . . . . . . . . 12

    D.    The Forest Service's internal wildlife report is not a lawful substitute for a
biological assessment under the ESA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        1.    The option to include a biological assessment in a NEPA analysis only
applies when the agency includes the biological assessment in an EIS. . 13

        2.    The wildlife report is insufficient under the ESA because it does not
consider any information more recent than 2010; the ESA mandates the
application of the best available scientific and commercial information.. 15

3.     The bulk of the arguments made by agency counsel were never actually presented in the Forest Service wildlife report or agency analysis documents; the Court should reject the impermissible post hoc rationales presented by counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

E.     The plain statutory language of the ESA requires a biological assessment for "any agency action" for which a listed or proposed species "may be present."  "Major construction activity" is not a prerequisite. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

1.     The fatal flaw in the agencies' analysis is that they insert the phrase "major construction activity" into their statutory construction argument, but that phrase does not actually appear in the statute; the statute uses the phrase "any agency action." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

2.     The statute, regulation, and the Ninth Circuit's en banc decision in Karuk Tribe all define "agency action" broadly . . . . . . . . . . . . . . . . . . . . . . . . . 19

3.     Statutory references to construction do not implicitly narrow the statutory phrase "any agency action" to mean only "major construction activities." 20

4.     The phrase "major construction activities" comes from the regulation; the statute and regulation can be read in harmony if the regulation is interpreted as a non-exhaustive example or addition to the statute, rather than a narrowing of the statute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

a.     The District of Montana holds that the regulation may be construed as a non-exhaustive example. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

b.     The Ninth Circuit has implied that the regulation may be construed as a non-exhaustive example. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

c.     The Eleventh Circuit holds that the regulation may be construed as an addition to the statute. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

5.     Plaintiffs are not arguing that Section 7(c)(1) requires a biological assessment for "every action;"  Section 7(c)(1) requires a biological assessment for "any agency action" for which proposed or listed species "may be present." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

6.     The benefit of the doubt goes to the grizzly bear, not the agencies. . . . . . 28

F.     The Forest Service's failure to disclose the efficacy rate for gates as a mitigation measure in the Project EA violates NEPA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

1.     The Project EA fails to disclose to the public the efficacy of the proposed mitigation measure as established by the only monitoring report in the record. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

2.     The briefing on the agency's NFMA argument does not fill in the gaps in its NEPA argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

3.     The Forest Service's response to Plaintiffs' statement of material facts is misleading regarding the monitoring report. . . . . . . . . . . . . . . . . . . . . . . 32

G.     In line with a number of other gates in EMU 7-6, it appears that a motorcycle can drive around the gate recently installed on Road 1956E; thus, the Project will result in a net loss of elk security. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

H.     A cumulative effects analysis under NEPA must be in the Project EA; here the cumulative effects analysis is three vague sentences that do not even mention that the elk population in the area has recently "declined dramatically." . . . . . . . . . 36

I.     The Forest Service fails to cite a single case where a National Forest logging project was allowed to continue after a court made a final determination on the merits that the project violated the law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

II.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

TABLE OF AUTHORITIES

CASES

*All. for Wild Rockies v. Higgins,* 2021 WL 1630546 (D. Id. 2021). . . . . . . . . . . . . . . . . . . . . . . 40

*All. for the Wild Rockies v. Savage,* 897 F.3d 1025 (9th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . 40

*All. for the Wild Rockies v. USFS,* 907 F.3d 1105 (9th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . 40

*Bark v. USFS,* 958 F.3d 865 (9th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*CTS Corporation v. E.P.A.,* 759 F.3d 52 (D.C. Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Chevron v. Nat. Resources Defense Council, Inc.,* 467 U.S. 837 (1984) . . . . . . . . . . . . . . 18, 24

*City of Sausalito v. O'Neill,* 386 F.3d 1186 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Conner v. Burford,* 848 F.2d 1441 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 9, 15

*Ctr. for Food Safety v. Johanns,* 2006 WL 2927121. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Friends of the Clearwater v. Higgins,* 472 F. Supp. 3d (D. Id 2020) . . . . . . . . . . . . . . 11, 18, 21

*Friends of the Clearwater v. USFS,* 2021 WL 3408595 (D. Id. 2021) . . . . . . . . . . . . . . . . . . . . 40

*Karuk Tribe of California v. U.S. Forest Serv.,* 681 F.3d 1006 (9th Cir. 2012) . . . . . . . . . 20, 27

*Kern v. U.S. Bureau of Land Mgmt.,* 284 F.3d 1062 (9th Cir. 2002) . . . . . . . . . . . . . . . . . 36, 37

*Klamath-Siskiyou Wildlands Ctr. v. BLM.* 387 F.3d 989 (9th Cir. 2004) . . . . . . . . . . . . . . passim

*Lands Council v. Cottrell,* 731 F. Supp. 2d 1074 (D. Id. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . 40

*League of Wilderness Defenders v. Forsgren,* 309 F.3d 1181 (9th Cir. 2002) . . . . . . . . 23, 24, 25

*Lewiston Milling Company v. Cardiff,* 266 F. 753 (9th Cir. 1920). . . . . . . . . . . . . . . . . . . . . . . . 2

*Muckleshoot Indian Tribe v. U.S. Forest Serv.* 177 F.3d 800 (9th Cir. 1999). . . . . . . . . . . . . . 37

*Motor Vehicle Mfrs. v. State Farm* 463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Native Ecosystems Council v. USFS,* 418 F.3d 953 (9th Cir.2005). . . . . . . . . . . . . . . . . . . . .  35, 40

*National Wildlife Federation v. NMFS,* 524 F.3d 917 (9th Cir. 2008) . . . . . . . . . . . . . . . . . .  28

*National Wildlife Federation v. Coleman,* 529 F.2d 359 (5th Cir. 1976) . . . . . . . . . . . . . . . .  22

*Native Ecosystems Council v. Krueger,* 946 F. Supp. 2d 1060 (D. Mont. 2013) . . . . . . . . . passim

*Native Ecosystems Council v. Marten,* 2020 WL 1479059 (D. Mont. 2020) . . . . . . . . . . . passim

*Neighbors of Cuddy Mountain v. USFS,* 137 F.3d 1372 (9th Cir. 1998) . . . . . . . . . . . . . . . . .  29

*Northern Plains Resources Council v. Surface Transportation Board,*
    668 F.3d 1067 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

*Northwest Indian Cemetery Protective Assn. v. Peterson,* 764 F.2d 581 (9th Cir. 1985) . . . . . .  28

*Southern Fork Band Council Of Western Shoshone Of Nevada v. U.S. Department of Interior,*
    588 F.3d 718 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28, 29

*Southern Oregon Barter Fair v. Jackson Cty., Oregon,* 372 F.3d 1128 (9th Cir. 2004). . . . . . .  39

*Sierra Club v. U.S. Army Corps of Engineers,* 295 F.3d 1209 (11th Cir. 2002) . . . . . . . . . .  14, 26

*Swan View Coalition v. Barbouletos,* 2008 WL 5682094 (D. Mont. 2008) . . . . . . . .  5, 14, 26, 28

*Swan View Coalition v. Weber,* 783 F. App'x 675 (9th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . .  14

*Tennessee Valley Authority v. Hill,* 437 U.S. 153 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5, 9

*Thomas v. Peterson,* 753 F.2d 754 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22, 23

*Turtle Island Restoration Network v. United States Department of Commerce,*
    878 F.3d 725 (9th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

*Western Watersheds Project v. Bennett,* 392 F.Supp.2d 1217 (D. Id. 2005). . . . . . . . . . . . . . . .  39

*Western Watersheds Project v. Rosenkrance,* 2011 WL 39651 (D. Id. 2011). . . . . . . . . . .  15, 37

*W. Watersheds Project v. Salazar,* 843 F.Supp.2d 1105 (D. Id 2012) . . . . . . . . . . . . . . . . . . . .  39

STATUTES

16 U.S.C. §1536. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

16 U.S.C. §1604. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

REGULATIONS

50 C.F.R. §402.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 27

50 C.F.R. §402.12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

RULES

51 Fed. Reg. 19926 (June 3, 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

INDEX OF EXHIBITS

| | |
|---|---|
| Exhibit 1 | U.S. Fish & Wildlife Service, Bitterroot Grizzly Reintroduction EIS |
| Exhibit 2 | U.S. Fish & Wildlife Service, Grizzly Bear Recovery Coordinator's Comments on St. Joe Highway Project |
| Exhibit 3 | "Grizzly Bear Moves from Kellogg to Kelly Creek Area," Bonner County Daily Bee (June 23, 2019) |
| Exhibit 4 | Idaho Fish and Game Hunting Regulations |

## I.  RESPONSE & REPLY

A.   **In their brief, the agencies evade the primary legal issue in this case: whether the undisputed possibility of a grizzly bear traveling through the Project area satisfies the legal "may be present" threshold for preparation of a biological assessment under the Endangered Species Act.**

   1.   **Even though the Forest Service wildlife report ignores all available information since 2010, it still admits the "possibility of transient" grizzly bears in the Project area. This admission alone satisfies the low "may be present" threshold.**

   In their brief, the agencies state: "Although *acknowledging the possibility that a grizzly bear might travel through the Project*, the Forest Service concluded that it was unlikely that a bear would wander through the action area."  Dkt 67-1 at 15.  More specifically, in an appendix in the Project file wildlife report, the Forest Service states: "Although based on current knowledge, the *potential for grizzly bear occurrence* on the St. Joe Ranger District and *in the project area cannot be totally dismissed*, there is nothing to suggest any occurrence other than the *possibility of transient individuals*; with even the potential for that considered to be unlikely."  USFS AR:014831 (emphases added).  Thus, the Forest Service concedes that there is a possibility that a grizzly bear may travel through the Project area, though it is unlikely based on the information available in 2010 that is cited in the wildlife report.  *Id.*

   Thus, a key issue presented in this case is whether the undisputed *possibility* that a grizzly bear may travel through the Project area satisfies the "may be present" threshold under the ESA. This question must be answered in the affirmative in light of the following:  (a) the statute uses the word "may," which means *possible*; (b) FWS's final rule implementing the 1986 ESA regulations explains that *known* or *believed* occurrence is not required, and that the threshold is met by migratory animals that may travel through an area; and (c) the District of Montana has already applied these considerations to traveling grizzly bears and found that they satisfy the

1

"may be present" threshold, and the agencies' appeal in that case was dismissed after withdrawal. *See Native Ecosystems Council v. Krueger*, 9th Cir. No. 13-35668 (Nov. 5, 2013).

First, the statute uses the phrase "may be present," 16 U.S.C. §1536 (c)(1), and "the word 'may,' . . . according to the best lexicographers simply means 'to be possible . . . .'" *Lewiston Milling Co. v. Cardiff*, 266 F. 753, 758 (9th Cir. 1920)(citation omitted). Thus the legal threshold requires only the possibility of presence. Second, the final rule for the 1986 ESA regulations confirms this meaning:

> One of these commenters urged the Service to include only species actually known or believed to occur in the action area. . . . However, the Act requires the Service to provide a list of all listed or proposed species that "may be present" in the action area. Thus, migratory species that "may be present" at some point within the action area must be included in the species list.

51 Fed. Reg. 19926, 19946 (June 3, 1986).

Accordingly, the "may be present" threshold does not require that a species is "actually known or believed to occur" but rather requires only that a species "may be present" by traveling through the area "at some point." *Id.* As summarized by the District of Montana, "[t]he Wildlife Service clearly rejected a standard which would require a species to be 'actually known or believed to occur' in an area because it would conflict with the statutory language.'" *Native Ecosystems Council v. Krueger*, 946 F. Supp. 2d 1060, 1073 (D. Mont. 2013) (citing 51 Fed. Reg at 19946). In their briefs, Intervenors simply ignore this passage from the final rule altogether, while the agencies dismiss this passage from the final rule in a footnote without ever engaging with the "known or believed occurrence" language. Dkt 67-1 at 17 n. 12. First, "[a] footnote is no place to make a substantive legal argument . . . ." *CTS Corp. v. E.P.A.*, 759 F.3d 52, 64 (D.C. Cir. 2014). Second, the agencies must bury this argument in a footnote because – as discussed in detail below – "known or believed occurrence" is the threshold the agencies actually applied in

this case, contrary to the express language of the 1986 final rule.  51 Fed. Reg at 19946.

Finally, in *Krueger*, the District of Montana applied the "may be present" threshold to traveling grizzly bears in Montana and found that a biological assessment was required:

> no grizzlies have been sighted in the Project area itself. . . . [however] it is not necessary that grizzly bears occupy an area . . . . Grizzly bears "may be present" if "transitory bears [ ] might move through the project area." []. The Project area has "fairly good connectivity" with areas with known grizzly bear activity, [], and implicit in the Wildlife Report's and Environmental Assessment's discussion . . . is the possibility that grizzly bears, which are known to occur nearby and are a wide-ranging species, might travel through the Project area. . . . . the first question in the section 7 analysis—whether grizzly bears may be present in the action area—must have been answered in the affirmative . . . .

*Krueger*, 946 F.Supp.2d at 1077.

The facts in this case are not meaningfully distinguishable.  Just as in *Krueger*, here too grizzly bears are wide-ranging, and their presence has been confirmed in nearby areas within easy traveling distance and with good connectivity to the Project area.  These facts are true even if the Court only considers the information available in 2010 as the Forest Service wildlife report did in this case.   USFS AR:014830-31.  As noted above, the wildlife report concedes that "the potential for grizzly bear occurrence on the St. Joe Ranger District and in the project area cannot be totally dismissed," and it expressly acknowledges that there is a "possibility of transient individuals" in the area.  USFS AR:014831.  As the District of Montana held in *Krueger*, "[g]rizzly bears 'may be present' if 'transitory bears [ ] might move through the project area. [].'" 946 F.Supp.2d at 1077.  The *Krueger* court further noted that the facts in that case indicate "the possibility that grizzly bears, which are known to occur nearby and are a wide-ranging species, might travel through the Project area."  *Id.*  The same is true in this case.  Thus, based on the wildlife report alone, the "may be present" threshold is satisfied in this case.

In their brief, the agencies fail to meaningfully engage with the strikingly similar facts in

*Krueger*, and the legal holding in that case.  Dkt 67-1 at 17.  Instead, the agencies offer a conclusory statement that *Krueger* is distinguishable apparently because "the Forest Service's wildlife report examined instances where grizzly bears had been possibly identified near the Project area" in this case.  *Id.*  This fact does not distinguish *Krueger*; instead, it puts this case on all fours with *Krueger*.  As noted above, in *Krueger* the facts indicated "the possibility that grizzly bears, which are known to occur nearby and are a wide-ranging species, might travel through the Project area."  946 F.Supp.2d at 1077.  The same is true in this case.

Intervenors make a different argument in part arguing or implying that *Krueger* was about forest plan consultation, and in part conflating connectivity with linkage zones, and based on that conflation arguing or implying that the key fact is whether there is an official designated grizzly bear linkage zone in the area.  Dkt 65-1 at 12-14.  First, in *Krueger*, the Forest-wide species list did include grizzly bears as a species that may be present: "the Forest Service recognized that grizzly bears 'may be present' based on the Wildlife Service's 2010 and 2011 lists of threatened and endangered species that may be present in the Forest as a whole."  946 F.Supp.2d at 1077 The same is true in this case:  the Forest-wide species list for the Idaho Panhandle National Forest includes grizzly bears as a species that may be present across the Forest as a whole.  USFS AR:011429.  Thus, the issue in *Krueger,* as here, is whether grizzly bears "may be present" in the Project area, thereby necessitating a biological assessment for the Project.  The *Krueger* court held:  "It is not entirely clear whether Defendants recognized that grizzly bears 'may be present' in the Project area."  946 F.Supp.2d at 1077.   Here too, the Forest Service recognized a possibility of grizzly bear presence in the wildlife report, but it is not clear whether the Forest Service recognizes that this possibility of presence meets the "may be present" threshold for the Project area.  *See* USFS AR:014831.

4

Second, *Krueger* did not find that there was a "linkage zone" in the project area; rather, *Krueger* focused on the fact that grizzly bears had been verified nearby.  For example, grizzly bears had been verified in the Anaconda-Pintler Wilderness area and the project area had 'fairly good connectivity [with the Anaconda–Pintler Wilderness], because there is only a narrow, low-speed, low-traffic highway between them, with few developed areas.' *Id.* Despite the good connectivity, no grizzlies have been sighted in the Project area itself."  946 F.Supp.2d at 1077 (brackets in original).  The same is true here.  In 2019, a grizzly bear was confirmed via radio collar traveling through this Forest on the St. Joe Ranger District 10-15 miles east of the Project area, and a different grizzly bear was confirmed via DNA in 2017 in a den 10-15 miles south of the Project area.  Exhibit 3 at 1-2;  USFS AR:014798.  Unlike in *Krueger*, here there is no highway between the Project area and these two verified locations.  Thus, here there is even better connectivity than in *Krueger*.  Furthermore, as previously noted, this region is marked as a potential grizzly linkage zone in the Grizzly Bear Recovery Plan.  USFS AR:008229.

Finally, if there is any doubt regarding whether grizzly bears satisfy the "may be present" threshold, the Court must apply "institutionalized caution" and "give the benefit of the doubt to the species." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 187 (1978); *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988).  The agencies do not acknowledge either of these mandates, much less explain how their arguments are consistent with them.  In other words, "Defendants fail to explain why any ambiguity should be resolved to the detriment of grizzly bears . . . . The ESA requires that protected species be given 'the benefit of the doubt' in management decisions." *Swan View Coal. v. Barbouletos*, 2008 WL 5682094, at *15 (D. Mont. 2008).

**2.     The agencies fail to point to any document in the record that indicates they applied the "may be present" legal standard in the FWS species list or Forest Service wildlife report.**

Rather than apply the "may be present" threshold in briefing, agency counsel simply argues that "there is no support in the record that the agencies used 'occupancy' rather than 'may be present' as the standard for determining the effects of the Project on grizzly bears."  Dkt 67-1 at 17.  Regardless of whether the agencies applied an "occupancy" standard, they did not apply the "may be present" standard.  For example, the wildlife report states: "Canada lynx, grizzly bear, or woodland caribou *are not known or suspected to occur* within the Brebner Flats project area."  USFS AR:014820.  The wildlife report further states that no actual grizzly bears were detected by DNA or camera in a 2008-2009 survey, that there is "no *known* grizzly bear population" in the St. Joe area, that there was no "*resident* population" in the Bitterroot as of 2000, and that this is not an area of "*known* grizzly bear use."  USFS AR:014831 (emphases added).  The wildlife report also states: "There is no evidence or reason to suspect that grizzly bears *are present* on the St. Joe Ranger District."   USFS AR:014831 (emphasis added).

Thus, the standard applied by the Forest Service was whether the species was "known or suspected to occur" or whether individual members of the species "are present," not the lesser standard of whether the species "may be present."  USFS AR:014831.  As noted above, this is inconsistent with the statute: "[t]he Wildlife Service clearly rejected a standard which would require a species to be '*actually known or believed to occur*' in an area because it would conflict with the statutory language.'" *Krueger*, 946 F. Supp. 2d at 1073(citing 51 Fed. Reg at 19946)(emphasis added).  Critically, this "clearly rejected" standard of "actually known or believed to occur" is almost verbatim the standard used by the Forest Service in this case when it used a standard of "known or suspected to occur."  *See id*; USFS AR:014831.

Moreover, there is no explanation in the record for how the conclusions in the FWS species list were reached.  The 2017 Forest-wide FWS species list includes grizzly bears as a species that may be present across the Forest with no limitations.  USFS AR:011429.  The FWS species list for the Project area, however, does not include grizzly bears, and provides no rationale for excluding grizzly bears.  FWS00513.  However, the FWS administrative record does include a map for grizzly bears, which is dated May 2015, and it does not include any of central or north central Idaho.  FWS00523.  Presumably, this May 2015 map is the basis for the Project species list.  However, this map does not even appear to include known locations of grizzly bears in central and north central Idaho, much less all locations where grizzly bear presence is possible.  FWS00523.  For this reason, the Project species list fails to apply the statutory "may be present" threshold because "[g]rizzly bears 'may be present' if 'transitory bears [ ] might move through the project area. [].'" *Krueger*, 946 F.Supp.2d at 1077.

### 3.   Verified grizzly bear DNA was found in 2017 in a den 12 miles south of the Project area, which puts the Project area in the potential home range of a grizzly bear.

Although the Forest Service only considered evidence available as of 2010, USFS AR:014831, and the FWS apparently only considered evidence as of 2015, FWS00523, as noted in Plaintiffs' opening summary judgment brief, in 2017, Idaho Fish and Game found a grizzly bear den approximately 12 miles south of the Project area.  USFS AR:014798.  Thus, the Project area is within the home range of that grizzly bear.   Accordingly, Plaintiffs' statement of material facts states: "Additionally, in October 2019, Idaho Fish and Game provided information to the Forest Service regarding a den with confirmed grizzly DNA, which was incidentally observed in the area during an aerial mountain goat survey in 2017: [quoted material omitted]. USFS AR:014798."  Dkt 62 ¶47.  In response, the agencies state:   "Disputed. Federal Defendants

dispute Plaintiffs' characterization of *the email, which states that the den was not likely that of a grizzly bears* and because the author admits he is 'not a grizzly bear or fox expert' and therefore is 'not the best person to try to interpret' the information. FS014799." Dkt 68-1 ¶47 (emphasis added).

The agencies' representation that the cited email from Idaho Fish and Game "states that the den was not likely that of a grizzly bear[]" is false; there is no such statement. USFS AR:014799. Instead, the cited page actually states the opposite: "So perhaps a griz denned there and fox denned, or visited, after?" USFS AR:014799. Furthermore, the prior page states: "Laura Wolf and Casey McCormack were conducting an aerial goat survey. They observed the den and took the attached photograph. *The den appeared to be a wolverine or grizzly bear den.* Based on its location in the Joe we suspected it was a wolverine den." USFS AR:014798 (emphasis added).

An Idaho Fish and Game technician visited the den on foot and took hair and scat samples, then submitted 17 samples for DNA analysis. USFS AR:014798. Seven samples were red fox and one sample was grizzly bear. *Id.* The other samples failed to produce a result. *Id.* The email further states: "There certainly was something large under the snow judging from the tracks and size of the hole. We also know, from Leah's visit, there was a den. That certainly doesn't look like any fox den I've ever seen. ... So perhaps a griz denned there and fox denned, or visited, after?" USFS AR:014798-99.

Thus, in summary, the Idaho Fish and Game saw a den during an aerial survey, thought that the den was either wolverine or grizzly bear, but most likely wolverine, and then they took DNA samples that found grizzly and fox DNA, but no wolverine DNA. USFS AR:014798-99. There is really only one logical conclusion here: it was a grizzly bear den. The agencies attempt

to minimize this finding in their brief because it does not support their legal argument.  Dkt 67-1 at 44.  This minimization does not comport with their legal obligation to act with "institutionalized caution" and "give the benefit of the doubt to the species."  *Hill*, 437 U.S. at 187; *Conner*, 848 F.2d at 1454.  Moreover, the mere fact that a FWS employee suggested further DNA testing does not negate the fact that the DNA test came back as a grizzly bear.  USFS AR:014798-99.  Furthermore, there is no indication that further DNA testing ever occurred, much less what the results were.  If further DNA testing had found that the sample was not a grizzly bear, the agencies would most likely have included that information in the administrative record.  Finally, the agencies fail to explain how their attempts to minimize the evidence are consistent with the finding that "[t]here certainly was something large under the snow judging from the tracks and size of the hole."  USFS AR:014798-99.

At  minimum, the DNA results found only fox and grizzly bear DNA in the den, and the den was the correct size for a grizzly bear but too large for a fox.  USFS AR:014798-99. The ESA mandates an approach of "institutionalized caution" and requires that the Court "give the benefit of the doubt to the species." *Hill*, 437 U.S. at 187; *Conner*, 848 F.2d at 1454.  Thus, under this precautionary approach, the verified grizzly bear DNA –  in a den that was the size of a grizzly bear den – 12 miles south of the Project area could indicate that the Project area is within the home range of a grizzly bear because grizzly bears have home ranges "up to 1,000-1,500 [square miles]."  USFS AR:008225.

**B.     Plaintiffs are challenging the adequacy of the species list; as in *Krueger*, here too the Court may remand the species list to FWS to apply the correct legal standard for the "may be present" threshold.**

In a footnote, the agencies represent that Plaintiffs "do not specifically challenge the list or seek any remedy relating to the list."  Dkt 67-1 at 17.  To the contrary, the heading of

Plaintiffs' very first argument states: "The Forest Service's refusal to prepare a Biological

Assessment for the Project for grizzly bears violates the ESA. *To the extent the Fish and Wildlife*

*Service's species list does not include grizzly bears, the species list also violates the ESA.*"  Dkt

61-1 at i (emphasis added).  As noted in Plaintiffs' opening brief, the conclusions of FWS in the

species list are not given blind deference.  A species list will violate the ESA, and thus have no

legal effect, if it does not apply the "may be present" threshold properly "based on the best

scientific and commercial data available . . . ." 16 U.S.C. § 1536 (c)(1).  As further explained by

the District of Montana, "the 'may be present' standard does not require actual occurrence"

because such a requirement would "conflict with the statutory language" and "create[] a metric

more stringent than, and contrary to, what the ESA dictates." *Krueger*, 946 F.Supp.2d at 1074.

Nonetheless, in violation of the ESA, the FWS species list in this case is apparently limited to

actual grizzly bear occurrence as of 2015, as discussed in more detail above.  FWS00523.  The

proper remedy in this case is the same remedy ordered in *Krueger*, the FWS species list should

be remanded because it does not apply the "may be present" threshold in a lawful manner, and

the Project should be suspended in the interim.  946 F.Supp.2d at 1074.

Notably, the agencies never provide evidence in their brief that the Forest Service actually

requested the official FWS species list and used it in making the decision not to prepare a

biological assessment for lynx or grizzly bears for the Project.  The regulations state:

> The Federal agency or the designated non-Federal representative shall convey to
> the Director either (1) a written request for a list of any listed or proposed species
> or designated or proposed critical habitat that may be present in the action area; or
> (2) a written notification of the species and critical habitat that are being included
> in the biological assessment.
> . . .
> Within 30 days of receipt of the notification of, or the request for, a species list,
> the Director shall either concur with or revise the list or, in those cases where no
> list has been provided, advise the Federal agency or the designated non-Federal
> representative in writing whether, based on the best scientific and commercial

> data available, any listed or proposed species or designated or proposed critical
> habitat may be present in the action area.

50 C.F.R. §402.12 (c),(d).

The agencies' brief states: "the Forest Service requested, and FWS provided, a species list, thereby complying with Section 7(c)(1)'s first requirement.  FS014851-56; *see also* FS014807."  Dkt 67-1 at 15.  This statement appears to be misleading.  The wildlife report states that the agency used an online tool, not an official FWS species list.  USFS AR:014807.  Furthermore, the cited FWS species list, USFS AR:014851-56, was not added to the administrative record for this Project until after this lawsuit was filed and after the Court issued a ruling on the preliminary injunction raising this as an issue.  Declaration of Rebecca K. Smith ¶2 (August 16, 2021)(project file index pre-litigation compared to administrative record index post-litigation); *Friends of the Clearwater v. Higgins*, 472 F. Supp. 3d 859, 871 (D. Idaho 2020), *aff'd sub nom. Friends of Clearwater v. Higgins*, 847 F. Appx 394 (9th Cir. 2021)("By its plain terms subsection (c)(1) requires the action agency to request a list of endangered or threatened species and prepare a biological assessment for any species that may be present for any agency action").

Moreover, the sworn declaration provided by FWS to the Court on June 22, 2020 during preliminary injunction briefing on this issue does not state that the Forest Service requested a written species list and received it from FWS prior to the Project decision.  Dkt 24-9.  In preliminary injunction briefing in 2020 the agencies represented that the Forest Service only queried the online database:  "As to species lists, contrary to Plaintiffs' suggestion, there is no magic format.  The point is to determine if relevant species may be present in the action area.  The Forest Service did just that when it queried FWS's online database and reported its findings in the Wildlife Report."  Dkt 24 at 8.  The agencies do not squarely address these discrepancies between their preliminary injunction brief and declaration and their summary judgment brief.

Notably absent from the agencies' summary judgment filings are any sworn declarations establishing that the official species list was requested and received and used by the Forest Service prior to the Project decision.   *See* Dkt 67 and attachments, Dkt 68 and attachments.

Nonetheless, FWS has now produced a species list that does not include grizzly bears, and therefore this Court may review the list for compliance with the ESA "may be present" threshold, and may remand the list to FWS because the list does not comport with the ESA, just as the District of Montana did in *Krueger*: " the Project must be enjoined until the Wildlife Service reconsiders its listing determination in accordance with this opinion."  946 F.Supp.2d at 1074.

**C.    A "no effect" conclusion cannot come before a biological assessment; it is the biological assessment that must make the "no effect" conclusion.**

The Forest Service argues:  "Although acknowledging the possibility that a grizzly bear might travel through the Project, the Forest Service concluded that it was unlikely that a bear would wander through the action area. []. Thus, the Forest Service concluded that the Project would have no effect on grizzly bear. []. The Forest Service was therefore not required to prepare a BA for grizzly bear. []."  Dkt 67-1 at 15 (citations omitted).  The agency misunderstands the legal process.  A "no effect" conclusion cannot come before a biological assessment; it is the biological assessment that must make the "no effect" conclusion.

A biological assessment must be prepared if a proposed, threatened, or endangered species "may be present."  16 U.S.C. §1536 (c)(1).  So the first distinct inquiry is whether the species "may be present."  The purpose of the biological assessment is to analyze whether species are "likely to be affected" by the agency action. 16 U.S.C. §1536 (c)(1).  So the second distinct inquiry – which occurs within the biological assessment – is whether the species is "likely to be affected."  Consistent with the statute, the ESA consultation regulations state:

"Purpose. A biological assessment shall evaluate the potential effects of the action on listed and proposed species and designated and proposed critical habitat and determine whether any such species or habitat are likely to be adversely affected by the action and is used in determining whether formal consultation or a conference is necessary."  50 C.F.R. §402.12 (a).

As the District of Montana has held, the Forest Service cannot simply skip over the "may be present" inquiry, and make a "no effect" conclusion as a means to avoid the preparation of a biological assessment: "a no effect determination does not obviate the need for a BA, as the BA is the mechanism by which an agency concludes that its proposed action will have 'no effect,' 'may affect,' or 'is likely to adversely affect' a listed or proposed species.'" *Native Ecosystems Council v. Marten*, - - - F.Supp.3d - - - -, 2020 WL 1479059, at *6 (D. Mont. 2020).

**D.      The Forest Service's internal wildlife report is not a lawful substitute for a biological assessment under the ESA.**

The Forest Service further argues that even if a biological assessment is required for grizzly bears, the Court should simply construe the wildlife report in the project file as the biological assessment.  Dkt 67-1 at 16.  The agency makes no attempt to square this argument with the fact that it prepared actual biological assessments for bull trout and lynx.  *See* USFS AR:013663-734; USFS AR:018000-06.  Moreover, as set forth below, the agency's argument fails because the Forest Service did not prepare an EIS for the Project, the wildlife report does not meet the legal requirements of the ESA, and agency counsel's arguments that the Forest Service considered all of the information are not supported by the wildlife report itself and instead constitute impermissible  post-hoc rationale by agency counsel.

**1.      The option to include a biological assessment in a NEPA analysis only applies when the agency includes the biological assessment in an EIS.**

The Forest Service argues:  "Plaintiffs mistakenly presume that the wildlife report

13

prepared by the Forest Service does not satisfy the BA requirement. *See, e.g.*, Pls.' Mem. at 16. Section 7(c)(1), however, expressly authorizes an action agency to include its BA in a project's NEPA documentation." Dkt 67-1 at 16.  To the contrary, the statute does not expressly use the phrase "a project's NEPA documentation." *Id.*  Instead, it states: "Such assessment may be undertaken as part of a Federal agency's compliance with the requirements of section 102 of the National Environmental Policy Act of 1969 (42 U.S.C. 4332)."  16 U.S.C. § 1536 (c)(1).  The incorporated provision of NEPA, 42 U.S.C. §4332, addresses the EIS requirement; thus, the Ninth Circuit case the agency itself cites in support states: "such assessment may be undertaken as part of a Federal agency's compliance with the requirements of [conducting an EIS under NEPA]." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1216 (9th Cir. 2004)(bracketed phrase in original).  The other published case the Forest Service cites is from the Eleventh Circuit and it states: "When an agency prepares an EIS, it is complying with the BA requirement, provided that one of the environmental impacts discussed is the impact on threatened and endangered species." *Sierra Club v. U.S. Army Corps of Engineers*, 295 F.3d 1209, 1219 (11th Cir. 2002).

Unlike in *City of Sausalito* and *Sierra Club*, however, here the Forest Service chose not to prepare an EIS; therefore this provision is not applicable in this case.  *See id.*  The Forest Service provides only one other citation in support of this argument: a non-precedential, unpublished Ninth Circuit memo, which does not address the EIS limitation from the published cases.  *Swan View Coal. v. Weber*, 783 F. App'x 675 (9th Cir. 2019).  In *Swan View*, however, the "no jeopardy" conclusion for wolverine was found within the 2018 Supplemental Project EA.[1]  Thus, even if *Swan View* had precedential value, it does not apply to this case.  The Project EA in this

---

[1]Supplemental EA available online:
https://www.fs.usda.gov/nfs/11558/www/nepa/81796_FSPLT3_4285787.pdf

case does not contain any analysis on grizzly bears; it does not even include the four paragraphs

on grizzly bears found in the Project wildlife report.  .  USFS AR:014830-31.  Moreover,  "[a]

NEPA document cannot tier to—i.e. cannot incorporate by reference—a non-NEPA document."

*W. Watersheds Project v. Rosenkrance*, 2011 WL 39651, at *12 (D. Idaho 2011).  Thus, the

Project EA, a NEPA document, cannot tier to the wildlife report, a non-NEPA document.  For

these reasons, the agency's argument fails.

       **2.**      **The wildlife report is insufficient under the ESA because it does not consider any information more recent than 2010; the ESA mandates the application of the best available scientific and commercial information.**

The Forest Service further argues that the wildlife report "is adequate, and therefore

satisfies the BA requirement, because it does not 'entirely fail[] to consider an important aspect

of the problem or to consider the relevant factors and articulate a rational connection between the

facts found and the choice made.'"  Dkt 67-1 at 16.  To the contrary, the wildlife report refuses to

consider any available information after 2010.  USFS AR:014830-31.  The wildlife report cites

three references: USFWS (2000), USFWS (1996), and Servheen and Shoemaker (2010).  USFS

AR:014830-31.  Thus, the wildlife report fails to consider nine years of information that was

available prior to the signing of the Project decision in the fall of 2019.

The ESA mandates the use of the "best scientific and commercial data available."  16

U.S.C. §1536 (c)(1).  At minimum, this means that the agencies "cannot ignore available

biological information . . . ."  *Conner*, 848 F.2d at 1454.  As noted above, in 2017, Idaho Fish

and Game found a grizzly bear den 12 miles south of the Project area, which puts the Project area

in the home range of any grizzly using that den.  USFS AR:014798.  Moreover, FWS has records

of  radio-collared bear 927 traveling through the St. Joe in the summer of 2019.  Exhibit 3 at 1-2;

USFS AR:000353.  Both of these verified reports of grizzly bears on the St. Joe were available to

the Forest Service with a phone call to Idaho Fish and Game and FWS.  Instead, the Forest

Service chose not to update the wildlife report with any information more recent than 2010.

Accordingly, the wildlife report is not a lawful substitute for a biological assessment because it

ignores available information of verified grizzly bears on the St. Joe, and falsely represents to the

contrary that "there are no verified records or reports of grizzly bears on the St. Joe . . . ."  USFS

AR:014831.

> **3.      The bulk of the arguments made by agency counsel were never actually
> presented in the Forest Service wildlife report or agency analysis documents;
> the Court should reject the impermissible post hoc rationales presented by
> counsel.**

Finally, agency counsel spends several pages of briefing attempting to discredit the

mounting evidence of grizzly bear presence in north central Idaho.  Dkt 67-1 at 16-19.  The

problem is that agency counsel is drawing conclusions and presenting analysis and argument that

are not found in the agencies' actual analysis documents: the Project EA, decision, wildlife

report, species list, and species list map.  For example, agency counsel argues that the agencies

"did not credit" the DNA evidence of the grizzly bear at the Blackdome Peak den.  Dkt 67-1 at

18.  However, the only citation provided is USFS AR:014798-99, which is the Idaho Fish and

Game email discussed above at length.  Dkt 67-1 at 18.  In truth, there is no agency analysis

document for this Project that reviews and discredits this DNA evidence.  Instead, it is simply

agency counsel's interpretation of the Idaho Fish and Game email.  Dkt 67-1 at 18.  The Supreme

Court's decision in *Motor Vehicle Mfrs. v. State Farm* is instructive here:

> Although the agency did not address the mandatory airbags option . . . petitioners
> recite a number of difficulties that they believe would be posed . . . . But these are
> not the agency's reasons for rejecting a mandatory airbag standard. Not having
> discussed the possibility, the agency submitted no reasons at all. The short—and
> sufficient—answer to petitioners' submission is that the courts may not accept
> appellate counsel's post hoc rationalizations for agency action. [] It is
> well-established that an agency's action must be upheld, if at all, on the basis

articulated by the agency itself. []

463 U.S. 29, 49–50 (1983).  Thus, agency counsel's interpretation of the Idaho Fish and Game

email is not a basis for upholding the Project decision in this case.  *Id.*

Agency counsel also argues that information regarding radio-collared bear 927 "was

examined" but the citation is to a declaration prepared for litigation.  Dkt 67-1 at 18.  Agency

counsel also argues that information regarding radio-collared bear 927 should be ignored because

it purportedly "post-dates the decisions . . . ."  Dkt 67-1 at 18 n.13.  To the contrary, this

information was published in the local newspaper in June 2019, months before the Project

decision in this case.  Exhibit 3 at 1-2.

For these reasons, when agency counsel argues that "[a]t bottom, the Court's review 'is

narrow' and the Court cannot 'substitute [its] judgment for that of the agency,'" that principle

must be realized as a two-way street.  *See* Dkt 67-1 at 19.  The actual judgment of the agencies is

expressed in the species list, species list map, Project EA, Project decision, and Project wildlife

report; none of those documents apply the available information in compliance with the ESA.

**E.**     **The plain statutory language of the ESA requires a biological assessment for "any agency action" for which a listed or proposed species "may be present."  "Major construction activity" is not a prerequisite.**

The Forest Service has now prepared a biological assessment for lynx for the Project, in

addition to its prior preparation of a biological assessment for bull trout for the Project.  *See* Dkt

67-1 at 15 note 10. Nonetheless, the agencies' primary argument in this case is that a biological

assessment is only required for "major construction activities," and therefore is not required for

this Project for grizzly bears.  *See e.g.* Dkt Entry 67-1 at 9-14.  However, this Court discussed

this argument at length in its preliminary injunction order, and correctly rejected the argument:

"By its plain terms subsection (c)(1) requires the action agency to request a list of endangered or

threatened species and prepare a biological assessment for any species that may be present for any agency action. This was the Ninth Circuit's original understanding of the statute in *Thomas* and the regulations do not command otherwise." *Higgins*, 472 F.Supp.3d at 867-871; *see also Marten*, 2020 WL 1479059 at *3 – 8 (same argument also rejected by District of Montana).  This Court further held:  "In *Marten* the court rejected many of the same arguments Defendants make here.  There the court found that Congress had clearly spoken on the issue through § 1536(c)(1) and the agency's interpretation was not entitled to *Chevron* deference." *Higgins*, 472 F.Supp.3d at 870 (citation omitted).

Consistent with the findings of this Court and the District of Montana, the plain language of Section 7 (c)(1) of the statute requires a biological assessment for "any agency action" for which listed or proposed species "may be present."  16 U.S.C. § 1536(c)(1).  The agencies' argument must be rejected because it is contrary to the plain language of the statute, and therefore no *Chevron* deference is available: "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).

1.    **The fatal flaw in the agencies' analysis is that they insert the phrase "major construction activity" into their statutory construction argument, but that phrase does not actually appear in the statute; the statute uses the phrase "any agency action."**

In their brief, after setting forth the general *Chevron* test, and its emphasis on the plain statutory language, the agencies represent: "The second sentence of Section 7(c)(1) imposes a second, distinct obligation. Under this provision, if a threatened or endangered species may be present in the proposed action area, then—and only then—must an action agency prepare a BA for an action that is a 'major construction activity.'" Dkt 67-1 at 10.  However, in truth, the second sentence of Section 7(c)(1) does not contain the phrase "major construction activity" at

all; therefore, the agencies' argument collapses like a house of cards.

The second sentence of Section 7(c)(1) actually states: "If the Secretary advises, based on the best scientific and commercial data available, that such species may be present, such agency shall conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action."  16 U.S.C. § 1536 (c)(1).  The phrase "such action" refers back to the first sentence, which uses the phrase "any agency action of such agency for which no contract for construction has been entered into and for which no construction has begun on November 10, 1978." *Id.*  In turn, the statute defines "agency action" as "any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an 'agency action')." 16 U.S.C. §1536(a)(2).  As discussed below, binding *en banc* Ninth Circuit authority holds that the term "agency action" must be construed broadly.

> ### 2. The statute, regulation, and the Ninth Circuit's *en banc* decision in *Karuk Tribe* all define "agency action" broadly.

As noted above, the term "agency action" is defined broadly by the statute itself as "any action authorized, funded, or carried out by such agency. . . ." 16 U.S.C. § 1536(a)(2).  In turn, the ESA regulations also set out a broad definition of agency action:

> Action means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to: (a) actions intended to conserve listed species or their habitat; (b) the promulgation of regulations; (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or (d) actions directly or indirectly causing modifications to the land, water, or air.

50 C.F.R. §402.02.

Furthermore, the *en banc* Ninth Circuit set out a two-part test for "agency action" and reaffirmed a broad definition of the term:

> There is 'little doubt' that Congress intended agency action to have a broad definition in the ESA, . . . Our 'agency action' inquiry is two-fold. First, we ask

whether a federal agency affirmatively authorized, funded, or carried out the underlying activity. Second, we determine whether the agency had some discretion to influence or change the activity for the benefit of a protected species. . . .We have repeatedly held that the ESA's use of the term "agency action" is to be construed broadly.

*Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006, 1020-21 (9th Cir. 2012)(en banc)(citations omitted).

It is not reasonable for the agencies to completely ignore the plain language of the statutory definition, the plain language of the regulatory definition, and an *en banc* Ninth Circuit opinion and argue – contrary to all of the above – that "any agency action" is limited to "major construction activities."

### 3. Statutory references to construction do not implicitly narrow the statutory phrase "any agency action" to mean only "major construction activities."

The statute provides an express exemption from the biological assessment requirement for any agency actions for which construction had already started on November 10, 1978, or for which a contract for construction had been entered into by November 10, 1978.  16 U.S.C. §1536(c)(1).  November 10, 1978 was the day that the first amendments to the ESA were signed into law; those 1978 amendments to the statute created the biological assessment requirement. *See* PL 95–632 (S 2899), PL 95–632, NOVEMBER 10, 1978, 92 Stat 3751; *see also* 51 Fed. Reg. 19926 (noting that "[t]he 1978 Amendments also added section 7(c), requiring the preparation of biological assessments in appropriate instances").  Thus, the statutory language indicates that the biological assessment requirement does not apply retroactively, but it does apply after November 10, 1978 to "any agency action" where a proposed or listed species may be present.  16 U.S.C. §1536(c)(1).  The statute also mandates that a biological assessment must be completed prior to entering into any contract for construction.  16 U.S.C. §1536(c)(1).

The agencies argue that these two statutory references to construction "signal" that a

biological assessment is only required for "major construction activities" rather than "any agency action," which is the language actually used by the statute.  Dkt 67-1 at 10; 16 U.S.C. §1536(c)(1).  As noted above, however, the phrase "major construction activities" is not found anywhere in the statute.  Thus, the District of Montana held:  "the major-construction-activities language does not appear anywhere in the text. The question at this juncture is not whether the regulation can be harmonized with the text of the statute but whether the text itself embraces the notion that a BA is limited to major construction activities. Plainly, it does not."  *Marten*, 2020 WL 1479059 at *6.

Furthermore, as this  Court correctly held: "that reference [to construction] is only to make clear (1) that the statute did not apply to contracts for construction that had already been signed, and (2) that the requirements must be met before a contract for construction is signed. Nothing about those two references expressly or implicitly exclude agency actions where there is no contract for construction."  *Higgins*, 472 F. Supp. 3d at 871.  As the District of Montana additionally held: "If a construction activity and a major construction activity were obviously synonyms, the latter would not need a modifier."  *Marten*, 2020 WL 1479059, at *5.

The fact that the phrase "major construction activities" is not found in the statute raises the question of where that phrase came from.  As discussed in more detail below, the phrase "major construction activities" is found in the 1986 regulations, which were promulgated eight years after the biological assessment requirement was added to the statute.  In the Federal Register rule approving the 1986 ESA regulations, the stated source for the "major construction activities" provision was  "quoted language from the Conference Report to the 1979 Amendments."  51 Fed. Reg at 19936.

The glaring problem here is that the biological assessment requirement was passed in the

1978 ESA Amendments and it was not amended with the 1979 ESA amendments.  Thus, the

Conference Report to the 1979 Amendments was simply paraphrasing existing law; it cannot be

construed as legislative "history" for the 1978 Amendments by any stretch of the imagination.

*See* Pub.L. 95-632, § 3, Nov. 10, 1978, 92 Stat. 3752 (1978 ESA amendments adding BA

requirement); Pub.L. 96-159, § 4, Dec. 28, 1979, 93 Stat. 1226 (1979 ESA amendments).

Notably, however, a 1978 House Report cited by the agencies themselves in this case, *see*

Dkt 67-1 at 10, which  could be considered "legislative history" for the biological assessment

requirement, discusses "the exercise of agency discretion which would result in contracts for

construction, actual construction activities, *or other potentially destructive activities*."  H.R. Rep.

No. 95-1625, at 20 (1978)(emphasis added).  Thus, the legislative history does not limit

application of the biological assessment to construction activities, much less "major"

construction activities.  *Id.*  Moreover, one of the three cases discussed in H.R. Report 95-1625 –

*National Wildlife Federation v. Coleman*, 529 F.2d 359 (5th Cir. 1976) – addresses a road

construction project.  H.R. REP. 95-1625 at *11.

Thus, when the Ninth Circuit required a biological assessment for a National Forest

logging road in 1985, the court's decision was consistent with the legislative history.  *Thomas v.

Peterson*, 753 F.2d 754, 763 (9th Cir. 1985); H.R. REP. 95-1625 at *11 (*citing Coleman*, 529

F.2d 359).  The Ninth Circuit held unequivocally that "[o]nce an agency is aware that an

endangered species may be present in the area of its proposed action, the ESA requires it to

prepare a biological assessment to determine whether the proposed action 'is likely to affect' the

species." *Thomas*, 753 F.2d at 763.

In light of this actual legislative history, and the unequivocal holding of *Thomas v.

Peterson*, logging projects – which regularly include "contracts for [road] construction, actual

[road] construction activities, or other potentially destructive activity [such as logging]" –  are

covered by the Section 7 biological assessment requirement.  *See* H.R. REP. 95- 1625 at *20;

*Thomas*, 753 F.2d at 763.

> **4.    The phrase "major construction activities" comes from the regulation; the statute and regulation can be read in harmony if the regulation is interpreted as a non-exhaustive example or addition to the statute, rather than a narrowing of the statute**.

In 1986, eight years after the statute was amended to include the biological assessment

requirement, FWS implemented the following regulation:

> Biological assessments.
> . . .
> (b) Preparation requirement.
>
> (1) The procedures of this section are required for Federal actions that are "major construction activities"; provided that a contract for construction was not entered into or actual construction was not begun on or before November 10, 1978. . . .

50 C.F.R. §402.12 (b)(1); *see* 51 Fed. Reg. 19926 (June 3, 1986).

It is well-established that "[a]n agency simply may not interpret a regulation in a way that

contravenes a statute."  *League of Wilderness Defs./Blue Mountains Biodiversity Project v.*

*Forsgren*, 309 F.3d 1181, 1190 (9th Cir. 2002).  Thus, the courts "must ensure that the

interpretation is not inconsistent with a congressional directive; a court need not accept an

agency's interpretation of its own regulations if that interpretation is inconsistent with the statute

under which the regulations were promulgated."  *Turtle Island Restoration Network v. United*

*States Dep't of Commerce*, 878 F.3d 725, 733 (9th Cir. 2017).

Here, there is an available interpretation of the regulation that would be consistent with

the statute – the regulation can be interpreted as a non-exhaustive example of statutorily-covered

activities, or as an addition to activities covered by the statute.  The Ninth Circuit addressed a

similar situation in *Forsgren* regarding a regulation under the Clean Water Act.  309 F.3d at

1185-86.  In *Forsgren,* a pollutant fell within the statutory definition of point source pollutant

under the Clean Water Act.  Nonetheless, the Forest Service argued that a regulation provided an

exemption to the statute.  The Ninth Circuit rejected the argument:

> The Forest Service's argument fails because the statute itself is clear and
> unambiguous. The statutory definition of point source . . . clearly encompasses
> [the challenged activity.]  The Forest Service cannot contravene the will of
> Congress through its reading of administrative regulations.  "If the intent of
> Congress is clear, that is the end of the matter; for the court, as well as the agency,
> must give effect to the unambiguously expressed intent of Congress."

*Forsgren*, 309 F.3d at 1185-86 (9th Cir. 2002)(*citing Chevron*). The Ninth Circuit further

explained:

> Unlike the Forest Service, we read the regulation to conform to the statute . . . .the
> list [in the regulation] is not exhaustive . . . . The point of listing the four activities
> [in the regulation] is to ensure that they continue to be subject to permit
> requirements after the new criteria for identifying point and nonpoint sources take
> effect, not to exclude all other silvicultural activities from NPDES permit
> requirements. . . .We hold that the list of four silvicultural point source activities
> is not exhaustive.

*Forsgren*, 309 F.3d at 1188.  As the court clarified in a footnote: "we do not invalidate the

regulation.  Rather, we reject the Forest Service's interpretation of the regulation and give it a

construction consistent with its administrative history, case law, and the governing statute."  *Id*.

at 1190 n.8.

Similarly here, the regulation can be interpreted in a manner that is consistent with the

statute.  Just as in *Forsgren*, here this Court may "read the regulation to conform to the statute"

by finding that the regulation "is not exhaustive."  *Id.* at 1188.  Similar to *Forsgren*, here this

Court may find that "[t]he point of listing [major construction activities in the regulation] is to

ensure that they continue to be subject  to [BA] requirements . . . not to exclude all other . . .

activities from [BA] requirements."  *Id.*  Thus, here as in *Forsgren*, this Court need not invalidate

the regulation.  *Id.* at 1190 n.8.  However, it should "reject the Forest Service's interpretation of the regulation and give it a construction consistent with its administrative history, case law, and the governing statute." *Id*.

Furthermore, the agencies' interpretation in this case is premised on the addition of a key word to the regulation – the word "only" – thus, they assert that the 1986 regulation requires a biological assessment "only" if there are "major construction activities."  Dkt 67-1 at 9. However, the regulation itself does not use the term "only."  50 C.F.R. §402.12.  Instead it states: "The procedures of this section are required for Federal actions that are 'major construction activities'; provided that a contract for construction was not entered into or actual construction was not begun on or before November 10, 1978."  50 C.F.R. §402.12 (b)(1).  Thus, the agencies are not simply applying the plain language of the regulation; instead, they are adding the modifying term "only" as part of their interpretation.  Without the term "only," which does not appear in the regulation, the regulation can be interpreted as a non-exhaustive example, just as in *Forsgren*.

### a. The District of Montana holds that the regulation may be construed as a non-exhaustive example.

After reviewing substantial briefing on this issue, last year the District of Montana held that "Plaintiffs provide a compelling argument that it is not the agency's enactment of the regulation that is problematic, but rather its interpretation of it."  *Marten*, 2020 WL 1479059, at *8.  The court held: "Simply because the regulation requires a BA for major construction activities does not mean that it excuses the Forest Service from preparing a BA for projects that are not major construction activities. Interpreting the regulation as a non-exhaustive example of a circumstance when a BA is required harmonizes the regulation with the agency's statutory duty." *Id.*

        **b.**    **The Ninth Circuit has implied that the regulation may be construed as a non-exhaustive example.**

Likewise, in an unpublished memo, the Ninth Circuit similarly held: "It may well be that the 'major construction activities' language is not a broad limitation on the applicability of the regulation but an explanation of how the regulation applies to such activities in particular.  If so, then the regulation does not relieve agencies of the obligation to conduct a biological assessment for actions other than 'major construction activities.'"  *Swan View*, 783 F.Appx at 678 n.1 (unpublished).

        **c.**    **The Eleventh Circuit holds that the regulation may be construed as an addition to the statute.**

Similarly, the Eleventh Circuit has interpreted the regulation to add to the statutory language, not limit it.  Regarding the statutory requirements:  "If, however, FWS responds that there may be an endangered or threatened species in the action area, the agency is required to prepare a biological assessment ("BA"), which identifies any listed species within the area and evaluates the potential effects of the action on those species."  *Sierra Club*, 295 F.3d at 1213.  The Eleventh Circuit further explains:  "According to the implementing regulations, a BA *is also required* for all federal actions which constitute a "major construction activity," *whether or not a listed species is suspected* in the area." *Id.* (emphases added).  Thus, the one federal appeals court to address the conflict between the statute and the regulation in a published opinion has interpreted them in a consistent manner by finding that the statute applies the biological assessment requirement to all agency actions where a listed species may be present, and the regulation adds a biological assessment requirement for all major construction activities regardless of whether a listed species is present.  *Id.*

The District of Hawaii adopted the Eleventh Circuit's reasoning that the regulation adds to

the statute, finding that "there is another, parallel branch to the ESA decision tree." *Ctr. for Food Safety v. Johanns*, 2006 WL 2927121, at *2 (D. Haw.2006).  More specifically, the court found:

> In other words, an agency proposing an action must first determine if its action constitutes "major construction activity" (as defined in 50 C.F.R. §402.02).  If the agency determines that its proposed action is "major construction activity," then the agency must prepare a BA.  If the agency determines that its proposed action is not "major construction activity," then the agency must determine, in the first instance, whether a BA is required.  The agency must follow certain steps in making this decision. "First, the agency contemplating the action must request information from the appropriate federal wildlife service regarding 'whether any species which is listed or proposed to be listed may be present in the area of such proposed action.' *Forest Guardians*, 450 F.3d at 457 (quoting 16 U.S.C. §1536(c)(1)).  Second, if FWS or NMFS informs the agency that listed species may be present in the area of the proposed agency action, the agency must prepare a BA; if no listed species or critical habitats are present, then no BA is necessary. *Id*.

2006 WL 2927121, at * 3.

**5.      Plaintiffs are not arguing that Section 7(c)(1) requires a biological assessment for "every action;"  Section 7(c)(1) requires a biological assessment for "any agency action" for which proposed or listed species "may be present."**

The agencies argue: "the discretion provided to applicants in Section 7(c)(2) would be pointless if another part of the ESA made a BA mandatory for *every action*."  Dkt 67-1 at 11 (emphasis added).  However, no one in this case is actually arguing that a biological assessment is required for "every action" under Section 7(c)(1).  Dkt 67-1 at 11.  Instead, Section 7(c)(1) requires a biological assessment for "any agency action" for which proposed or listed species "may be present."  16 U.S.C. § 1536(c)(1).  Both requirements must be met.  Moreover,  as noted above, "agency action" has a statutory definition, and there is a two-part test for "agency action" established by the Ninth Circuit's *en banc* decision in *Karuk Tribe*.  681 F.3d at 1020-21.  That test requires that "the agency ha[s] some discretion to influence or change the activity for the benefit of a protected species. . . ."  681 F.3d at 1020-21.

6.      **The benefit of the doubt goes to the grizzly bear, not the agencies.**

Finally, if there is any doubt on this issue, this Court must "give the benefit of the doubt to the species" and find that the biological assessment requirement is not limited to major construction activities.  *See Connor*, 848 F.2d at 1454; *see also Swan View Coal.*, 2008 WL 5682094, at *15 ("Defendants fail to explain why any ambiguity should be resolved to the detriment of grizzly bears . . . . The ESA requires that protected species be given 'the benefit of the doubt' in management decisions").

**F.      The Forest Service's failure to disclose the efficacy rate for gates as a mitigation measure in the Project EA violates NEPA.**

The Ninth Circuit holds that NEPA requires agencies to "analyze the mitigation measures in detail [and] explain how effective the measures would be." *Northwest Indian Cemetery Protective Assn. v. Peterson*, 764 F.2d 581 (9th Cir. 1985).  The Ninth Circuit also holds: "An essential component of a reasonably complete mitigation discussion is an assessment of whether the proposed mitigation measures can be effective."  *S. Fork Band Council Of W. Shoshone Of Nevada v. U.S. Dep't of Interior*, 588 F.3d 718, 727 (9th Cir. 2009).  Furthermore, if "agencies lack the power to guarantee the improvements in question. . . . the proper course is to exclude them from the analysis and consider only those actions that are in fact under agency control or otherwise reasonably certain to occur."  *Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917, 936 (9th Cir. 2008).

1.      **The Project EA fails to disclose to the public the efficacy of the proposed mitigation measure as established by the only monitoring report in the record.**

In briefing on this NEPA claim, the Forest Service argues that it "ensures the effectiveness" of the mitigation measure by promising to monitor and repair if anything goes wrong.  Dkt 67-1 at 31-32.  However, promises of future monitoring and remedial action do not

constitute a disclosure to the public of the available information on the efficacy of the proposed mitigation measure, which is required by NEPA. *See e.g. S. Fork Band*, 588 F.3d at 727. While promises of future measures "may help alleviate impact after construction, [they] do not help to evaluate and understand the impact before construction." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1084 (9th Cir. 2011). Thus, the NEPA process "cannot serve its larger informational role, and the public is deprived of their opportunity to play a role in the decision-making process." *Id.*

This case is particularly problematic in this regard because information on the efficacy of gates was available to the agency from its own monitoring report in the record, which found a 75% failure rate when gates in EMU 7-6 were last monitored. USFS AR:011601 - 011603. This information is directly relevant to any discussion of the efficacy of the proposed mitigation measure. Although NEPA does not require any particular substantive result, it does require disclosure to the public and analysis of this type of relevant information under the "hard look" requirement. *Neighbors of Cuddy Mountain v. USFS,* 137 F.3d 1372, 1380 (9th Cir. 1998).

Instead of disclosing the 75% failure rate for gates in EMU 7-6 to the public, the Project EA represents that the opposite is true. The Project EA includes a misleading statement that "[e]xcept for isolated instances, gates are secure on the District." USFS AR:000077. This statement is contrary to the evidence in the only monitoring report in the record, USFS AR:011601 - 011603, yet the statement that "gates are secure" except for "isolated instances" is the full extent of the Project EA discussion of the efficacy of the mitigation measure, USFS AR:000077. In briefing, the Forest Service evades the question of how it could have taken the NEPA-required "hard look" at the efficacy of the mitigation measure when it never disclosed or discussed the results of the only monitoring report for that mitigation measure available in the

29

record.  Moreover, when addressing this argument in its brief, the Forest Service simply ignores

its misleading representation in the Project EA that "[e]xcept for isolated instances, gates are

secure on the District." USFS AR:000077; USFS AR:011601 - 011603.

The Forest Service instead argues generally that it has a mitigation plan and mitigation can

offset impacts.  This is a red herring.  The issue here is not whether it is permissible to include

mitigation measures in an EA.  *See* Dkt 67-1 at 33.  The issue is whether the Project EA takes a

"hard look" and provides an accurate analysis of the efficacy of the proposed mitigation measure

to the public in the Project EA.  Because the Project EA fails to disclose the results of the only

monitoring report in this record, it does not take the required hard look.

### 2. The briefing on the agency's NFMA argument does not fill in the gaps in its NEPA argument.

In briefing on its NFMA argument, the Forest Service argues that it did not need to

disclose the results of its monitoring report to the public because the monitoring report was

purportedly "outdated" or "stale."  Dkt 67-1 at 23.   However, Plaintiffs encountered one of these

ineffective gates in a visit to the Project area last year.  Thus, six years after the monitoring report

was issued, there is still a well-established user-created illegal road around the gate:



Dkt 7-2 at ¶ 3; *see* USFS AR:011601 - 011603 (photo above is Gate #8, Road 1251).  Without any

supporting evidence in the record, such as more recent monitoring reports, there is no reason to

assume that the other 22 ineffective gates in EMU 7-6 have fared any better.

Intervenor argues that there is a more recent monitoring report in the record: "the Project's

Travel Analysis Report, prepared about four months before Project authorization . . . ."  Dkt 65-1

at 30.  However, the travel analysis report does not help the Forest Service here; it simply

confirms the ineffectiveness rate for gates in this Project area.  USFS AR:014058.  The travel

analysis report in the record addresses the existing condition of roads in the Project area, but not

all of the gated roads in EMU 7-6.  USFS AR:014058.  Below, Plaintiffs set forth the existing

condition for gated roads in the Project area, as noted by the travel analysis report, compared to

the 2014 monitoring report:

| Road | Monitoring Report Conclusion (August 2014) USFS AR:011601<br><br>Effective (Y/N) | Travel Analysis Report Conclusion (June 2019) USFS AR:014058<br><br>Effective (Y/N) |
|---|---|---|
| 1234 | N | N |
| 1235 | N | N |
| 1236 | N | N |
| 1250 | Y | Y |
| 1251 | N | N |

Thus, the findings in the 2019 travel analyis report are the same as the 2014 monitoring report.

USFS AR:014058; USFS AR:011601.

Instead of providing citations to other monitoring evidence in the record, the Forest

Service states its "commitment" to do better, and it cites to unsupported conclusory statements in

the Project EA that there are only a few problem gates.  Dkt 67-1 at 23.  If these representations

31

were true, there would be monitoring reports in the record to substantiate them.  Instead, there is

only one monitoring report in the record for this Project and it paints a vastly different picture:

75% of gates are ineffective in EMU 7-6.  USFS AR:011601 - 011603 (23 out of 30 gates are

ineffective).

>       **3.      The Forest Service's response to Plaintiffs' statement of material facts is
>               misleading regarding the monitoring report.**

Plaintiffs' statement of material facts states: "In the Project record, there is a spreadsheet

in which the Forest Service found a 75% failure rate for gates in EMU 7-6.  USFS AR:011601 -

011603."  Dkt 62 ¶ 31.  In response the Forest Service represents:  "Dispute Plaintiffs' citation to

the Administrative Record.  Plaintiffs' citation is to an unrelated Forest Service vegetative data

document.  The referenced spreadsheet appears to be located at FS014174-205. *See also*

20-cv-35623, ECF No. 19-3 at E.R. 585-87."  Dkt 68-1 ¶31.

The Forest Service's representation to the Court that Plaintiffs' citation is incorrect is

false.  In conference on the administrative record, the Forest Service agreed to supplement the

administrative record with a legible version of the monitoring report spreadsheet, and it assigned

that document as AR:011601 - 011603.  Declaration of Rebecca K. Smith ¶1 (August 16,

2021)(including email correspondence and three additional documents with Bates numbers).  The

legible version of the gate effectiveness monitoring report spreadsheet with Bates numbers is

attached to the Smith Declaration as Appendix E.  Thus, it was the agency itself that assigned

these Bates numbers – AR:011601 - 011603 –  to this spreadsheet and then provided the

document to Plaintiffs.

Plaintiffs further state in their statement of material facts:  "As listed in the table below,

the Forest Service's own survey found that <u>out of 30 total gates, 23 gates were not effective</u>: [table

omitted]."  Dkt 62 ¶32.  In response, the Forest Service states:

> Dispute the accuracy of Plaintiffs' table, as it includes selective portions of the spreadsheet summarizing 2014 surveys located at FS014174-205, and in some cases omits relevant comments. Three of the gates listed in Plaintiffs' table as having "no lock" (gate nos. 1, 20, and 21 in Plaintiffs' table) include further detail in the actual spreadsheet explaining that those gates were otherwise effective. FS014190; FS014192. Plaintiffs' table omits comments on two of the gates (nos. 13 and 21) stating that there were no tracks circumventing the gate. FS014191-92.

Dkt 68-1 ¶32. To the extent that these comments are intended to dispute Plaintiffs' tally of ineffective gates, Plaintiffs direct the Court to the seventh column of the agency's spreadsheet, which states: "Barrier Effective (Y/N)." USFS AR:011601-603. There is no real dispute that the Forest Service itself reached a "N" conclusion for effectiveness for 23 of the 30 gates in EMU 7-6. USFS AR:011601-603. Moreover, each one of the four different gates mentioned by the Forest Service in Dkt 68-1 ¶32 has a conclusion of "N" in this column, which means the Forest Service itself concluded that the gate was not effective. USFS AR:011601-11603 (Gate #1, Road 288; Gate #20, Road 3762; Gate #21, Road 3767; Gate #13, Road 1483). Simply put, a gate with no lock is not effective at preventing motorized use.

The fact that locks are so routinely cut off gates in EMU 7-6 is an issue that the Forest Service never discloses to the public in the EA. The agency's refusal to disclose this known, documented information on gate ineffectiveness to the public in the EA violates NEPA. Moreover, this information indicates that the Project EA relies on the effectiveness of a mitigation measure to comply with the law even though the agency apparently "lack[s] the power to guarantee the improvements in question," which also violates NEPA. *Nat'l Wildlife Fed'n*, 524 F.3d at 936.

Similarly, Plaintiffs state: "In addition to this specific finding of a 75% failure rate for gates in EMU 7-6, other wildlife management documents, such as the Grizzly Bear Recovery Plan, have long found that both signs and gates are usually ineffective closure devices for wildlife

security purposes: 'Roads closed to public use through the use of only signs or gates are often not effective (Zager and Jonkel 1983).' USFS AR:008356."  Dkt 62 ¶33.   In response, again the Fores t Service avoids the facts:  "Disputed. The information Plaintiffs reference shows the status of gates throughout EMU 7-6 during a 2014 survey, and is not an analysis of 'failure rates.' Moreover, security requirements for elk and grizzly bear are distinct. While grizzly bear standards require roads be inaccessible during the bear year (approximately March to December), Ref011244, elk security standards only require roads be closed during the hunting season (approximately September through December, FS011259."  Dkt 68-1 ¶33.  Thus, instead of providing any contrary information showing that gates on the Forest are effective, or citing scientific literature establishing that gates are effective, the Forest Service simply evades the facts.

**G.     In line with a number of other gates in EMU 7-6, it appears that a motorcycle can drive around the gate recently installed on Road 1956E; thus, the Project will result in a net loss of elk security.**

As noted above, the Forest Service's only survey of gate effectiveness in EMU 7-6 in the record found a 75% failure rate:  out of 30 gates, 23 were ineffective.  USFS AR:011601-603. The reasons the gates were deemed ineffective by the Forest Service are five-fold: (1) gate has no lock, (2) gate is locked in an open position with a private lock, (3) visible ATV or motorbike tracks circumvent the gate, (4) gate is broken or a portion is missing, and/or (5) motorbike could circumvent the gate.  USFS AR:011601-603.  Several months after the parties litigated the motion for preliminary injunction, including the issue of whether the Project will include a gate or just a sign on Road 1956E, on September 4, 2020, the Forest Service installed a gate.  Dkt 67-8 ¶5.  The Forest Service did not provide notice of this gate to Plaintiffs until the filing of its declaration on July 19, 2021.  Dkt 67-8.  Thus, Plaintiffs have not yet had the opportunity to field-check this gate.  Nonetheless, from the photograph provided by the Forest Service in its declaration, it

appears that a motorbike could easily circumvent the gate by driving around it through the large

opening to the right of the gate:



Dkt 67-8 ¶5.

As noted above, if a motorbike can circumvent a gate, that gate is ineffective according to

the Forest Service's own monitoring protocol.  *See* AR:011601-603 (finding Gates 13 (Road

1483) and 15 (Road 3469) ineffective because motorbike could circumvent gate).  Thus, under the

Forest Service's own monitoring protocol for effectiveness of gates in EMU 7-6, this gate appears

ineffective at actually preventing motorized use on this road.  Accordingly, because the mitigation

measure proposed is ineffective, the Project will decrease elk security.  The Forest Service

concedes that it must "maintain existing levels of elk security to comply with the Forest Plan."

Dkt 67-1 at 21.  Thus, the decrease in elk security violates the Forest Plan.  This Forest Plan

violation is a violation of NFMA.  *Native Ecosystems Council v. USFS*, 418 F.3d 953, 961 (9th

Cir.2005) (citing 16 U.S.C. §1604(i)).

Moreover, in briefing the Forest Service discloses for the first time that two of the gated roads addressed in the monitoring spreadsheet are located in areas that are mapped as elk security areas in EMU 7-6:  "two of the roads listed on the spreadsheet actually fall within EMU 7-6's elk security habitat . . . ."  Dkt 67-1 at 23 (citing a map in the record at USFS AR:000832).  It appears that the two gated roads in the elk security area are Roads 1234 and 1235. USFS AR:000832.  Critically, the monitoring report found that ATV tracks were circumventing the gates on both of those roads – Road 1234 and Road 1235.  USFS AR:011601.  The 2019 travel analysis report also states that the gates on Roads 1234 and 1235 are ineffective.  USFS AR:014058.  Roads with ineffective closures such as Roads 1234 and 1235 cannot be included in elk security areas because the very purpose of an elk security area is to exclude motorized use:  "Area closures should address all motorized vehicles including all-terrain vehicles ."  USFS AR:011595.  Thus, it appears that the Project area has even less elk security than disclosed in the Project EA.

**H.    A cumulative effects analysis under NEPA must be in the Project EA; here the cumulative effects analysis is three vague sentences that do not even mention that the elk population in the area has recently "declined dramatically."**

The Forest Service first argues that it need not include a cumulative effects analysis in the EA itself.  Dkt 67-1 at 27, 27 n.17.  To the contrary, the cumulative effects analysis must be in the NEPA document – here the EA. The Ninth Circuit holds: "At a minimum, the BLM is required to provide such an analysis in the EA."  *Kern v. U.S. Bureau of Land Mgmt*., 284 F.3d 1062, 1078 (9th Cir. 2002).  In *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt*., the Ninth Circuit similarly held: "Although each of the EAs contains a section of more than a dozen pages under the heading 'Cumulative Effects,' a close read reveals that those sections do not adequately discuss the subject." 387 F.3d 989, 994 (9th Cir. 2004).

36

It is well-established law that the Forest Service cannot fix deficiencies with a cumulative effects analysis by pointing to a non-NEPA document in the record.  For example, *in Muckleshoot Indian Tribe v. U.S. Forest Serv.*, the Ninth Circuit held: "The appellees also attempt to tier the Exchange EIS to the Green River Watershed Report *to cure the deficiencies of the cumulative impact analysis* of the Exchange EIS. Such reliance is impermissible under the NEPA regulations, which only permit tiering to prior EIS's."  177 F.3d 800, 811 (9th Cir. 1999)(emphasis added). Thus, as this Court acknowledges: "A NEPA document cannot tier to—i.e. cannot incorporate by reference—a non-NEPA document."  *W. Watersheds Project v. Rosenkrance*, 2011 WL 39651, at *12 (D. Id 2011); *see also Klamath–Siskiyou Wildlands Ctr.*, 387 F.3d at 998 ("tiering to the Watershed Analysis cannot save the EAs, because the Watershed Analysis is not a NEPA document.[] A NEPA document cannot tier to a non-NEPA document"); *Kern*, 284 F.3d at 1073 ("tiering to a document that has not itself been subject to NEPA review is not permitted, for it circumvents the purpose of NEPA").  Thus, here, the Project EA cannot tier to the wildlife report, or any other non-NEPA document in the record, for the missing NEPA cumulative effects analysis. *Id.*

Plaintiffs' primary concern with cumulative effects here is that the elk population has "declined dramatically" in recent years according to Idaho Fish and Game.  USFS AR:015023. However, this crucial fact is not disclosed in the Project EA at all, much less in a quantified or detailed way; thus, there is no meaningful discussion of the actual cumulative effects of the Project.  USFS AR:000077; *see Bark v. USFS*, 958 F.3d 865, 872 (9th Cir. 2020).  In response, the Forest Service first implies that the dramatically declining elk population is merely Plaintiffs' assertion, rather than a fact.  Dkt 67-1 at 28.  To the contrary, it is the Idaho Fish and Game's formal finding in its elk management plan for the area.  The elk population in Unit 7 – which

encompasses the Project area – has "declined dramatically" since 2006.  USFS AR:015023.  More specifically, "[t]he 2012 survey showed about one third as many elk as estimated in 2006."  USFS AR:015023.  Idaho's Elk Management Plan lists the elk population's current status as "decreasing."  USFS AR:015024.  The Forest Service's refusal to acknowledge the dramatically declining elk population in this area, much less assess its own role in this decline, is the reason Plaintiffs bring this claim.

The Forest Service further argues that it does not need to disclose the dramatically declining population of elk in the area because the agency uses the "aggregate effects" approach. Dkt 67-1 at 28.  However, the "aggregate effects" approach simply allows the agency to avoid listing every past action that has affected the species; it does not allow the agency to completely ignore the current population status of the species at issue.  The Forest Service then spends several pages misconstruing Plaintiffs' cumulative effects argument as a challenge to the Forest Plan.  Dkt 67-1 at 29-30.  Plaintiffs, however, are not challenging the Forest Plan in this case.

Regarding Plaintiffs' real argument here – the Forest Service's failure to disclose the dramatically declining elk population in the Project EA cumulative effects analysis – the Forest Service argues: "This Court has already rejected Plaintiffs' claim that the Brebner Flat Project's site-specific EA should have included an additional, distinct analysis of cumulative effects to the elk population . . . ."  Dkt 67-1 at 30.  Contrary to the implication, this Court is not bound to determinations made at the preliminary injunction stage:

> Decisions on preliminary injunctions require the district court to assess the plaintiff's likelihood of success on the merits, not whether the plaintiff has actually succeeded on the merits. [].  Additionally, decisions on preliminary injunctions are just that—preliminary—and must often be made hastily and on less than a full record.[]. Thus, even though the facial challenge presented to the district court here involved primarily issues of law, we see no reason why the court should have deviated from the general rule that decisions on preliminary injunctions "are not binding at trial on the merits," []., and do not constitute the law of the case.

38

*S. Oregon Barter Fair v. Jackson Cty., Oregon*, 372 F.3d 1128, 1136 (9th Cir. 2004).

In *W. Watersheds Project v. Salazar*, this Court remanded a cumulative impacts analysis to address the impact on sage grouse populations:

> none of the five EAs at issue here contained a cumulative impact analysis that discussed the existing conditions of sage grouse habitat *and populations* throughout the Owyhee and Bruneau Field Offices. . . .the five EAs at issue here simply assumed that grazing restrictions would be imposed on those allotments that would protect sage grouse. But even assuming that was true, the point of the cumulative impact analysis is to get beyond the individual allotment analysis and determine the impacts of the overall grazing levels *on sage grouse numbers* and habitat.

843 F.Supp.2d 1105, 1127–28 (D. Id 2012)(emphases added).

Similarly, this Court also found a cumulative effects analysis unlawful when the agency was "unable to answer a simple, yet crucial, question: What is the cumulative environmental impact of increasing grazing on 21 of 28 allotments in the face of widespread FRH violations *and a dramatic decline of a sensitive species*? That question cannot be answered because nobody has looked at the big picture here." *W. Watersheds Project v. Bennett*, 392 F.Supp.2d 1217, 1225 (D. Id. 2005)(emphasis added), *modified in part*, 803 F.Supp.2d 1175 (D. Id. 2011).

As in both *Salazar* and *Bennett*, here too the agency has failed to issue a cumulative effects analysis that analyzes both "habitat and populations," and analyzes the cumulative environmental impact of increasing activities in the face of a "dramatic decline" of a species. *Salazar*, 843 F.Supp.2d at 1127–28; *Bennett*, 392 F.Supp.2d at 1225.

Finally, the Forest Service argues that Plaintiffs failed to clearly raise this issue and thus waived this claim, but it was the Forest Service who withheld the dramatically declining status of this elk population from the public in the Project EA.  As the Ninth Circuit recently held under similar circumstances: "Alliance's failure to object at an earlier time resulted from the Forest

Service's failure to disclose this aspect of the Project in the Draft Environmental Impact Statement." *All. for the Wild Rockies v. Savage*, 897 F.3d 1025, 1034 (9th Cir. 2018).  Thus, the agency's argument fails.

I.   **The Forest Service fails to cite a single case where a National Forest logging project was allowed to continue after a court made a final determination on the merits that the project violated the law.**

   Finally, regarding remedy, Plaintiffs request that the Court either vacate the Project decision, or remand to the agencies and suspend Project implementation.  These are the two routine remedies in a challenge to a timber sale project on National Forest lands.  *See e.g.  All. for the Wild Rockies v. USFS*, 907 F.3d 1105, 1121 (9th Cir. 2018)(vacatur); *Lands Council v. Cottrell*, 731 F. Supp. 2d 1074, 1093 (D. Id. 2010)(injunction); *All. for Wild Rockies v. Higgins*, 2021 WL 1630546, at *16 (D. Id. 2021)(injunction); *Friends of the Clearwater v. USFS*, 2021 WL 3408595, at *11 (D. Id. 2021)(injunction). *Native Ecosystems Council v. USFS*, 866 F. Supp. 2d 1209, 1235 (D. Id. 2012)(injunction).   The Forest Service's argument implies that this Court should allow the Project to move forward even if the Court issues summary judgment in Plaintiffs' favor.  *See* Dkt 67-1 at 39-49.  However, the agency fails to cite a single case that allowed a National Forest logging project to move forward after a court issued a final determination on the merits that the Project was unlawful.  For this reason, the argument fails.

## II.  CONCLUSION

   For all of the above-stated reasons, Plaintiffs respectfully request that this Court find that the Brebner Flat Project violates the law, and either vacate the Project Decision or remand and suspend implementation of the Project pending compliance with the law.


Respectfully submitted this 16th Day of August, 2021.

*/s/ Rebecca K. Smith*
Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC
Attorney for Plaintiffs


## CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing brief is no more than 40 pages in 12 point font,

excluding the caption, table of contents, table of authorities, index of exhibits, signature blocks,

and certificates of service and compliance, which complies with the 40-page limit set forth in this

Court's May 14, 2021 Order (Dkt 60).

*/s/ Rebecca K. Smith*
Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC
Attorney for Plaintiffs


## CERTIFICATE OF SERVICE

The undersigned certifies that foregoing was served today electronically on all parties through

their counsel, Emma Hamilton, Robert Norway, Julie Weis, and Sara Ghafouri, through

this Court's ECF system.

*/s/ Rebecca K. Smith*
Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC
Attorney for Plaintiffs