UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| FRIENDS OF THE CLEARWATER; and ALLIANCE FOR THE WILD ROCKIES,<br><br>    Plaintiffs,<br><br>    v.<br><br>CARL PETRICK[1], in his official capacity as Idaho Panhandle National Forest Supervisor; UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture; and UNITED STATES FISH & WILDLIFE SERVICE, an agency of the U.S. Department of Interior,<br><br>    Defendants,<br><br>    and<br><br>STIMSON LUMBER COMPANY,<br><br>    Defendant-Intervenor. | Case No. 2:20-cv-00243-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Mr. Petrick is being automatically substituted for his predecessor in the official public position he now holds for the U.S. Forest Service.

**MEMORANDUM DECISION AND ORDER - 1**

## INTRODUCTION

The Court has before it cross motions for summary judgment filed by all parties. The Court heard oral argument on October 6, 2021 and took the motions under advisement. For the reasons explained below, the Court will grant summary judgment to plaintiffs, the environmental groups, on the ESA claim. The Court will grant summary judgment to defendants, the federal agencies, and intervenor Stimson[2] on all other claims.

## BACKGROUND

The U.S. Forest Service issued a Decision Notice and Finding of No Significant Impact (FONSI) for the Brebner Flat project on October 3, 2019. FS000001-23. The Brebner Flat project is located in the St. Joe Ranger District of the Idaho Panhandle National Forests in Shoshone County, Idaho. FS000001-23. The project area includes the Theriault Creek, Kelly Creek, Williams Creek, and Siwash Creek drainages within the St. Joe River watershed. FS000024. The northern boundary of the project includes the wildland urban interface of Avery, Idaho and Forest Highway 50. FS000030. Shoshone County has identified this area

---

[2] The Court has reviewed and considered Stimson's arguments, which largely mirror the federal agencies' argument. As such, the Court will only reference Stimson when discussing its unique arguments.

as an area of concern for their Community Wildfire Protection Plan. *Id.* The

northern boundary of the project is within the St. Joe Wild and Scenic River

Corridor, but no proposed activities are within the corridor. FS000009.

The goals of the project are threefold: 1) improve forest health and increase

vegetation resilience to large scale disturbances such as wildfire, drought, insect

outbreaks, and disease; 2) provide sustainable use of natural resources and benefit

local communities; and 3) reduce hazardous fuels to lessen wildfire severity and

enable safe fire suppression efforts. FS000001. The project area is almost 12,000

acres and will include approximately 1,700 acres of timber harvest and prescribed

burning. FS000024. Approximately 10.5 miles of roads will be permanently or

temporarily constructed or reconstructed for the project. FS000033-34.

The Forest Service issued a scoping notice soliciting public comments on the

project in early 2018. FS000030. In March 2019, the Forest Service issued a draft

Environmental Assessment (EA) and again sought public comment. FS000030. In

response, the environmental groups submitted several dozen comments.

FS000277-93; FS000190-96. The final EA was issued in June 2019. FS000024.

### A.    Endangered Species Act Consultation

On October 19, 2018, the local U.S. Fish and Wildlife Service (USFWS)

field office sent the Forest Service a species list attached to a letter stating that the

list "fulfills the requirements of [USFWS] under section 7(c) of the Endangered Species Act." FS014851-64. The "Official Species List" identified Canada lynx, North American Wolverine, and Bull Trout as the only threatened, endangered, or candidate species that may be present in the project area. FS014853-56.

The Forest Service prepared a Fisheries BA that evaluated the project's possible effects on bull trout and concluded that the project may affect, but is not likely to adversely affect, bull trout or its designated critical habitat. FS013663-734. On June 11, 2019, the Forest Service submitted to USFWS the project's Fisheries BA and a request for concurrence on the potential effects of the project on bull trout. FWS00001. By letter dated July 19, 2019, USFWS concurred with the Forest Service's determination. FS013660-62.

The Forest Service also prepared a supplemental BA analyzing the potential environmental impacts of the project on Canada lynx in September 2020. FS018000-06. The Forest Service concluded that the project would have no effect on Canada lynx. FS018000-06.

The October 19, 2018 species list did not identify the grizzly bear as a species that may be present in the project area. FS014851-64. Nevertheless, in December 2018, the Forest Service prepared a wildlife report that considered, but did not analyze in detail, impacts to grizzly bears. FS014830. The report noted that

"although based on current knowledge, the potential for grizzly bear occurrence on the St. Joe Ranger District and in the project area cannot be totally dismissed, there is nothing to suggest any occurrence other than the possibility of transient individuals; with even the potential for that considered to be unlikely." FS014831. The wildlife report determined the project would have no effect on grizzly bears. FS014815.

The Final EA found that no federally endangered or threatened wildlife species were likely to be affected by the project. FS000075.

B.    **Elk Analysis**

The Forest Service analyzed the project's impact on elk through the concept of elk security habitat. The Idaho Panhandle National Forest Plan defines elk security habitat as timbered areas greater than 250 acres that are more than one-half mile from a motorized route. REF003332. The forest plan calculates security habitat for individual elk management units and dictates that all management activities maintain existing levels of elk security habitat in each elk management unit. REF003332; REF0033239.

The Brebner Flat project is located within elk management unit 7-6, which is a low-priority management unit. FS000076. The project's timber harvest and road construction will reduce elk security habitat by 210 acres. FS000008.

The Forest Service initially considered amending the forest plan to allow for that reduction in elk security habitat. FS000010. But the Forest Service changed course, opting instead to offset the reduction by closing a road that was not within the project area but was within elk management unit 7-6. FS000061. The Forest Service decided to close approximately one mile of the OHV portion of road 1956E during elk hunting season (September through December).[3] FS000082. According to the Forest Service, the closure would increase elk security habitat in elk management unit 7-6 by 314 acres, creating a net 94-acre gain in security habitat and obviating the need to amend the forest plan.[4] FS000010.

The EA does not clearly state the mechanism for closing road 1956E but indicates the road "would be signed during the seasonal restriction." FS000061. The wildlife report clarifies the Forest Service's plan to seasonally close the road using a gate.[5] FS014822. The EA discusses a monitoring plan "to ensure the security of gates in elk security areas during the closure period." FS000077. The

---

[3] As Stimson notes, this portion of the road might more appropriately be labeled an ATV trail. The semantics are immaterial to the Court's analysis.

[4] The Forest Service's math in the FONSI does not quite add up. The FONSI explains that combining 314 acres of new elk security habitat with 210 acres of lost elk security habitat yields "a net gain in security of 94 acres." Despite this imprecise calculation, whether net gain is 94 or 104 acres does not affect the Court's analysis.

[5] The Forest Service followed through on this plan and installed the gate in September 2020. *Decl. of Matthew A. Davis*, Dkt. 24-3, at ¶¶5-6.

**MEMORANDUM DECISION AND ORDER - 6**

plan includes annually monitoring gates that have been breached in the past as well as 30 percent of gates generally. The Forest Service will also document any damaged or breached gates so that they can be prioritized for repair the next year. FS000077.

### C.    St. Joe Wild and Scenic River Analysis

Congress designated the St. Joe River as a Wild and Scenic River in 1978. FS013600. The project maps attached to the EA show the project area bordering the St. Joe River. FS000089-91. Siwash Creek, one of the St. Joe's tributaries, flows through the Brebner Flat project area. FS013600. Although no project activities will occur within the wild and scenic river corridor, the project does include the removal of fifteen culverts from non-fish bearing streams in Siwash Creek. FS000013; FS013608; FS013600-01.

In the EA, the Forest Service considered the project's potential impacts to the St. Joe River itself, FS000087; to the hydrology of St. Joe tributaries, FS000069; and to fisheries if sediment reached the St. Joe, FS000083. The Wild and Scenic Rivers Act evaluation determined that removing 15 culverts in Siwash Creek would not diminish the scenic, recreation, fish, or wildlife values of the river. FS013600-01.

During the administrative review process, the environmental groups commented that the EA draft contained "no analysis . . . of the impacts on this river," which "must be considered since a portion of the river corridor is within the project area." FS000193. The Forest Service responded by explaining that "[n]o project activities are planned within the [wild and scenic river] boundary" and that the EA's evaluation of potential effects found "[n]o unreasonable diminishment" of the river's "scenic, recreation, fisheries or wildlife qualities." FS000193.

Nevertheless, the final EA incorrectly states that the project area does not include the wild and scenic river corridor. FS000051. The EA goes on to correctly assert that "the wild and scenic river corridor [was] not proposed for timber harvest." FS000057. In addition, the FONSI corrected the misstatement by explaining that, "[p]arts of the northern boundary of the project area falls within the St. Joe Wild and Scenic River Corridor (WSR). There are no activities proposed within the WSR corridor." FS000013.

### D.    Conclusion

The environmental groups now seek summary judgment on their claims. The environmental groups allege that the Forest Service violated the APA in the following ways: 1) by failing to obtain an adequate species list from the USFWS and by failing to prepare a biological assessment that included grizzly bears as

required by the Endangered Species Act (ESA); 2) by failing to take a hard look at the cumulative effects of the project on the elk population and failing to analyze the efficacy of the proposal to gate road 1956E as required by the National Forest Management Act (NFMA) and National Environmental Policy Act (NEPA); and 3) by failing to take a hard look at potential impacts to the St. Joe Wild and Scenic River Corridor. The federal agencies and Stimson moved for cross-summary judgment on the environmental groups' claims.

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Karuk Tribe of Cal. v. U.S. Forest Serv*., 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc). Because this is an administrative record review case, the Court may grant summary judgment to either party based upon a review of the administrative record. *Id*.

In addition, the Court "may consider evidence outside the administrative record for the limited purposes of reviewing Plaintiffs' ESA claim." *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 497 (9th Cir. 2011). Such outside evidence must be otherwise admissible and relevant to the question of whether relief should be granted. *See Order,* Dkt. 53 at 3-12. The Court can take judicial notice of government documents for their existence and contents, but not

for the truth of the matter asserted when the facts are in dispute. *Coal. for a Sustainable Delta v. Fed. Emergency Mgmt. Agency*, 812 F. Supp. 2d 1089, 1093 (E.D. Cal. 2011); accord *Dine Citizens Against Ruining Our Env't v. Bureau of Indian Affairs*, 932 F.3d 843, 848 n.1 (9th Cir. 2019); *Ctr. for Env'tl. Law & Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1011 n.5 (9th Cir. 2011); *Dent v. Holder*, 627 F.3d 365, 371–72 (9th Cir. 2010). Post-decision information cannot be used to challenge the merits of the agency's decision. *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 944 (9th Cir. 2006).

Under the APA, the reviewing court must set aside the agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A decision is arbitrary and capricious if the agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *O'Keeffe's, Inc. v. U.S. Consumer Prod. Safety Comm'n*, 92 F.3d 940, 942 (9th Cir. 1996).

An agency action is also arbitrary and capricious if the agency fails to articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made. *Id*. An agency must set forth clearly the grounds on which it acted. *See Atchison T. & S.F. Ry. v. Wichita Bd. of Trade*, 412 U.S. 800, 807 (1973). A court may not accept an agency's post hoc rationalizations for its action. *State Farm*, 463 U.S. at 50. "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id*. (citations omitted).

## ANALYSIS

### A.    Endangered Species Act Claims

In Claim Two, the environmental groups assert that "[t]he agencies' failure to include the lynx in the Project Biological Assessment and Letter of Concurrence violates the ESA." *Complaint,* Dkt. 1 at 28. The Forest Service has subsequently provided USFWS with a BA for the Lynx, making the environmental groups' claim moot. FS18000-6. Accordingly, the environmental groups' motion for summary judgment as to Claim Two is denied as moot. *See Forest Guardians v. Johanns*, 450 F.3d 455, 462 (9th Cir. 2006).

In Claim One, their remaining ESA claim, the environmental groups assert that the Forest Service violated ESA section 7(c)(1)'s requirement to obtain a list

of endangered or threatened species that may be present in the project area and prepare a biological assessment for any species that may be present. The environmental groups insist the grizzly bear should be on the list and the Forest Service should prepare a BA for the grizzly bear.

### 1. Species List

Section 7(a)(2) of the ESA provides that

> Each Federal agency shall, in consultation with and with the assistance of the Secretary [of Interior], insure that any action authorized, funded, or carried out by such agency (hereinafter . . . "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species. . . . In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

16 U.S.C. § 1536(a)(2). Section 7(c)(1) of the ESA further provides that

> To facilitate compliance with the requirements of subsection (a)(2), each Federal agency shall, with respect to any agency action of such agency . . . request of the Secretary information whether any species which is listed or proposed to be listed may be present in the area of such proposed action. If the Secretary advises, based on the best scientific and commercial data available, that such species may be present, such agency shall conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action. . . . Such assessment may be undertaken as part of a Federal agency's compliance with the requirements of section 102 of the National Environmental Policy Act of 1969.

*Id.* § 1536(c)(1).

The USFWS and National Marine Fisheries Service promulgated regulations implementing the above sections of the ESA in 1986. 51 Fed. Reg. 19926 (June 3, 1986); 50 C.F.R. Part 402. To comply with the ESA and its accompanying regulations, an agency proposing an action must obtain "a list of any listed or proposed species or designated or proposed critical habitat that may be present in the action area" from USFWS. [6] 50 C.F.R. § 402.12(c)-(d) (emphasis added); 16 U.S.C. § 1536(c)(1). Section 7(c)(1) requires that the list apply the "may be present" standard "based on the best scientific and commercial data available." *Id*. "In making this determination, the USFWS must give the benefit of the doubt to the species." *League of Wilderness Defs./Blue Mountains. Biodiversity Project v.*

---

[6] The plain statutory language requires USFWS to make the "may be present" determination. 16 U.S.C. § 1536(c)(1) (requiring that an agency prepare a BA "if the Secretary advises, based on the best scientific and commercial data available, that such species may be present," where the term "Secretary" refers to consulting agency, here USFWS). However, the regulations provide a second, parallel option, which allows an action agency to make an initial determination and seek USFWS's concurrence. 50 C.F.R. § 402.12(c)-(d).

In this case, the Forest Service obtained a list from USFWS. Nevertheless, the environmental groups argue the Forest Service needs to make its own, additional determination about whether grizzly bears may be present. Much of the environmental groups' argument depends on their contention that the Forest Service misapplied the standard in section 7(c)(1). *See, e.g.*, *Pl. Br.*, Dkt. 61-1 at 22 (arguing that "the Forest Service did not issue a determination 'based on the best scientific and commercial data available' for this Project, as required by the ESA, 16 U.S.C. § 1536 (c)(1)"); *Pl. Br.*, Dkt. 70 at 14 ("[T]he standard applied by the Forest Service was whether the species was 'known or suspected to occur' or whether individual members of the species 'are present,' not the lesser standard of whether the species 'may be present.'").

The Court will not impose this extra-statutory step on the Forest Service. Once USFWS gives the Forest Service an adequate list, the Forest Service must only perform a BA for species on the list. The Forest Service does not have an independent duty to determine whether, contrary to USFWS's list, endangered species may be present.

*Connaughton*, 752 F.3d 755, 763 (9th Cir. 2014) (internal quotation and citation omitted).

If USFWS advises that listed species "may be present, [the action] agency shall conduct a biological assessment." 16 U.S.C. § 1536(c)(1). The plain language of the statute and regulation thus set out a simple two-step process for an action agency to comply with section 7(c)(1): receive an adequate list and prepare biological assessments for any species on that list.

The federal agencies argue, however, that there is an additional preliminary step: the action agency must first determine whether a proposed action may affect a listed species. The regulations implementing section 7(a)(2) only require the action agency to consult with the USFWS if the agency first determines that the action "may affect" a listed species. 50 C.F.R. § 402.14. Thus, the regulations exempt an agency that has determined its action will have "no effect" on a listed species from section 7(a)(2) consultation with USFWS. *Id*. The bulk of Ninth Circuit authority similarly describes the ESA as requiring consultation only when the action agency has determined that its action "may affect" a listed species.[7]

_____

[7] *See, e.g.*, *Southwest Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1447–48 (9th Cir. 1996) (holding that the "finding [of no effect] obviates the need for formal consultation under the ESA"); *Karuk Tribe of Cal.*, 681 F.3d at 1027 ("An agency may avoid the consultation requirement only if it determines that its action will have 'no effect' on a listed
(Continued)

Relying on the regulations and this line of cases, the federal agencies argue that because section 7(a)(2) does not apply when there has been a "no effect" determination, and because section 7(c)(1) provides that its requirements are "[t]o facilitate compliance with the requirements of subsection (a)(2)," section 7(c)(1) should also not apply where there has been a no effect determination.[8] The federal agencies contend they do not need to prepare a BA for grizzlies because the Forest Service determined in its wildlife report that the action would have no effect on the grizzly bear.

The Court disagrees. Simply put, the federal agencies' argument puts the cart before the horse—in a way not consistent with the statutory language. USFWS created the "may affect"/"no effect" distinction through the regulations regarding consultation under section 7(a)(2). The plain language of the statute does not contain that limitation. Furthermore, the language of the ESA suggests that

---

species or critical habitat."); *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 596 (9th Cir. 2014) ("If no effect is found, consultation is not required.").

[8] *See, e.g.. Def. Br.*, Dkt. 67-1 at 19 ("the ESA's consultation requirements are not triggered unless and until an action agency determines that a proposed action may affect a listed species."); *id.* at 28 (arguing that "because Forest Service concluded that the Project would have no effect on grizzly bear . . . . [t]he Forest Service was therefore not required to prepare a BA for grizzly bear."); *Def. Br.*, Dkt. 75 at 17 ("Here, the Forest Service determined that the proposed action had 'no effect' on grizzly bear. It therefore was not required to consult with FWS under section 7(a)(2). The Forest Service was also not required to prepare a BA under section 7(c)(1) with regard to grizzly bear.).

Congress designed section 7(c)(1) as a precursor to assist in the final determination that an agency action may affect a listed species.[9]

The Forest Service must adhere to the requirements of § 1536(c)(1)—requesting a species list and preparing a BA for species that may be present—as part of the process of determining whether the action may affect a listed species.

### a. List Adequacy

The Court now turns to the central issue of the environmental groups' ESA claim: whether the Forest Service complied with ESA section 7(c)(1). The Forest Service prevails on this issue, if it (1) obtained a list that (2) was "based on the best scientific and commercial data available" and (3) properly applied the "may be present" standard. The Forest Service then needed to prepare any BA the list required.

The administrative record shows that on October 19, 2018, the local USFWS field office sent the Forest Service a species list attached to a letter stating that the list "fulfills the requirements of [USFWS] under section 7(c) of the Endangered

---

[9] *See, e.g.*, *Native Ecosystems Council v. Marten*, 2020 WL 1479059, at *6 (D. Mont. Mar. 26, 2020 ("[A] no effect determination does not obviate the need for a BA, as the BA is the mechanism by which an agency concludes that its proposed action will have 'no effect,' 'may affect,' or 'is likely to adversely affect' a listed or proposed species."); 16 U.S.C. § 1536(c)(1) (stating that the "purpose" of a BA is to "identify[] any endangered species or threatened species which is likely to be affected by such action.").

Species Act." [10] FS014851-64. The "Official Species List" identified Canada lynx,

North American Wolverine, and Bull Trout as the only threatened, endangered, or

candidate species that may be present in the project area. FS014853-56. Notably,

the list did not include the grizzly bear. Nevertheless, before the Forest Service is

relieved of its obligation to prepare a BA for the grizzly bear, the list needs to be

adequate. To meet the ESA's standard, the species list must be "based on the best

scientific and commercial data available" and properly apply the "may be present"

standard.[11]

### i.  Best Scientific and Commercial Data Available

"The ESA's requirement that agencies use the best scientific and

commercial data available means that agencies must support their conclusions with

---

[10] The environmental groups emphasize that the October letter and attached species list was not part of the administrative record at the time of the preliminary injunction proceeding. *See Pl. Br.*, Dkt. 70 at 18-20. They similarly note that the agencies have not provided evidence that the Forest Service actually requested or used the species list in making its decision not to prepare a BA for grizzly bears. *Id.* But these are not legal arguments and are not relevant to the question at issue here. As the environmental groups concede, because "FWS has now produced a species list . . . this Court may review the list for compliance with the ESA." *Id.* at 20.

[11] The federal agencies cite *Alliance for the Wild Rockies v. Weber* to argue that the Court should not consider the environmental groups' arguments about the adequacy of the species list because "legal issues raised for the first time in reply briefs are waived." 979 F.Supp.2d 1118, 1126 (D. Mont. 2013) (quoting *Eberle v. City of Anaheim*, 901 F.2d 814, 817-18 (9th Cir. 1990)). But, as the federal agencies acknowledge, the environmental groups clearly raised the issue in their argument heading. *See Pl. Br.*, Dkt. 61-1 at 11 ("To the extent the Fish and Wildlife Service's species list does not include grizzly bears, the species list also violates the ESA."). In addition, where, as here, the federal agencies have had the opportunity to reply to an argument, the Court may consider it. *Alliance for Wild Rockies*, 979 F.Supp.2d at 1126.

accurate and reliable data." *League of Wilderness Defs.*, 752 F.3d at 763-64

(internal quotation and citation omitted). Agencies must "consider[] all relevant

data," *id.,* and "cannot ignore available biological information." *Kern Cnty. Farm*

*Bureau v. Allen*, 450 F.3d 1072, 1080-81 (9th Cir. 2006) (internal quotation and

citation omitted). However, agencies "may rely on that available evidence even

when it is imperfect, weak, and not necessarily dispositive." *League of Wilderness*

*Defs.*, 752 F.3d at 764.

    USFWS did not articulate a basis for the species list in the administrative

record. FWS00509-22. Instead, as part of this litigation, the Forest Service

explained the list's origins through the declaration of Kathleen Hendricks, an

assistant state supervisor for the Idaho USFWS office. Hendricks explains that the

list was generated using USWFS's Information Planning and Consultation (IPaC)

maps for Idaho. *Hendricks Decl.*, Dkt 24-6 at ¶¶ 2, 6. Hendricks further explains

that "IPaC creates species lists by comparing shapefiles of potential species

presence with a delineated project area, and listing species whose potential

presence overlaps with the project area." *Id.* ¶ 4.

    The issue, then, is whether the grizzly bear IPaC maps were based on the

best scientific and commercial data available. USFWS's Idaho Ecological Services

Field Office (IFWO) manages the maps, which have two sources: data from the

most recent 5-year review and "input from IFWO biologists." *Id.* ¶ 6. Hendricks describes the biologist input process only vaguely. Apparently, USFWS makes "updates to IPaC species shapefiles . . . in consultation with IFWO species leads as population statuses change and information regarding habitat, survey data and confirmed sightings is collected by USFWS." *Id.* ¶ 4.

Importantly, USFWS does not say that it updates the grizzly bear IPaC maps using what, according to the agency's own opinion, is the "the best available science on the status of the [Selkirk Cabinet-Yaak] grizzly bear populations"— annual reports from the Selkirk Cabinet-Yaak Grizzly Bear Subcommittee. *Sarensen Decl.*, Dkt. 24-9 at ¶ 6. In fact, there is nothing in the record to support the idea that USFWS prepared the October 2018 list based on 2017 Research and Monitoring Report for the Selkirk Mountains. FWS00004-48.

These hazy descriptions of how USFWS updates IPaC maps from time to time are not enough to conclude that the agency used the best scientific and commercial data available. The federal agencies assert that the species list "is rational and is supported by the record." *Def. Br.*, Dkt. 75 at 9. That may be true, but it is not enough. Without evidence in the administrative record to draw a connection between the species list and the agencies' analysis of grizzly bear presence, the list does not meet ESA requirements. In short, USFWS failed to

"articulate a rational connection between the facts found and the choice made."
*City of Sausalito v. O'Neill*, 386 F.3d 1186, 1216 (9th Cir. 2004).

### ii.  May Be Present Standard

The ESA requires USFWS's species list to include all endangered species
that may be present in the project area. 16 U.S.C. § 1536(c)(1).The Court agrees
with the District of Montana that "the 'may be present' standard does not require
actual occurrence" or occupancy. *Native Ecosystems Council v. Krueger*, 946
F.Supp.2d 1060, 1074 (D. Mont. 2013). Rather the plain text of the statute requires
only the possibility that a listed species is present.  *See May*, *Black's Law
Dictionary* (11th ed. 2019).

The environmental groups point to four pieces of evidence which, they
insist, demonstrate that grizzly bears may be present in the project area: a bear
killed near Kelly Creek in 2008, a 2019 Bonner County Daily Bee article
discussing grizzly bears, the 2019 travel route of radio-collared grizzly bear 927,
and a den near Blackdome Peak that contained grizzly bear scat in 2017. *Pl. Br.*,
Dkt. 61-1  at 19-22; *Pl. Notice of Supplemental Authority*, Dkt. 79. The
environmental groups also highlight a statement in the Forest Service's wildlife
report that there is a "possibility of transient [grizzly bears]" in the area. FS014831.

The environmental groups argue that the key issue here is "whether the

undisputed *possibility* that a grizzly bear may travel through the Project area satisfies the 'may be present' threshold under the ESA." *Pl. Br.*, Dkt. 70 at 9. Not so. In fact, the question for the Court is "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did"—namely, that available evidence did not indicate that grizzly bears may be present. *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769-70 (9th Cir. 1985).

The distinction between how the issue is framed is subtle, but significant. In considering whether the agency used the best scientific and commercial data available, the Court must ensure that the agency considered all relevant data. Then, in examining the agency's application of the "may be present" standard, the Court looks for a sufficient connection between the evidence in the record and the agency's conclusion. The Court cannot substitute its own judgment for that of the agencies to make an independent determination about whether the may be present threshold is satisfied.

In this case, USFWS indicated that its species list "identifies threatened, endangered, proposed and candidate species . . . that may occur without the boundary of your proposed project and/or may be affected by your proposed project." FWS00509. USFWS articulated the right standard—looking at species which "may occur" or "may be affected." *Cf. Native Ecosystems Council*, 946

F.Supp.2d at 1074 (remanding a species list for misapplying the "may be present" standard where USFWS did not include lynx on a list because the project area was not "occupied" by lynx).

However, as discussed above, USFWS offered no explanation for its conclusions. Simply stating the right standard and drawing a conclusion is not enough to survive APA review. The administrative record must show some analysis—some application of facts to the standard—that permits the agency's conclusion. Here, there is none. Therefore, the list again falls short of the ESA's requirements.[12]

## 2. Major Construction Project Defense

The Court now turns to the federal agencies' argument that even if they failed to comply with the requirements of section 7(c)(1), their action is nevertheless lawful under the ESA because the Brebner Flat project is not a major construction activity.

As discussed previously, section 7(c)(1) provides that an action agency must obtain a list of all endangered species that may be present in a project area and

---

[12] Both the federal agencies and Stimson argue that the wildlife report satisfies the Forest Service's obligation to perform a BA for grizzlies. The Court will not address that argument because regardless of whether that is the case, the ESA nevertheless requires the Forest Service to obtain an adequate species list for the project.

prepare a biological assessment for any species on that list. § 1536(c)(1). But that provision includes a prerequisite; it applies only "with respect to any agency action of such agency for which no contract for construction has been entered into and for which no construction has begun on November 10, 1978." *Id.*

USFWS and the National Marine Fisheries Service issued regulations implementing that section of the ESA in 1986. 51 Fed. Reg. 19926 (June 3, 1986); 50 C.F.R. Part 402. Relying on the Conference Report to the 1978 ESA amendments, the Services determined that the species list and BA provisions of section 7(c)(1) should only be mandatory for "major construction activities." 51 Fed. Reg. 19936 ("The legislative history of section 7(c) of the Act plainly focused the mandatory duty to prepare biological assessments on 'major Federal actions . . . designed primarily to result in the building or erection of dams, buildings, pipelines and the like.'" (quoting H.R. Conf. Rep. 96-697, 13 (1979)).

According to the regulations, the action agency must first determine whether an action is a major construction activity.[13] 50 C.F.R. § 402.12. If the project is a major construction activity, the agency needs to comply with section 7(c)(1) by

---

[13] Major construction activity is defined as "a construction project (or other undertaking having similar physical impacts) which is a major Federal action significantly affecting the quality of the human environment as referred to in the National Environmental Policy Act [NEPA, 42 U.S.C. 4332(2)(C)]." 50 C.F.R. § 402.02.

requesting a list of endangered species that may be present and preparing a BA for any species on the list. *Id*. If the action is not a major construction activity, however, the regulations exempt the project from the species list and biological assessment requirements. *Id.*

In this case, the Forest Service argues that it is exempt from the species list and BA requirements because the Brebner Flat project is not a major construction activity. The environmental groups agree that the project is not a major construction activity but contend that section 7(c)(1) regulates any agency action where a listed species may be present.

Because Congress charged USFWS with administering the ESA, *Chevron* governs the Court's analysis of the issue. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837 (1984). That case sets out a two-step approach for evaluating when courts should defer to agencies' interpretation of statutes they administer.

At *Chevron* step one, the Court examines the governing statute itself to determine whether Congress has spoken directly to the precise question at issue. *Id*. at 842. In making this determination, the Court uses "traditional tools of statutory construction," such as examining statute's text, structure, and legislative history. *Id*. at 843 n.9. "Whether statutory language is sufficiently plain or not is

'determined by reference to the language itself, the specific context in which the language is used, and the broader context of the statute as a whole.'" *Western Watersheds Project v. Interior Bd. of Land Appeals*, 624 F.3d 983, 987 (9th Cir. 2010) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). If the intent of Congress is clear, that is the end of the inquiry because agencies—and courts reviewing their actions—must give effect to the unambiguously expressed intent of Congress. *Chevron*, 467 U.S. at 842-43. The Court does not owe deference to an agency's regulation that contradicts the plain language of the statute. *Id*.

If, however, the Court determines that "the statute is silent or ambiguous with respect to the specific issue," the Court turns to Chevron's second step. *Id*. at 843. At this step, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. The Court defers to an agency's construction "if it is a reasonable one" *Dep't of Treasury, I.R.S. v. Fed. Lab. Rels. Auth.*, 494 U.S. 922, 928, (1990)—even if it is not "the best interpretation of the statute," *United States v. Haggar Apparel Co.*, 526 U.S. 380, 394 (1999), "the only construction that the agency permissibly could have adopted" *Corrigan v. Haaland*, 12 F.4th 901, 907 (9th Cir. 2021) (cleaned up), or the Court would construe the statute differently. *Dep't of Treasury*, 494 U.S. at 928.

a. *The Statute is Unambiguous.*

The "precise question at issue" here is whether section 7(c)(1) requires an agency to obtain a list and prepare a BA for any action where a listed species may be present, even though the regulations only require a list and BA for major construction activities. *Chevron*, 467 U.S. at 842. The Ninth Circuit has not directly decided this issue. *Swan View Coal. v. Weber*, 783 F. App'x 675, 678 n.1 (9th Cir. 2019). The Court concludes that the ESA unambiguously answers this question affirmatively.

i.   Plain Text

"In construing what Congress has enacted a court must begin, as always, with the language of the statute." *Corrigan*, 12 F.4th at 909 (cleaned up) (citing *Duncan v. Walker*, 553 U.S. 167, 172 (2001)).

The plain terms of section 7(c)(1) apply to "any agency action." The statutory language does not include any carve-outs or qualifiers for particular kinds of agency action, such as those that are not major construction activities. Moreover, the statute clearly defines "agency action" as "any action authorized, funded, or carried out by" a federal agency. 16 U.S.C. § 1536(a)(2); *see also Karuk Tribe of Cal.*, 681 F.3d at 1020 ("There is little doubt that Congress intended agency action to have a broad definition in the ESA, and we have followed the

Supreme Court's lead by interpreting its plain meaning in conformance with Congress's clear intent.") (internal quotation and citation omitted)).

Section 7(c)(1) does reference contracts for construction in setting out its applicability to agency action. But that reference is only to make clear (1) that the statute did not apply to contracts for construction that had already been signed, and (2) that the requirements must be met before a contract for construction is signed. Nothing about those two references expressly or implicitly exclude agency actions where there is no contract for construction.

### ii.  Statutory Structure

"In making the threshold determination under *Chevron* step one, a reviewing court should not confine itself to examining a particular statutory provision in isolation. Rather, the meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *Corrigan*, 12 F.4th at 910 (cleaned up) (citing *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007)).

Here, the Court must situate section 7(c)(1) in the broader context of section 7. The statutory structure demonstrates that BAs are sometimes mandatory and sometimes discretionary. For example, section 7(c)(2) provides that parties applying for exemptions "*may* conduct a biological assessment to identify any

endangered species or threatened species which is likely to be affected by such action." 16 U.S.C. § 1536(c)(2) (emphasis added). And "may is permissive." Bryan A. Garner & Antonin Scalia, Reading Law 112 (2012). Likewise, section 7(g) provides that an exemption applicant must "conduct[] any biological assessment required by subsection (c)." 16 U.S.C. § 1536(g)(3)(A)(ii). "[T]his language indicates that certain projects do not require a BA—or else the language would read 'conduct a BA' rather than 'any required' BA." *Native Ecosystems Council v. Marten*, 2020 WL 1479059, at *5 n.6 (D. Mont. Mar. 26, 2020).

According to the federal agencies, this mandatory and discretionary context clarifies the meaning of section 7(c)(1). They argue that the fact of mandatory and discretionary BAs supports their claim that BAs—and, by extension, species lists—are only mandatory for actions that are major construction activities. *Def. Br.*, Dkt. 67-1 at 10.

The Court disagrees. The mandatory scope of the BA requirement is set out plainly in the text of 7(c)(1). A BA (and species list) is required for the subset of agency actions for which "the Secretary advises, based on the best scientific and commercial data available, that [listed] species may be present." 16 U.S.C. §1536(c)(1). The permissive aspect, as demonstrated in subsections 7(c)(2) and 7(g)(3), exists where that requirement has not been met.

In contrast, there is no textual support for the federal agencies' interpretation of the mandatory scope. In fact, the phrase "major construction activities" does not appear anywhere in the text of section 7(c)(1). Although the language does repeatedly reference construction, those references do not contain the phrase "major construction activities," nor, as discussed above, do they expressly or implicitly exclude other agency actions.

In the alternative, the federal agencies claim that by recognizing the permissive and mandatory scope of 7(c)(1), the Court "inject[s] ambiguity into the statute." In support of their argument, they highlight the *Marten* court's speculation about the nature of the permissive scope and decision not to resolve that ambiguity. *Def. Br.*, Dkt. 75 at 17. But at step one, *Chevron* does not require that the statute be unambiguous in its entirety. Rather, the statute must be unambiguous "with respect to the specific issue" at hand. *Chevron*, 467 U.S. at 843. Here, the statute unambiguously addresses the issue at hand—the scope of the mandatory BA and species list requirement. That is enough.

### iii. Statutory Purpose

"In interpreting a statute, a court must also account for that statute's history and purpose." *Corrigan*, 12 F.4th at 912 (citing *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 90–93 (2007)). The legislative and statutory history

does not support the federal agencies' position that the mandatory scope of the BA

requirement is confined to major construction projects.[14]

Congress amended the ESA to add Section 7(c)(1) in 1978. *Endangered*

*Species Act Amendments of 1978*, Pub. L. No. 95-632, § 3, 92 Stat. 3751, 3753

(1978). Congress designed section 7(c)(1) to stop agencies spending public funds

on projects that had not undergone ESA review. *See A Bill to Authorize*

*Appropriations to Carry Out the Endangered Species Act of 1973 During Fiscal*

*Years 1979, 1980, and 1981: Hearings on Endangered Species Authorization—*

*H.R. 10883 Before the Subcomm. on Fisheries and Wildlife Conservation and the*

*Env't of the House Comm. on Merchant Marine and Fisheries*, 95th Cong. 95-39,

Part 1 (1978); *A Bill to Authorize Appropriations to Carry Out the Endangered*

*Species Act of 1973 During Fiscal Years 1979, 1980, and 1981: Hearings on*

*Endangered Species Authorization—H.R. 10883 Before the Subcomm. on Fisheries*

*and Wildlife Conservation and the Env't of the House Comm. on Merchant Marine*

---

[14] Stimson's argument about the purpose of the ESA is similarly unpersuasive. Requiring BAs for projects that meet 7(c)(1)'s statutory requirements would, according to Stimson, "require consultation for a whole host of projects where no effect is plausible . . . needlessly divert[ing] agency resources away from ESA consultations actually needed to protect listed species." *Intervenor Br.,* Dkt 65-1 at 28. But the Supreme Court has held that "[t]he plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, *whatever the cost*." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 184-85 (emphasis added).

*and Fisheries*, 95th Cong. 95-39, Part 2 (1978). The legislative history emphasizes expensive construction projects because the amendment came in response to a Supreme Court decision enjoining the completion of a nearly $80 million dam project that violated the ESA. *See Tennessee Valley Authority v. Hill*, 437 U.S. 153, 159-66 (1978); *see also* Subcomm. Hr'gs Part 1 at 1-2, 15, 17, 51-52, 66-67; Subcomm. Hr'gs Part 2 at 563-64, 705. But the legislative history does not demonstrate congressional intent to only apply section 7(c)(1) to costly construction projects.[15] *See generally* Subcomm. Hr'gs Part 1 at 20-22.

The following year, Congress further amended the ESA to add Section 7(c)(2), allowing parties seeking exemptions to perform discretionary BAs. Pub. L. No. 96-159, § 4, 93 Stat. 1225, 1226-27 (1979). The legislative history for that amendment includes language indicating that "existing law [ESA section 7(c)(1)] requires federal agencies to conduct biological assessments on major federal actions initiated after November 10, 1978 and designed primarily to result in the building or erection of dams, buildings, pipelines and the like." H.R. Rep. No. 96-697, at 13 (1979) (Conf. Rep.). The federal agencies argue that this legislative

---

[15] For example, a 1978 House Report discussed "the exercise of agency discretion which would result in contracts for construction, actual construction activities, or *other potentially destructive activities*." H.R. Rep. No. 95-1625, at 20 (1978) (emphasis added). Similarly, another House Report discussed the road construction project at issue in *Federation v. Coleman*, 529 F.2d 359 (5th Cir. 1976). H.R. REP. 95-1625 (1978) at *11.

history demonstrates clear congressional intent to limit the BA requirement to major construction activities. *Def. Br.*, Dkt. 67-1 at 26.

The Court disagrees. This summary of subsection 7(c)(1) is not legislative history for the subsection itself and the limitation described in the Conference Report was not included in the language of the statute. Although "subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction," that weight is limited to actual legislation for which "Congress has proceeded formally through the legislative process. A mere statement in a conference report of such legislation as to what the Committee believes an earlier statute meant is obviously less weighty." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 124 (1980).

Furthermore, the origin of this understanding of subsection 7(c)(1) is not clear. The prior versions of the act contained no such limitation. P.L. 95–632, November 10, 1978, 92 Stat 3751. And the history of the prior versions contained no discussion of "major federal actions" in relation to then subsection (c)(3), now (c)(1). *See* H.R. Rep. 95-1625, 20, (1978) ("The new section 7(c)(3) is designed to stimulate the development of additional biological information to assist federal agencies in complying with section 7."); H.R. Conf. Rep. 95-1804, 19 (1978).

*b.  Harmonizing Regulation and Statute*

The text, structure, and purpose of ESA section 7(c)(1) unambiguously require an agency to obtain a species list and prepare a BA for any action where a listed species may be present. Because Congress's meaning is clear, the Court must follow the statute without consideration for the agencies' interpretation. *Chevron*, 467 U.S. at 843. However, the Court agrees with the District of Montana that the agencies' *interpretation* of the "major construction projects" regulation contradicts the statute, rather than the regulation itself. *Native Ecosystems Council*, 2020 WL 1479059 at *8.

"An agency simply may not interpret a regulation in a way that contravenes a statute." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Forsgren*, 309 F.3d 1181, 1190 (9th Cir. 2002). Thus, the Court "must ensure that the interpretation is not inconsistent with a congressional directive; a court need not accept an agency's interpretation of its own regulations if that interpretation is inconsistent with the statute under which the regulations were promulgated." *Turtle Island Restoration Network v. United States Dep't of Commerce*, 878 F.3d 725, 733 (9th Cir. 2017). The Court may reject an inconsistent interpretation of a regulation and "give it a construction consistent with its administrative history, case law, and the governing statute" rather than invalidating it. *League of Wilderness Defs*, 309 F.3d at 1190 n.8.

The regulation here provides that agencies must obtain a species list and prepare a BA "for Federal actions that are 'major construction activities.'" 50 C.F.R. § 402.12. In this case, the agencies have interpreted that regulation to mean that "a species list and BA are required only for actions that are major construction activities." *Def. Br.,* Dkt. 67-1 at 23. As the environmental groups explain, the agencies' interpretation thus adds the modifying term "only," rather than "simply applying the plain language of the regulation." *Pl. Br.*, Dkt. 70 at 33.

The Court can easily interpret the regulation in a manner that is consistent with both the ESA and the text of the regulation itself. In fact, the Ninth Circuit has already provided such an interpretation. In *Swan View Coalition v. Weber*, the Ninth Circuit's unpublished memorandum disposition suggests:

> It may well be that the "major construction activities" language is not a broad limitation of the applicability of the regulation but an explanation of how the regulation applies to such activities in particular. If so, then the regulation does not relieve agencies of the obligation to conduct a biological assessment for actions other than "major construction activities."

783 F. App'x at 678 n.1. This interpretation aligns with the text of the regulation and statute. "Simply because the regulation requires a BA for major construction activities does not mean that it excuses the Forest Service from preparing a BA for projects that are not major construction activities. Interpreting the regulation as a non-exhaustive example of a circumstance when a BA is required harmonizes the

regulation with the agency's statutory duty." *Native Ecosystems Council*, 2020 WL 1479059 at *8; *see also League of Wilderness Defs*, 309 F.3d at 1188 (reading a regulation "to conform to the statute" by finding that the regulation's list "is not exhaustive").

Rather than invalidating the regulation, therefore, the Court rejects the Forest Service's interpretation. The Court adopts the interpretation of the *Marten* court—"major construction activities" are a non-exhaustive example of a circumstance requiring a species list and a BA.

### 3.  Remedy

Because the Forest Service failed to fully comply with the ESA, the Court will grant summary judgment to the environmental groups on Claim One. The federal agencies prevail on all the other claims, so the Court will turn to the question of remedy now.

The environmental groups argue that the proper remedy is either vacating the project decision or remanding to the agencies and suspending project implementation. The Court disagrees. Although remand without vacatur is appropriate only in "limited circumstances," those circumstances are present here. *Cal. Cmties. Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012) (per curium).

The APA provides that courts shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not accordance with law." 5 U.S.C. § 706(2) & (2)(A). "Ordinarily when a regulation [or agency decision] is not promulgated in compliance with the APA, the regulation is invalid." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995). Thus, "vacatur of an unlawful agency action normally accompanies a remand." *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018). "When equity demands, however, the regulation can be left in place while the agency reconsiders or replaces the action, or to give the agency time to follow the necessary procedures." *Id.*

The decision of whether to vacate is "controlled by principles of equity." *Id.* (quoting Nat'l Wildlife Fed'n v. Espy, 45 F.3d 1337, 1343 (9th Cir. 1995)). In determining the appropriate remedy, the Court must "weigh the seriousness of the agency's errors against 'the disruptive consequences'" of vacatur. *Pollinator Stewardship Council v. U.S. E.P.A.*, 806 F.3d 520, 532 (9th Cir. 2015) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51, 300 U.S. App. D.C. 198 (D.C. Cir. 1993)). Here, the agency's error is limited in severity, and vacatur would result in a disproportionate disruption to the project, which has largely withstood the environmental groups' legal challenge. Thus, the

circumstances of this case justify the relatively rare remedy of remand without vacatur.

### a. The Seriousness of the Error

To determine whether vacateur is warranted, the Court must first consider the seriousness of the Forest Service's error. As discuss above, the Forest Service's error consisted of its failure to obtain an adequate list as required by the ESA. *See supra,* Part A.1.a. In short, the list is inadequate because USFWS did not offer sufficient analysis or explanation to support its conclusions.

As part of the seriousness of the error analysis, the Court "look[s] at whether the agency would likely be able to offer better reasoning or whether by complying with procedural rules, it could adopt the same rule on remand." *Nat'l Family Farm Coal. v. United States EPA*, 960 F.3d 1120, 1145 (9th Cir. 2020). Here, the Forest Service's error could be remedied through further explanation. *See Pollinator Stewardship Council*, 806 F.3d at 532. Indeed, the Forest Service has presented significant evidence that further analysis is likely to yield a better-substantiated but unchanged determination. *See* FS01824; FS014832; *Decl. of Jennifer Fortin-Noreus*, Dkt. 49-1.

The Court is reticent to categorize any violation of the APA as not serious. But on the spectrum of seriousness, this procedural, non-substantive error does not

carry significant weight. The first *Allied-Signal* factor thus favors remand without vacatur.

### b.  The Consequences of Vacatur

The Court next considers the disruptive consequences of vacating the agency decision rather than remanding for correction of the identified deficiency. Here, project activities have already been ongoing for years. Vacatur is likely to cause immediate economic harm and would threaten the safety of local communities. When considered alongside the limited scope and technical nature of the Forest Service's error, the equities favor remand without vacatur.

The project's economic impact is relevant to the question of whether to vacate on remand. *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010). Vacating the project's timber harvest activities would significantly impact the local economy. The project is expected to generate an estimated $2.5 million in labor income on an average annual basis. *Decl. of Colin Sorenson* ¶¶ 3, 5, Dkt. 24-12. In addition, timber sale activities will yield approximately $520,000 for use in forest management activities. *Id.*

The potential disruptive effects on the environment, local communities, and wildlife are also relevant considerations to the question of whether to vacate. *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010). As the Court discussed

at the preliminary injunction phase, the project will decrease the likelihood and intensity of wildfires, which threaten local communities and the forest ecosystem. The Court is particularly mindful of the dangers that ceasing harvest operations now would pose to the wildland urban interface of Avery for the upcoming fire season.

Conversely, the environmental groups still have not shown that irreparable injury to wildlife or the environment is likely. Construing the environmental groups' evidence in the most generous light, they have shown that perhaps three transient bears have come within 15 miles of the project within the last two decades. FS014830-31 (one bear in the drainage of the North Fork of the Clearwater River in 2007); FS014795-97 (one bear tracked by radio collar in 2019); FS014798-99 (email chain requesting authorization to conduct a different genetic test for a single scat sample collected near Blackdome peak in 2017). The consequent likelihood of injury is significantly outweighed by the other considerations.

On balance, the Forest Service's error does not justify the significant delay, expense, and risks to people and property that would result from vacatur. The Court accordingly remands without vacatur for further analysis of the endangered species list as required by the ESA.

B.      **Elk Claims**

In Claim Four, the environmental groups assert that the Forest Service's analysis of the project's effects on elk violated NFMA and NEPA.

NEPA requires all federal agencies, including the Forest Service, to prepare an environmental impact statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). To determine whether a proposed project will "significantly affect" the environment, federal agencies may prepare an Environmental Assessment (EA). *Id.* "An EA is a 'concise public document that briefly provide[s] sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact' (FONSI)." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (quoting 40 C.F.R. § 1508.9).

"If the EA concludes that the action will not have a significant effect on the environment, the agency may issue a Finding of No Significant Impact and may then proceed with the action." *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004). But the agency must prepare an EIS if the EA raises "substantial questions" as to "whether a project may cause significant degradation of some human environmental factor." *Blue Mountains.*

*Biodiversity Project*, 161 F.3d at 1212 (citing *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998)) (cleaned up).

For the Brebner Flat project, the Forest Service prepared an EA and issued a FONSI. The environmental groups claim that the Forest Service needs to prepare an EIS. The challenge primarily focuses on the Forest Service's decision to offset the project's reduction in elk security by seasonally gating a portion of road 1956E. The environmental groups argue that the Forest Service violated NEPA by failing to take a hard look at the efficacy of this mitigation measure. They also claim that the gate will not be effective, meaning the Brebner Flat project will decrease elk security habitat, violating NFMA. The environmental groups further argue that the EA did not adequately analyze the project's cumulative effects.

The Court is not persuaded. For the reasons explained below, the Court will grant the federal agencies' motion for summary judgment on this claim.

### 1.  Tiering and Incorporation

Before addressing the substance of the environmental groups' claims, the Court turns to a preliminary issue: the environmental groups' allegations that the Forest Service improperly "tiered to" non-NEPA documents in the EA—namely the wildlife report, hydrology report, and appendix to the recreation reports.

Tiering is a particular term of art, which NEPA's implementing regulations define as

> [T]he coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared.

40 C.F.R. § 1508.28. As is the case with all NEPA documents, an EA cannot tier to non-NEPA documents. *Kern v. Bureau of Land Mgmt.*, 284 F.3d 1062, 1073 (9th Cir. 2002).

But an EA may reference an outside document without tiering to it. NEPA's implementing regulations allow an EIS to "incorporate by reference" both NEPA and non-NEPA documents. *See* 40 C.F.R. § 1502.21 ("Agencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action."); *see also* 40 C.F.R. § 1500.4(j) ("Agencies shall reduce excessive paperwork by . . . [i]ncorporating by reference."). Any material incorporated by reference must be "cited in the statement," "briefly described," and "reasonably available for inspection by potentially interested persons." 40 C.F.R. § 1502.21.

The plain language of the regulation apparently limits "incorporating by reference" to EISs. *See* 40 C.F.R. § 1502.21 ("Agencies shall incorporate material *into an EIS* by reference") (emphasis added). But the Ninth Circuit has explained that EAs may also incorporate material by reference. *See Jones v. Nat'l Marine Fisheries Serv.*, 741 F.3d 989, 998 (9th Cir. 2013) ("[A]n agency may incorporate data underlying an EA by reference."); *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 956 (9th Cir. 2008) ("BSC argues that the Corps did not adequately consider the environmental impacts of the Rock Creek Mine Project in the EA . . . . This is incorrect . . . . The Environmental Information Document, incorporated by reference in the EA, also includes specific data on the air quality issues at the site, and concludes that there are none that are significant.").

In this case, it is clear that the Forest Service incorporated the wildlife report, hydrology report, and recreation index by reference. In so doing, the Forest Service adhered to the requirements set forth in 40 C.F.R. § 1502.21. The Forest Service was not impeding agency or public review because the documents were available for inspection. The EA appropriately cited to and briefly described the documents referenced to support its conclusions. FS00076 (incorporating by reference the wildlife report); FS000084-87 (incorporating by reference the

hydrology report); FS000101 (incorporating by reference the recreation report). The supporting documents were available to the public within the comment time. The draft and final EA both explain that "[s]upporting resource reports, references, and biological assessments are incorporated by reference into this document. These documents are part of the project record and are available upon request." FS000051 (final EA); FS000107 (draft EA).

Because the Forest Service properly incorporated by reference the wildlife report and other supporting documents into the EA, the Court will consider these materials in addressing the environmental groups' claims.

## 2.  Gate Closure of Road 1956E

The environmental groups question the efficacy of the Forest Service's decision to close about one mile of the OHV portion of road 1956E during elk hunting season. *Pl. Br.*, Dkt. 61-1 at 33-35. To support this claim, the environmental groups point to a 2014 gate-monitoring survey. In that survey, the Forest Service concluded that 23 out of 30 gates (about 75%) in elk monitoring unit 7-6 were not effective. FS011601-03. The environmental groups also highlight a 2019 travel analysis report that only looked at five of those gates but reached the same effectiveness conclusions as the 2014 survey. FS014058.

Although the results of the monitoring survey are certainly troubling, the federal agencies point out several important clarifications. First, they emphasize that the survey is from 2014, making it somewhat stale simply because of the intervening years. *Def. Br.,* Dkt. 67-1 at 36. Second, they point out that the Forest Service conducted the survey in August and the travel analysis report in June. *Def. Br.,* Dkt. 75 at 20. For the Brebner Flat project, however, the Forest Service will close gate 1956E during elk hunting season, from September through December. *Id; see also* REF009449 ("The concept of security habitat for elk . . . applies to the hunting season."). Finally, the federal agencies stress that the survey considered gates within the entire elk management unit, many of which are not in elk security habitat. *Def. Br.,* Dkt. 67-1 at 36. In fact, only two of the gates analyzed in the monitoring survey and travel report, 1234 and 1235, are actually within elk security habitat. *Id; Def. Br.*, Dkt. 75 at 21. Importantly, however, both the 2014 survey and the 2019 travel report indicated that gates on those roads are ineffective because ATV tracks circumvented the gates. FS011601; FS014058.

The federal agencies also underscore the Forest Service's plan to ensure the security of gates in elk security habitat during the closure period. FS000077. The EA explains that the Forest Service has implemented a monitoring plan consisting of "1) monitoring at least 30 percent of gates in elk security each year, 2)

monitor[ing] 'problem' gates annually (those with some history of breaching), 3) document[ing] any damage or breaches and have them prioritized for repair the next year (contract process can take up to a year)." FS000077. The Forest Service further explained that it had "beef[ed] up [gate] designs" to prevent breaching and "trained more Forest Protection Officers" to complete the monitoring "with special emphasis on [gates] in elk security areas." FS000192.

With this background in mind, the Court will now turn to the specific claims that the Forest Service's gate closure decision did not comply with NFMA and NEPA.

### a. Impact on Elk Security Habitat Acreage

The environmental groups argue that the Forest Service's gate closure decision violates NFMA. NFMA and its implementing regulations direct the Forest Service to develop a forest plan "which consists of broad, long-term plans and objectives for the entire forest." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012); *see generally* 16 U.S.C. § 1604. The Forest Service then implements the forest plan through site-specific projects, which must "be consistent" with the forest plan. *Id.;* 16 U.S.C. § 1604(i).

As discussed previously, the Idaho Panhandle National Forest Plan requires that low priority elk management units maintain existing levels of elk security

habitat—timbered areas greater than 250 acres that are more than one-half mile from a motorized route. REF003332; REF0033240. Because the Brebner Flat project is in unit 7-6, a low-priority unit, the project must maintain existing elk security habitat levels.

During its initial consideration of the project, the Forest Service determined that the proposed timber harvest and road construction would reduce elk security habitat by 210 acres. FS000008. To comply with NFMA's mandate, the Forest Service decided to offset that 210-acre loss by creating 314 acres of new security habitat elsewhere in elk management unit 7-6. FS000010. The Forest Service determined that using a gate to close about one mile of the OHV portion of road 1956E during elk hunting season would result in a net 104-acre gain in security habitat in elk management unit 7-6. FS000077; FS000010.

The environmental groups claim that because the gate will not effectively close the road, the project will in fact reduce elk security habitat and violate NFMA. "Agency decisions challenged under the NFMA may be set aside only if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Native Ecosystems Council*, 697 F.3d at 1053 (citing *Forest Guardians*, 329 F.3d at 1096-97).

In this case, the Forest Service acknowledged "a handful (5-10) of 'problem' gates that need to be monitored/repaired annually." FS000077. But the Forest Service crafted a remedy for that problem: a multistep monitoring plan for gates in elk security habitat. *Id.* It was rational for the Forest Service to conclude that, although there had been gate failures in the past, increased monitoring would address the issue. *See Forest Guardians v. United States Forest Serv.*, 329 F.3d 1089, 1098 (9th Cir. 2003) (upholding a Forest Service decision to address its past overgrazing problem with an improved monitoring program).

The environmental groups do not demonstrate a broader gate problem. The circumstances of the 2014 survey and the 2019 travel report are factually distinct from the situation at issue here. The Forest Service could rationally conclude that a somewhat outdated summertime survey of gates mostly outside elk security habitat was not a good indicator of gate reliability inside elk security habitat during the late autumn hunting season. For the same reason, the Forest Service's decision not to discuss the gate monitoring survey in its NEPA documents passes NEPA muster.

The Forest Service's gate monitoring program—which focused on gates in elk security habitat during closure periods—further supports for that distinguishment. Even without quantitative evidence that the surveyed gates were

different than the gate on Road 1956E, the Forest Service could rationally conclude that gates subject to a multistep monitoring plan were distinguishable from other gates in the elk management unit. The evidence of gate ineffectiveness is not analogous enough to show that the Forest Service failed to consider relevant evidence or made a clear error of judgment.

Finally, the Forest Service's interpretation of elk security habitat, as defined by the forest plan, is entitled to deference. The forest plan defines elk security habitat in part by an area's distance from a motorized route open to the public. REF0033332. Notably, this definition set certain efficacy benchmarks for road closures to create elk security habitat. The Forest Service has interpreted this definition to mean that the agency can maintain or create additional elk security by closing motorized routes to public use and committing to monitor such closures and repair them when necessary. *See* FS014821. That interpretation of the definition is reasonable, and the Court will give it substantial deference. *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 947 (9th Cir. 2014) ("The Forest Service's interpretation and implementation of its own forest plan is entitled to substantial deference.").

> *b.*   Efficacy of Mitigation Measure

The environmental groups further argue that Forest Service's gate closure decision violates NEPA because it is not an effective mitigation measure.

NEPA permits an action agency to justify a finding of no significant impact by adopting measures to mitigate the project's adverse environmental impact. *Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 733-34 (9th Cir. 2001). In such instances, a finding of no significant impact must be supported by more than perfunctory descriptions or mere lists of mitigation measures that lack supporting analytical data, *id.*, and "cannot rely on monitoring and mitigation alone," *Jones*, 741 F.3d at 999. Rather, "the proposed mitigation measures must be developed to a reasonable degree," although "the agency is not required to develop a complete mitigation plan detailing the precise nature of the mitigation measures." *Id.* (internal quotations and citations omitted).  Mitigation measures adhere to these requirements when they render the project's negative environmental impacts "so minor as to not warrant an EIS." *Id.; Friends of Payette v. Horseshoe Bend Hydroelectric Co.*, 988 F.2d 989, 993 (9th Cir. 1993).

Many cases applying this mitigation measure standard wrestle with complex qualitative information. For instance, in *North American Wild Sheep*, the court considered whether gating a road would effectively mitigate disturbances to a Bighorn Sheep herd's lambing area and mineral lick social activities. *Found. for N.*

*Am. Wild Sheep v. United States Dep't of Agric.*, 681 F.2d 1172, 1176 (9th Cir. 1982).

In contrast, this case is relatively simple because the relationship between the environmental impact and the mitigation measure is fully quantitative. The Brebner Flat EA identified a specific, adverse environmental impact: decreasing elk security habitat by 210 acres. The proposed mitigation measure not only minimizes that environmental impact, it offsets the harm completely. In fact, the project creates more elk security habitat unit 7-6 than it destroys. The Forest Service thus fully mitigated the potential impacts of reductions in elk security habitat.

The Forest Service's proposed mitigation measure satisfies NEPA's requirement that a plan be developed to a reasonable degree, though it need not be fully developed. The Forest Service selected a portion of road 1956E for closure, a mechanism to close it, and a monitoring system to accommodate for possible lapses or breaches. As discussed previously, the Forest Service's determination that this plan would create elk security habitat is entitled to deference. The mitigation measure is supported by analytical data about elk security habitat— namely, precise measurements that 210 acres will be lost and 314 acres will be

gained. And the mitigation plan does not rely on monitoring alone. The gate is the mitigation mechanism, and gate monitoring is a tool to ensure its effectiveness.

The Forest Service's analysis shows the agency took the requisite hard look at this mitigation measure. The plan is thorough. The Service's analysis supports its conclusion that seasonally closing road 1956E will offset the environmental harms such that the reduction in elk security habitat does not warrant an EIS.

### 3.  Cumulative Impact

Finally, the environmental groups argue that the Forest Service did not adequately analyze the Brebner Flat project's potential cumulative effects on the area's elk population.

From the outset the environmental groups run into problems pursing their argument that the Forest Service did not adequately analyze the project's cumulative effects – the record indicates that they waived this challenge because they did not raise it during the administrative review process.

To challenge an agency's compliance with NEPA, a party must participate in the administrative review process in a way that "alerts the agency to the parties' positions and contentions" so that the agency has the opportunity "to give the issue meaningful consideration." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,

435 U.S. 519, 553 (1978)) (cleaned up). Where parties do not raise particular objections to an EA during the administrative review process, they "forfeit[] any objection to the EA on [those] ground[s]." *Id.* at 764-65; *see also* 36 C.F.R. § 218.14.

In this case, the federal agencies contend that "Plaintiffs' comments on the Forest Service's draft NEPA analysis contain only a short section discussing elk, which is limited to the status of gates that protect species habitat." *Def. Br.*, Dkt. 67-1 at 39 (citing FS000287, FS000190-96). In reply, the environmental groups do not dispute the point but instead contend that the argument fails because the Forest Service "withheld the dramatically declining status of this elk population from the public in the Project EA." *Pl. Br.*, Dkt. 70 at 47.

The environmental groups cite *Alliance for the Wild Rockies v. Savage* to support their argument, but the case is inapposite. 897 F.3d 1025 (9th Cir. 2018). In that case, the Ninth Circuit permitted plaintiffs to bring a claim that was not raised in response to the draft EIS—and so would usually be untimely—because the Forest Service did not disclose the specific fact underlying the claim, "the alleged increase in total linear road miles," until the final EIS. *Id.* at 1033-34. The court held that because plaintiffs raised their objection "at the first available opportunity," the objection was not waived. *Id.* (citing 36 C.F.R. § 218.8(c)).

Here, in contrast, the environmental groups argue that the Forest Service failed to take a hard look at the project's cumulative effects because the Service did not "disclose and discuss" three factors: declining elk population, private clearcutting, and the percentage of elk security habitat in the project area. *Pl. Br.,* Dkt. 61-1 at 29. But the facts underlying these claims come from publicly available analysis from the Idaho Department of Fish and Games. *Pl. Br.,* Dkt. 70 at 45. This information was available to the environmental groups when the Forest Service published the draft EA. The Forest Service did not fail to disclose any information necessary to the claim. Therefore, the environmental groups have waived this argument.

Moreover, the environmental groups' claim fails on the merits. The Court will briefly address the arguments.

An EA "must fully assess the cumulative impacts of a project." *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 917 (9th Cir. 2012) (internal quotations and citations omitted). The cumulative effects of a project are "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7.

"In a cumulative impact analysis, an agency must take a 'hard look' at all actions that may combine with the action under consideration to affect the environment." *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1104 (9th Cir. 2016) (citing *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 605 (9th Cir. 2010)) (cleaned up). This analysis should include "some quantified or detailed information that results in a useful analysis," but may "characterize the cumulative effects of past actions in the aggregate without enumerating every past project that has affected the area." *Cnt. For Envtl. L. and Pol'y v. Bureau of Land Mgmt.*, 655 F.3d 1000, 1007 (9th Cir. 2011). To prevail in a challenge to an agency's cumulative effect analysis, the environmental groups need to "show only the potential for cumulative impact," and not "what cumulative impacts would occur." *Te-Moak Tribe of W. Shoshone of Nev.*, 608 F.3d at 605.

The first issue is whether the Forest Service must issue a cumulative analysis that specifically analyzes declining elk population numbers. According to the environmental groups, because the Forest Service has refused "to acknowledge the dramatically declining elk population in the area," the Forest Service has not offered a "meaningful discussion of the actual cumulative effects of the Project." *Pl. Br.,* Dkt. 70 at 45-46.

**MEMORANDUM DECISION AND ORDER - 55**

True, the Forest Service's analysis focuses on the Brebner Flat project's impact to elk security habitat, rather than its impact on the elk population. But that is because the forest plan—and, in turn, the EA and wildlife report—addresses population management through elk security habitat. Since adopting the 2015 forest plan, the Forest Service has used the tool of elk security habitat to measure impacts on elk populations. REF011259; REF011166-67; REF009449-50. The issue, therefore, is whether the Forest Service was reasonable in using this methodology to analyze the Brebner Flat project's potential effects.

The wildlife report shows that it was. The report explains that because elk are a popular species to hunt, they are particularly vulnerable to disturbances that humans cause when accessing their habitat. FS014820. Managing motorized access during hunting season is an important tool address this issue. FS014820. The report thus lays out sound reasoning underpinning the Forest Service's decision to use elk security to measure the project's cumulative effects on elk. FS014821. As a methodology, elk security habitat analysis fits into NEPA's "aggregate effects" method of analyzing cumulative impacts. *See* 36 C.F.R. § 220.4(f); *Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1111-13 (9th Cir. 2015). By analyzing cumulative impacts to elk security habitat—which is linked explicitly to

the elk population itself—the Forest Service satisfied NEPA's mandate to take a hard look at the likely effects of the proposed action on elk population.[16]

In addition, the EA and the wildlife report adequately analyzed the project's cumulative effects on elk security habitat. The wildlife report considered the cumulative impacts of timber harvest, fire suppression, pre-commercial thinning, and public activities to elk security habitat. The EA only briefly discusses the cumulative effects to elk security habitat—"[a]lthough there may be temporary disturbances to elk during project implementation, the result of this project would be improved conditions for elk with no long-term detrimental effects"—but the wildlife report provides a thorough discussion of the cumulative effects. FS000075. The environmental groups may disagree with the Forest Service's conclusion, but they have not raised serious questions regarding the cumulative impacts analysis.

The next issue is whether, as the environmental groups argue, the Forest Service should have considered whether private land clearcutting makes the project area "some of the last best forested buffers for elk." *Pl. Br.*, Dkt. 67-1 at 26. The

---

[16] The Court is also unpersuaded by the environmental groups' citations to its previous decisions involving cumulative impacts on sage grouse populations. See *Pls.' Br.*, Dkt. 70 at 39. Neither of those cases involved analysis through habitat security based on a forest plan. What's more, the sage grouse is a designated sensitive species and therefore entitled to more protections under federal law than elk.

forest plan only considers National Forest land when defining elk security habitat,

reasoning that "any security habitat that exists on other land ownerships would be

considered a bonus." REF009450. Thus, the foreseeable timber harvest planned on

private lands—which the environmental groups put at issue—would not, by

definition, affect elk security habitat. FS000077. Because, as discussed above, the

Forest Service reasonably decided to analyze the project's cumulative effects using

elk security habitat, the environmental groups' argument about private clearcutting

fails.

The final issue is whether elk management unit 7-6 has sufficient levels of

elk security habitat. The environmental groups highlight sources in the

administrative record that suggest that elk security habitat can best "provide a

reasonable level of bull survival" if it is makes up at least 30% of an elk

management unit. FS021836; *see also* FS011595.  At present, however, only about

5% of elk management unit 7-6 is elk security habitat. The environmental groups

argue that the Forest Service should have disclosed the 30% scientific threshold

and the 5% existing condition in the EA. *Pl. Br.*, Dkt. 61-1 at 28.

Again, the environmental groups' dispute is with the forest plan, not the

Forest Service's analysis. The forest plan notes the 30% elk security habitat

threshold for elk management units, but sets adjusted benchmarks that are as

"realistic, attainable, and biologically based as possible." REF009449. Those

benchmarks, as discussed previously, require low-priority elk management units to

maintain existing levels of elk security habitat, but push to increase elk security

habitat in high-priority units with the eventual goal of moving at least three high-

priority units to 30% elk security habitat. REF009450.

The environmental groups have not challenged the forest plan in this case.

Indeed, it would likely be the wrong vehicle for such a challenge. And so the Court

will repeat itself once more: the Forest Service's decision to analyze the

cumulative effects of the Brebner Flats project using the forest plan's elk security

habitat standard is reasonable and meets the Service's NEPA obligations.

### C.    Wild and Scenic Rivers Act Claim

In their third and final claim, the environmental groups assert that the Forest

Service violated the WSRA and NEPA.

The WSRA prohibits "developments . . . on any stream tributary" to a Wild

and Scenic River if the development will "invade the area or unreasonably

diminish the scenic, recreational, and fish and wildlife values present in the area on

the date of designation of a river as a component of the National Wild and Scenic

Rivers System."  16 U.S.C. § 1278(a). Federal agencies must make a "section 7(a)

determination" that a project complies with that mandate. To make that

determination, the WSRA's implementing regulations direct federal agencies to

include potential impacts to a Wild and Scenic River in a project's NEPA analyses:

> The determination of the effects of a proposed water resources project
> shall be made in compliance with the National Environmental Policy
> Act (NEPA). To the extent possible, authorizing agencies should
> ensure that any environmental studies, assessments, or environmental
> impact statements prepared for a water resources project adequately
> address the environmental effects on resources protected by the Wild
> and Scenic Rivers Act.

36 C.F.R. § 297.6(a). The WSRA applies to the Brebner Flat project because

Siwash Creek, one of the St. Joe Wild and Scenic River tributaries, flows through

the project area. *Id.* However, no project activities will occur within the wild and

scenic river corridor. FS000013.

The environmental groups' primary WSRA and NEPA claim is procedural.

They point to two steps in the administrative review process that they say denied

the public the opportunity to meaningfully comment on the issue.

The environmental groups first highlight the Forest Service's incorrect

statement in the final EA that the project area does not include the wild and scenic

river corridor. FS000051; FS000107. As the Court previously concluded, the EA's

single sentence incorrectly stating the scope of the project did not so drastically

undermine public participation as to render the Forest Service's action unlawful.

Despite the misstatement, the Forest Service provided significant accurate information to the public. The EA correctly describes the state of project activities in the corridor: namely that "the wild and scenic river corridor [was] not proposed for timber harvest." FS000057. In addition, the FONSI corrected the misstatement by explaining that, "[p]arts of the northern boundary of the project area falls within the St. Joe Wild and Scenic River Corridor (WSR). There are no activities proposed within the WSR corridor." FS000013.

Moreover, the administrative record itself defies the environmental groups' claims that the misstatement prevented the public's informed participation. The project record available for public comment along with the Draft EA in March 2019 included the EA, Biological Assessment, and recreation report that all discussed and analyzed the potential impacts on water quality and fish habitat. FS000107. In fact, the environmental groups wrote comments expressing concern about the potential effects to the St. Joe Wild and Scenic River resources. *See* FS000209 (the environmental groups' comments to Forest Service); FS00193 (Forest Service's response to the environmental groups' comment).

The environmental groups next argue that the public was entitled to comment on the potential negative effects on fisheries, which were included in the draft EA, but not in the final EA. But the environmental groups have not raised a

serious argument that the Forest Service indeed "edited out" these unfavorable findings. The discussion changed because in response to the draft EA's potential negative effect findings, the Forest Service adjusted the project to reduce harvest units in certain areas. *Compare* FS020012 (preliminary draft EA listing 1,879 acres of proposed harvest), *with* FS000007 (final decision notice including 1,719 acres of timber harvest). The Forest Service did not violate the WSRA or NEPA by changing the plan and adjusting the effects discussion in the final EA accordingly. *See, e.g., Nat'l Ass'n of Home Builders*, 551 U.S. at 659 ("[T]he fact that a preliminary determination [is not carried forward into the final document] does not render the decisionmaking process arbitrary and capricious.").

To the extent that the environmental groups make substantive arguments challenging the EA's WSRA analysis, those claims also fail. The EA and its supporting documents comprehensively analyze potential impacts to the wild and scenic corridor from the removal of 15 culverts in the Siwash tributary of the St. Joe River. FS013600-01.

The EA includes detailed descriptions of impacts to hydrology and fisheries in tributaries of the St. Joe and to the river itself. FS000069; FS000083. The EA also discussed impacts to scenery and recreation resources, including to the St. Joe River. FS000079-80. The recreation report, included as an appendix to the EA,

contains a brief statement related to the section 7(a) analysis. FS013611; FS013600-01. The section 7(a) evaluation provides a brief discussion of the culvert removals and references the analysis of the Biological Assessment for fisheries. FS013600-01.

The EA's primary concern is that removing 15 culverts will increase the sediment in the St. Joe River, which could affect bull trout and their critical habitat. The Forest Service prepared a biological assessment for bull trout and received concurrence from the USFWS that the project may affect, but is not likely to adversely affect, bull trout and designated critical habitat. FS013660-62. The USFWS noted that, although the project may increase sediment loads in tributaries to the St. Joe, the sediment will settle out before reaching the river. The EA thus concluded that culvert removal "could create short-term pulses of sediment" but that "[i]n the long term, this would be beneficial because there would be a reduction in risk of culvert failure, which could cause large inputs of sediment to the channel." FS000085.

The Forest Service could have included more specific information about the potential environmental effects in the EA itself to create a single, clear document. But, as discussed previously, the Forest Service properly incorporated the supporting documents by reference. *See supra*, Part B.1. On balance, the Forest

Service's method for addressing the Wild and Scenic River's resources is reasonably discerned and adequately addresses the environmental effects on resources protected by the Wild and Scenic Rivers Act. The Forest Service also took the requisite hard look at the impacts of its decision by providing a reasonably thorough discussion of the significant aspects of the probable environmental consequences within the EA and supporting documents.

## ORDER

IT IS HEREBY ORDERED

1. Plaintiffs' motion for summary judgment is **GRANTED** as to Claim 1, because the Forest Service did not obtain an adequate species list.

2. Plaintiffs' motion for summary judgment is **DENIED AS MOOT** as to claim 2.

3. Defendants' cross-motions for summary judgment are **GRANTED** as to all other pending claims.

4. The case is **REMANDED** to the Forest Service **WITHOUT VACATUR** for further analysis of the endangered species list in compliance with this ruling.

5. The Clerk of the Court shall close this case.

DATED: March 2, 2022

B. Lynn Winmill
U.S. District Court Judge